UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V. ) | Crim. No. 15-cr-10271-WGY |
| ) | |
| ALEX LEVIN ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Alex Levin, submits this memorandum to assist the Court in determining an appropriate sentence in this case. The defendant requests that the Court impose a sentence of 18 months incarceration followed by 60 months of supervised release. The sentence is sufficient, but not greater than necessary to comply with the purposes enunciated by Congress in 18 U.S.C. § 3553(a).

## Alex Levin's Background

Alex Levin is 53 years old. He was born in Belarus, which was then a part of the Soviet Union. Alex is the youngest of three siblings; his parents, Yefim and Bertha Levin, raised Alex and his older brothers, Edward and Gregory. Alex's parents gave him a happy upbringing, and encouraged him to play hockey and ski. Nevertheless, life in the Soviet Union in the 1960s and 1970s was difficult for Alex and his family. They were one of just a few Jewish families in their village in Belarus at a time when anti-Semitism was rampant in Soviet society. Alex was frequently bullied and called a "kike" by other children when he was growing up. As a result, the family chose to immigrate to the United States in 1980.

After spending nine months in Italy on route to the United States, Alex and his family settled in Worcester, Massachusetts. Alex spent his teenage years growing up in Worcester. He

1

attended Doherty Memorial High School, graduating in 1984. During high school, Alex developed a number of hobbies and interests that followed him throughout his life. Alex was involved with athletics from a young age. Aside from hockey and skiing, both of which he took an interest in as a youth in Belarus, Alex played soccer and became a devout runner. It was through soccer that Alex met his best friend, Yury Brainin. Alex and Yury met while playing soccer at the Jewish Community Center in Worcester. They became fast friends, and remain especially close to this day. Yury has been a major source of support for Alex throughout this case. In fact, Yury has expressed a willingness to help Alex transition back into society when he is ultimately released. The two have already discussed scouting locations for a coffee shop that they would enter into business together. A letter from Yury describing his friendship with Alex and his opinion of him is appended with this memorandum.

Other than athletics, Alex has a diverse array of hobbies. He has raced motorcycles, studied religions and philosophy, attended scores of live concerts, and traveled the world. His friend Yury describes Alex as "extremely well read and well versed on almost any subject matter." Another friend, Alex Sheyner, describes Alex as "smart" and "inquisitive." The interest that drove Alex's professional life was in computers. Alex developed an interest in computers when he was in high school, and continued to study them when he attended college at Central New England College of Technology in Worcester. Alex earned a Bachelor's Degree in Computer Science in 1988. He also minored in Comparative Religions. Alex then went on to earn a Master's Degree in Computer Science from Fitchburg State University in 1993.

Alex spent the majority of the next 22 years working in one manner or another with computers. His first job in the field was as an imbedded systems developer for point of sale terminals. Alex developed systems for credit card machines and cash registers at retail outlets.

2

Alex was still in graduate school when he began designing these systems. He went on to have a long and successful career in a variety of senior technology leadership roles. For the approximately 15 – 20 years prior to his arrest, Alex led large technology teams for several corporations, and worked with companies such as Bank of America, State Street Corporation, and Blue Cross Blue Shield.

Alex's IT career came to an end when he was arrested in August 2015. Given the nature of this case, working with computers was all but out of the question. Alex has always maintained a strong work ethic, and was determined to find work in order to support himself and contribute to his family. Following his release from detention in April 2016, Alex found work with Amazon. He took a job at the Amazon Fulfillment Center in Stoughton, Massachusetts as a process manager. This position was a significant cut in pay compared to Alex's previous work, but he performed his job dutifully and with pride. Alex was promoted several times at Amazon. He ultimately resigned from this position after approximately two and a half years when it became clear he would be terminated due to this case.

Despite the troubles he has incurred over the past four years, Alex has a number of supportive friends and family members. Several of these people have written letters that are also attached hereto. The common thread throughout the letters is that Alex's friends and family have all been positively impacted by having him in their lives. As noted, his friend Yury has been particularly supportive. Alex also has a close relationship with his brother, Greg. Greg has been steadfastly behind Alex, including attending every day of the jury trial last May. Alex has also remained very close with his parents. When his parents both became ill, Alex became their primary caregiver. He frequently traveled to Worcester to see to their needs. He helped with whatever household tasks they needed accomplished, including bathroom assistance. Alex

helped his parents move into an assisted living home just days before his trial concluded and he was incarcerated. He was with them right up until the conclusion of the case, putting their needs before his. His brother Greg has assumed Alex's responsibilities in his absence. Sadly, Alex's mother passed away on June 11, 2019, less than two weeks after he was remanded to custody. The loss of his mother while he was incarcerated has been particularly difficult for Alex. His father, who is 92 years old, greatly misses Alex as well.

The most important person in Alex's life is his 13-year-old daughter, Elizabeth ("Ellie"). Ellie was born in 2006 to Alex and his ex-wife, Suzan. After an amicable divorce in 2011, Alex and Suzan arranged to co-parent Ellie. Even throughout this case, Alex has regularly seen and spent time with Ellie. He was an active parent throughout his period of pretrial release; Alex attended Ellie's bat mitzvah last March, and maintained his regular visitation schedule with her. Alex and Ellie have a very close relationship. By all accounts, Alex is a devoted and caring father. From the time that Ellie was a young child, Alex sought to give her the best life that he could. He put her on skis for the first time when she 18 months old, and taught her to play hockey when she was a little older. Alex and Ellie had scheduled "library nights" together where they would go to the local library and pick out new books to read and discuss. Alex is incredibly proud of the person that Ellie is growing up to be; she recently placed in the top 1% of MCAS scorers and consistently earns high grades in school. Alex's greatest worry, far beyond any concern about what effect the outcome of this case will have on him, is what impact it could have Ellie. Alex considers any harm that could come to her out of this case to be "his greatest nightmare." Alex hopes to be able to work through his current difficulties, emerge a better person, and rejoin Ellie's life so he can continue to be a positive presence for her.

<u>**An Appropriate Sentence**</u>

This case is before the Court following the defendant's conviction for a single count of Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). As the Court appreciates, the advisory guideline sentencing range is the "starting point and the initial benchmark" but it is not the only consideration in the sentencing analysis. *Gall v. United States*, 552 U.S. 38, 49 (2007). There is no presumption that a guideline range is reasonable. *Id*. at 50. The Court must ultimately "make an individualized assessment based on the facts presented." *Id*. The Court must conduct a case-by-case analysis, "the hallmark of which is flexibility." *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008). The overarching goal is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id*. (quoting *Gall*, 552 U.S. at 52).

I.       **18 U.S.C. § 3553(a) Factors**

As the Court is well aware, the factors enunciated in 18 U.S.C. § 3553(a) must be considered when imposing a sentence. An examination of these factors supports the defendant's sentencing recommendation.

a.   **The Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

The Court having presided over the trial of this matter and the related proceedings over the past four years is well aware of the facts. They will only be recited briefly here. Alex was convicted of possessing 13 videos and one still image depicting child pornography. Though the circumstances of the investigation were not discussed at trial, the government described in other pleadings and hearings how Alex was identified as part of a nationwide sting concerning the child pornography website, Playpen. Playpen was hosted on the Tor internet server, a private

browser where user's activities cannot be monitored. The government seized control of the server hosting Playpen in 2015 and installed a piece of software on it that would relay identifying information about any computer that accessed the website. A computer linked to Alex purportedly visited Playpen. The account believed to belong to Alex allegedly logged 2 hours, 19 minutes, and 35 seconds on Playpen. A search warrant was obtained for Alex's apartment, which led to the discovery of the illicit materials on one of his laptops. As discussed *infra*, while the crime for which Alex has been convicted is very serious, the facts of this case are far less extreme than many of those that have come before this Court where defendants have received sentences far lower than Alex's projected guideline incarceration range.

Alex has an exemplary background. He is devoted to his friends and family, has a history of gainful employment, and for years was a productive, upstanding member of the community. Additionally, this case marks the first time he has ever encountered the criminal justice system. Alex has no history of arrests, restraining orders, mental illness, or substance use disorder. This case represents an aberration in an otherwise law-abiding life.

Incarceration will not just impact Alex's life; it will have a devastating effect on his daughter. Alex and his daughter have a close relationship. Several of the letters submitted with this memorandum describe Alex as a loving father to Ellie. While she has been remarkably successful up this point in her young life, there is concern that Alex's imprisonment could hinder her development. Alex's brother, Greg, described in his letter how Ellie has been devastated by Alex's present incarceration, and how she anxiously waits for his return.

Recent studies also support the notion that a parent's incarceration can have long-term, negative consequences on an adolescent's development. A study published this past August found that parental incarceration is linked to increased "anxiety and substance use disorders a

decade or more later, and associated with significant hurdles during the transition to adulthood, including having a felony charge, spending time incarcerated, not completing high school, becoming a parent when younger than 18 years, and being socially isolated." Elizabeth Glifford *et al.*, *Association of Parental Incarceration with Psychiatric and Functional Outcomes of Young Adults*, at 8, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2748665 (2019). The report goes on to conclude:

> Parental incarceration appears to cast a long shadow on offspring's adult years. These associations may be partly explained by the traumatic separation from a parent or loved one, the stigma of having a parent incarcerated, the short- and long-term economic ramifications that may occur from parental incarceration, or other factors. [The] findings are informative about the potentially high societal costs of incarcerating children's caregivers—potentially for generations to come.

*Id.* at 9. These conclusions ring true in this case. Alex's daughter is of an age where the loss of one her parents – especially one with whom she has a particularly close relationship – could create problems that could affect her for the rest of her life. Some of those issues may already be present based on the accounts of Alex's family who have interacted with Ellie since his imprisonment. The person who will be most damaged by Alex's incarceration will not be Alex; it will be his daughter.

### b. The Need to Adequately Deter Criminal Conduct

Alex asserts that he himself has been adequately deterred from future criminal conduct given the events of this case. As of the date of his sentencing hearing, he will have spent over one year in custody on these charges, split over an eight month period from August 2015 – April 2016, and a roughly five month period from May 2019 to present. As a result of his conviction, he will be forced to register as a sex offender for life. His name has appeared in the media, and, due to the initial success of his motion to suppress evidence, he has earned the ignominy of being perhaps the most famous of the defendants in the nationwide Playpen saga. He has lost his

career, and forever changed the way people will think of him. Alex will live with this shame for the rest of his life.

The defendant also contends that the Court should not impose a lengthy term of incarceration in order to deter others from criminal conduct. Simply put, there is no evidence to support that such a sentence would achieve this goal. A plethora of studies suggest that there is no relationship between sentence length and general or specific deterrence, regardless of the type of offense. *See e.g.*, Andrew von Hirsch *et al*., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (finding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."). In light of this research, little weight should be given to the deterrent effect of an unnecessarily long period of incarceration. Moreover, given the widespread social ill of child pornography, it can hardly be said that harsh sentences have deterred future offenders.

### c.  To Protect the Public from Further Crimes of the Defendant

There is no evidence to suggest that Alex presents any harm to the public. His behavior during the three years that he was free from custody in this case illustrates this point. Following his arrest on August 12, 2015, Alex was detained in custody until his release on April 26, 2016. The Court imposed strict conditions of release, which included that he be subject to home confinement with GPS monitoring, that he not be allowed to access the internet, that he refrain

8

from excessive use of alcohol, and that his travel be restricted to the District of Massachusetts. These conditions were gradually relaxed during the three years between Alex's release and his trial. Home confinement was first modified to allow for a curfew, which was later removed altogether. Once the curfew was no longer in place, Alex's GPS monitor was removed. His travel restrictions were also relaxed to allow him to travel to the surrounding New England states without the need to obtain prior permission. On the occasions where he did wish to travel outside of New England, Alex requested permission and was allowed to do so on each occasion. Lastly, the Court ultimately allowed Alex to use a computer with internet access that was equipped with software that allowed the Probation department to monitor his activities. The relaxed conditions of release allowed Alex to work at Amazon and achieve promotions for nearly two and a half years.

Alex had an unblemished record of compliance throughout his three years of pretrial release. He did not have a single reported violation of any of his conditions during this time. He was supervised by two different probations officers: Chrissy Murphy and Jessica Turkington. Alex reported having good relationships with both probation officers. When he had questions about whether he was allowed to do something, he contacted his probation officers. He made sure he was available when they visited him to perform home inspections. During the approximately two years that Alex's internet use was monitored, there was not a single instance where he accessed or attempted to access any prohibited material. Notably, Alex's conduct during pretrial supervision demonstrates the seriousness with which he takes the Court's orders, and the respect he has for the Court. It also reflects how he will behave when supervised at the conclusion of his sentence. Most importantly, it indicated that he does not pose a threat to the community, as he was an upstanding part of it while on release.

Moreover, there are no additional factors in Alex's background that suggest that he will

pose a danger to the public once released. In a 2011 article, Troy Stabenow, an Assistant Federal

Defender, discussed much of the research concerning recidivism and contact-sex offenses

amongst defendants convicted of child pornography possession. *See generally*, Troy Stabenow, *A*

*Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines*, 24

Federal Sentencing Reporter 121 (2011). He found that while the overall recidivism rate for

these types of offenders was low, the risk factors for repeat offenses included "substance abuse

issues, criminal history, instability factors (lack of employment, lack of community support

structure, etc.), using non-Internet child pornography, and cognitive disorders and distortions of

certain types." *Id.* None of these characteristics applies to Alex. Further, Stabenow notes that

research suggests that this is little to no link between possession of child pornography and hands-

on sex crimes. *Id.* at 118 (citing Jerome Endrass, et al., *The Consumption of Internet Child*

*Pornography and Violent Sex Offending*, 9 BMC Psychiatry 1-7 (2009) (stating "[t]he empirical

literature does not put forth any evidence that the consumers of child pornography pose a

considerably increased risk for perpetrating hands-on sex offenses . . . the majority of child

pornography users do not [commit hands-on sex offenses]."). Any suggestion that Alex should

be incarcerated solely to prevent the abstract risk that he could commit a hands-on sex offense is

belied both by the research and his personal history.

> **d.  The Sentencing Guidelines and The Need to Avoid Unwarranted Sentencing Disparities**

Perhaps no guideline formation has come under greater scrutiny than those applied in

non-production, child pornography cases, much like this one. The criticisms are well-known, and

have been discussed by both Circuit and District courts throughout the country. *See e.g.*, *United*

*States v. Dorvee*, 616 F.3d 174, 186-187 (2d Cir. 2010) (citing previous Sentencing Commission

10

Report and noting "adherence to the Guidelines results in virtually no distinction between the sentences for Defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories"); *United States v. Hanson*, 561 F.Supp.2d 1004, 1011 (E.D. Wis. 2008) (discussing "flaws" in the routinely applied enhancements in child pornography cases); *United States v. Grober*, 595 F.Supp.2d 382, 412 (D.N.J. 2008) (concluding that "the guideline does not guide."). The defendant argues that the guidelines fail to meaningfully differentiate between serious offenders and those like him who are convicted of possessing a relatively small amount of child pornography. Moreover, given the guideline ranges and sentences imposed in other cases before this Court and in this District, a sentence in this case that is within the guidelines would constitute an unwarranted sentencing disparity.

### i. The Guideline Sentencing Range Should be Accorded Little Weight in Imposing a Sentence

The Probation Department calculates Alex's advisory guideline sentencing range as 108 – 135 months. This range equates to 9 to 11.25 years in prison. The defendant contends that this range is bereft of empirical support, factors in unwarranted sentencing enhancements, and is vastly disproportionate to the conduct for which Alex has been convicted.

The sentencing guidelines under § 2G2.2 fail to meaningfully differentiate between the most serious possessory offenders and those like Alex, who engage in far less severe conduct. In the Presentence Report, the Probation Department applied four sentencing enhancements to Alex's guidelines: images depicting prepubescent minors; sadomasochistic images; use of a computer; and possession of 600 or more images.[1] PSR at ¶¶ 34-37. Alex's base offense level of

---

[1] Alex was convicted of possessing 13 videos and one still image of child pornography. Pursuant to § 2G2.2, Application Note 6(b)(ii), each video is considered to be 75 images. Thus, any offender convicted of possession of eight or more videos is subject to this enhancement.

18 is increased to 31 with these enhancements. The statistics indicate that the majority of child

pornography defendants are subject to the exact same set of enhancements, as opposed to only

those who commit the most serious crimes. As stated in the 2012 United States Sentencing

Commission Report to Congress regarding Child Pornography Offenses:

> In particular, four of the six enhancements in §2G2.2(b) — together accounting
> for 13 offense levels — now apply to the typical non-production offender. In
> fiscal year 2010, §2G2.2(b)(2) (images depicting pre-pubescent minors) applied
> in 96.1 percent of cases; §2G2.2(b)(4) (sadomasochistic images) applied in 74.2
> percent of cases; §2G2.2(b)(6) (use of a computer) applied in 96.2 percent of
> cases; and §2G2.2(b)(7) (images table) applied in 96.9 percent of cases. Thus,
> sentencing enhancements that originally were intended to provide additional
> proportional punishment for aggravating conduct now routinely apply to the vast
> majority of offenders.

p. 316, available at: https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-
and-reports/sex-offense-topics/201212-federal-child-pornography-
offenses/Full_Report_to_Congress.pdf.

Because they are applied so liberally, the guideline enhancements group nearly all

possessory offenders together regardless of their actual conduct. Stabenow's article is again

instructive. The following scenario illustrates the inequity of the guidelines:

> [E]ven if ALL § 2G2.2 possessors were first-time offenders, nearly 74% would be
> expected to have a recommended sentence in the range of six to eight years or
> higher . . . [A] person who downloaded nine thirty-second videos in one session
> (one of which had a brief depiction of an adult and a 10-year-old engaged in sex)
> would face the exact same sentencing range as another offender who over a
> period of years collected 100,000 images of children under the age of 3 being
> violently raped. That still leaves the other 26% of first-time offenders. Of those
> defendants, less than 5% would face a recommended sentence below three years.
> NO ONE would have a recommended sentence below 18-24 months. . .

Stabenow, *supra*, 24 Federal Sentencing Reporter at 111. Alex is one of many first time,

possessory offenders who is disproportionally affected by the guidelines. While Alex does not

gainsay the seriousness of his offense, his conduct, as noted below, is significantly less severe

than that in many comparable cases. Given the indiscriminate application of the guidelines, the

Court should grant them little weight when deciding Alex's sentence.

### ii. A Guideline Sentence Would Constitute an Unwarranted Sentencing Disparity

Alex's conduct is similar to, and in many instances less egregious than, that committed by defendants in similar cases that have been before this Court and others in this District. A survey of the sentences received by the defendants in those cases support the defendant's sentencing recommendation. An appendix detailing several cases in this District where child pornography offenders received substantial downward variances from the guidelines has also been appended with this memorandum.

### 1. Cases Before this Court

This Court has sentenced a number of defendants charged with Possession of Child Pornography and related offenses below the guidelines. In *United States v. Stefanidakis*, 10-cr-10174-WGY, the defendant's guideline range was 151 – 188 months. Unlike the charges in the present case, the defendant in *Stefanidakis* was convicted of Transportation of Child Pornography in addition to possession. The defendant possessed thousands of videos and still images of child pornography. The defendant meticulously organized his child pornography into folders, subfolders, and sub-subfolders on his computer that he labelled according to the types of pornography he stored in each. For example, the defendant's computer had folders with names such as: "Man-Boy," "Boy-Boy," "Man-Boy Fuck," and "Boy Asshole." The defendant's collection of child pornography was particularly disturbing given that he frequently collected images and videos depicting the rape of infants and toddlers. He created specific folders for these videos, which were titled "Baby and Toddler" and "Very Young." The defendant also made his collection available to others by sharing it over the internet via peer-to-peer file sharing programs. This Court imposed a sentence of 84 months incarceration and five years of

13

supervised release.

The defendant in *United States v. Starr*, 12-cr-30036-WGY faced a guideline sentencing range of 78 – 97 months. The defendant, who had worked as a camp counselor, was convicted of possessing 2,900 video files and over 100,000 image files depicting child pornography. A portion of the videos depicted anal or vaginal penetration of prepubescent females and other violent and sado-masochistic conduct. Of note, the defendant possessed one video that was one hour, thirty-five seconds, and 14 seconds long and depicted a prepubescent girl engaged in several sexually explicit acts with an adult male, as well as another video that was forty-five minutes and fifty-one seconds long and displayed similar content. This Court sentenced the defendant to 42 months of incarceration and ten years of supervised release.

In *United States v. Paterson*, 14-cr-10133-WGY, the defendant was convicted of possessing scores of child pornography, and had a guideline sentencing range of 78 – 97 months. The defendant, who managed a sober house in Attleboro, Massachusetts, was observed watching child pornography in his office by a house resident who reported his conduct to the authorities. Searches of the defendant's computer, vehicle, and a DVD found in his office revealed numerous child pornography files. When interviewed by police, the defendant stated that he may have "millions" of images on the devices that were seized from his office. This Court sentenced the defendant to 60 months in custody followed by ten years of supervised release.

Finally, in *United States v. Lorenz*, 14-30007-WGY, following his conviction for Possession of Child Pornography, the defendant's guideline range was calculated at 135 – 168 months. The government dismissed multiple charges each of Distribution and Receipt of Child Pornography pursuant to a plea agreement. The defendant admitted to possessing over 800 images of child pornography, many of which displayed vaginal and anal penetration of

14

prepubescent girls and various forms of sado-masochistic conduct. He also admitted to arranging to meet with minor females that he met online, and that he was sexually attracted to underage girls. He also shared child pornography over the internet through e-mail and peer-to-peer file sharing programs. In particularly troubling conduct, the defendant created social media profiles in the name and age of a minor victim in the case for the purpose of obtaining additional child pornography and engaging in sexually explicit conversations with minor children. The defendant acknowledged that he found the conversations "sexually and emotionally exciting." This Court sentenced the defendant to 120 months incarceration and 120 months supervised release.

### 2.   Cases Before other Judges in this District

A review of cases that have been heard by other judges sitting in this District reveals similar results: defendants charged with Possession of Child Pornography often receive sentences below the guidelines for conduct more egregious than that alleged in this case. For example, in *United States v. Garner*, 13-cr-10274-PBS, the defendant had a guideline range of 135 – 168 months. In accordance with a plea agreement, the government agreed to recommend a range of 87 – 108 months. The defendant's child pornography collection consisted of more than 2,300 images and 1,100 videos. The defendant shared his collection with others online. Additionally, the defendant actively sought out children to have sex with, sought advice from others online on how to do so, and arranged to meet with multiple children in order to have sex. Chief Judge Saris sentenced the defendant to 84 months imprisonment on each of the counts in the indictment, all to run concurrently.

The defendant's guidelines in *United States v. Andre*, 13-cr-10267-DPW were 97 – 120 months. The defendant was convicted of possessing 1,799 images and 29 videos of child pornography. He also possessed 315 images and 3 videos of child erotica, as well as 233 images

depicting both child pornography and child erotica. During his plea colloquy, the defendant qualified his admission of guilty, and claimed that another person downloaded the files to his computer, and that he simply knew that they were there. Nevertheless, Judge Woodlock sentenced the defendant to 24 months in custody and 5 years of supervised release.

In *United States v. St. Pierre*, 13-cr-10271-RWZ, the defendant was convicted of possessing 32,595 images and videos of child pornography. This number was drawn from a partial forensic examination of an external hard drive, which was one of six electronic devices seized from the defendant. Some of the materials depicted children as young as 18 months old. The defendant's guideline range was 97 – 120 months. Judge Zobel sentenced the defendant to 18 months in federal custody and 5 years of supervised release.

Noncustodial sentences have also been imposed on a number of child pornography defendants in this District. *See e.g.*, *United States v. Rita*, 12-cr-10045-MLW (defendant sentenced to five years of probation with 70 – 87 month guideline range); *United States v. Proulx*, 11-cr-10274-JLT (five years of probation with 51 – 63 month guideline range); *United States v. Reardon*, 11-cr-10325-JLT (five years of probation with 97 – 120 month guideline range); *United States v. Teves*, 11-cr-10351-JLT (five years of probation with a 97 – 120 month guideline range). Several other defendants have received brief incarcerated sentences in the face of high guideline recommendations. *See e.g.*, *United States v. Bhavsar*, 10-cr-40018-FDS (defendant sentenced to three months incarceration with 41 – 51 month guideline range); *United States v. Cannon*, 12-cr-10130-RWZ (one year and one day incarceration with 97 – 121 month guideline range); *United States v. Corbett*, 12-cr-10168-RWZ (one year and one day incarceration with 97 – 121 month guideline range).

### 3.   A Comparison of Alex's Conduct

The conduct for which Alex has been convicted, while no doubt very serious, pales in comparison to many of the aforementioned cases. The evidence at trial was that Alex knowingly possessed 13 videos and one still image depicting child pornography. Evidence was also introduced that there were link files on Alex's laptop with titles suggesting that they depicted child pornography. The true contents of these files could not be determined as the originals were not located on the computer. The government also alleges that there were also 46 thumbnail images of child pornography, and that Alex visited the child pornography website Playpen.[2] Even assuming for argument's sake that Alex knowingly possessed the 46 thumbnail images that were not introduced at trial, the total amount of child pornography is far below that which the defendants in other cases possessed. Take for example the defendants in *Stefanidakis*, *Starr*, and *St. Pierre* who each respectively possessed thousands of still images of images and videos. Each of these defendants received sentences not only far below their individual guidelines, but also considerably below the low end of Alex's range.

Aside from the obvious disparity in the amount of child pornography Alex was convicted of possessing, Alex never engaged in the same aggravating conduct as many of these defendants. The evidence at trial established that Alex downloaded child pornography from peer-to-peer file sharing programs. However, it was never alleged that Alex shared these videos or made them available for others to download. This is in contrast to the defendants in *Stefanidakis* and *Lorenz*. Likewise, Alex never sought out underage children in order to commit contact sex offenses. The defendants in *Lorenz* and *Garner* each arranged to meet children for sex in addition to possessing child pornography. The defendant in *Lorenz* went so far as to fabricate social media profiles based on one of his victims in order to obtain more graphic images from other young girls. Each defendant, who could rightfully be classified as a predator, still received substantial downward

---

[2] The jury did not hear evidence as to either of these points.

variances from their guidelines. Alex, having done nothing remotely similar, should not be subject to a sentence far greater than these defendants received for committing significantly more heinous conduct.

<u>**Conclusion**</u>

A sentence of 18 months incarceration is an appropriate sentence for Alex. It holds him accountable for the offense for which he has been convicted, and takes into account his lack of criminal record, his personal history, and the nature and circumstances of the offense. This recommendation is especially appropriate in light of the sentences that similarly situated defendants have received. This sentence will also allow Alex to once again be a productive member of society, and a positive influence in the lives of his friends and family, most especially his daughter. For these reasons, the defendant urges the Court to impose a sentence of 18 months incarceration followed by five years of supervised release. Due to the nature of his offense and in order to be close to his family and friends, Alex also requests placement by the Bureau of Prisons at FMC Devens.

ALEX LEVIN
By his attorneys,
CARNEY & ASSOCIATES

*J. W. Carney, Jr.*

J. W. Carney, Jr.
B.B.O. # 074760

*Daniel J. Gaudet*

Daniel J. Gaudet
B.B.O. # 688120

20 Park Plaza, Suite 1405
Boston, MA 02116
617-933-0350
October 7, 2019                JCarney@CARNEYdefense.com

18

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on or before the above date.

*Daniel J. Gaudet*

Daniel J. Gaudet

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| V. | )     Crim. No. 15-cr-10271-WGY |
| | ) |
| ALEX LEVIN | ) |
| | ) |

**AFFIDAVIT SUPPORTING DEFENDANT'S SENTENCING MEMORANDUM**

I, J. W. Carney, Jr., state that the facts contained in the attached memorandum are true to the best of my information and belief.

Signed under the penalties of perjury.

*J. W. Carney, Jr.*

J. W. Carney, Jr.

October 7, 2019