1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3                                    No. 1:15-cr-10271-WGY

4

5

6    UNITED STATES OF AMERICA

7

8    vs.

9

10   ALEX LEVIN

11

12                         * * * * * * * * *

13

14

                            For Jury Trial Before:
15                          Judge William G. Young

16

17

                            United States District Court
18                          District of Massachusetts (Boston.)
                            One Courthouse Way
19                          Boston, Massachusetts 02210
                            Tuesday, May 21, 2019
20

21                         * * * * * * * *

22

                     REPORTER: RICHARD H. ROMANOW, RPR
23                         Official Court Reporter
                         United States District Court
24         One Courthouse Way, Room 5510, Boston, MA 02210
                          bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3   ANNE PARUTI, ESQ.
        United States Attorney's Office
 4      One Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
 5      (617) 748-3310
        E-mail: Anne.paruti.lohnes@usdoj.gov
 6      For the United States of America

 7

 8   J.W. CARNEY, JR., ESQ.
     DANIEL J. GAUDET, ESQ.
 9      J.W. Carney, Jr. & Associates
        20 Park Plaza, Suite 1405
10      Boston, Massachusetts 02116
        (617) 933-0350
11      Email: jcarney@carneydefense.com
        for the defendant
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       I N D E X

 2

 3    JUDGE'S INTRODUCTION TO JURY....................    4

 4    OPENING STATEMENT BY MS. PARUTI................   21

 5    OPENING STATEMENT BY MR. CARNEY................   28

 6

 7    WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

 8

      SERGEANT MICHAEL SULLIVAN

 9
         By Ms. Paruti:        32
10
         By Mr. Carney:
11

12    CLAYTON PHELPS

13       By Ms. Paruti:        65

14       By Mr. Gaudet:

15
                        E X H I B I T S
16

17          EXHIBIT 1 ......................   44

18          EXHIBIT 17 ....................  112

19          EXHIBIT 18 ....................  107

20          EXHIBIT 19 ....................  113

21          EXHIBIT 20 ....................  117

22          EXHIBIT 21 ....................  123

23          EXHIBIT 22 ....................  127

24          EXHIBITS 24, 25, 26............  143

25
```

```
1              P R O C E E D I N G S
2              (Jury enters, 10:00 a.m.)
3              THE COURT:  Good morning, ladies and
4  gentlemen, thank you so very much for all your efforts
5  to be here right on time.  We really do depend upon it.
6  You are all equal as jurors, we can't start unless we
7  have all of you, and all of you have to hear all the
8  evidence in the case.
9         All right.  The Court appoints Ms. Centrella the
10 forelady of this jury.  And we may swear the jury.
11             THE CLERK:  Members of the jury, please stand,
12 raise your right hand, and repeat after me.
13             (THE JURY, sworn.)
14
15 JUDGE'S INTRODUCTION TO JURY:
16        At this time, in this courtroom, there are 15
17 judges, you 14 men and women are the judges of the
18 facts, you are the only judges of the facts, that is not
19 my function.  You are going to determine the facts in
20 this case based solely and entirely on the evidence as
21 you see it and hear it right here from this witness
22 stand and upon such exhibits, stipulations, evidentiary
23 material, as may be laid before you.  You'll evaluate
24 it, as I said, fairly and impartially, without any
25 leanings one way or another, without any sympathy,
```

1  without any desire for revenge, nothing but the cool,

2  careful, sifting of the evidence so that here, in this

3  courtroom, justice truly may be done.

4       We operate under two great, essential

5  constitutional principles always to be kept in mind.

6  Here they are.  Mr. Levin is innocent.  He is an

7  innocent man.  Were the trial to stop now, before we had

8  any evidence, there is only one possible verdict in

9  accordance with the law and that verdict is not guilty.

10  He starts the trial truly innocent.  So you don't hold

11  it against him that we're going to have a trial.  You

12  don't hold it against him that we're here.  Nothing

13  counts up until this point.  He starts a truly innocent

14  man.

15       And that requirement, that protection of every

16  person accused by the government -- not just him, every

17  person has that protection, that really tells us a lot

18  about the case, it tells us who has to prove what, it

19  tells us that the burden rests upon the government.  The

20  government made this charge, the government has to prove

21  this charge beyond a reasonable doubt.  That's the

22  standard.  And you would all -- the verdict has to be

23  unanimous, you would all have to come to believe, beyond

24  a reasonable doubt, that Mr. Levin is in fact guilty of

25  the crime before he could be found guilty.

1    So with those basic constitutional principles in

2  mind, it informs us how, I expect, indeed how I require,

3  this trial is going to be handled.  The government's

4  going to go first and the government will put on

5  whatever evidence it has, and each bit of evidence, each

6  time they call a witness -- of course Mr. Levin, through

7  his attorneys, Mr. Carney and Mr. Gaudet, they have a

8  right also to examine, to cross-examine the government's

9  witnesses, and when they're done, if there's any

10  affirmative evidence that Mr. Levin wants to put on, he

11  can put his evidence on, and that's the order in which

12  things will take place.  But remember, that burden of

13  proof rests entirely on the government and it never

14  shifts to him.

15    He doesn't have to explain anything.  You can't

16  bring a charge against someone, hail them into court and

17  say, "Well now explain yourself," that's not the way it

18  is in the United States of America.  He doesn't have to

19  do anything.  He doesn't have to testify, he doesn't

20  have to call witnesses, he doesn't have to let

21  Mr. Gaudet and Mr. Carney say a single word.  They may

22  do everything, everything the government can do within

23  the rules of evidence, so may he do, but he doesn't have

24  to.  And so if there's any gaps here, anything left

25  unexplained, don't hold it against him, because he has

no responsibility.  The burden rests on the government and it never shifts to him.  Now let's get to some practicalities.

You're judges, you are the judges of the facts.  I want you to think of yourself as judges.  And the court staff and I will do everything we can to empower you to be fair and impartial judges.

So first we're going to pass out notebooks to you. No one says you have to take notes.  This case is going to have this gap in the middle, that's nobody's fault, it's the holiday and it's my wrestling with the rules of law, but we'll probably now finish up next week and there will be a gap.  But if you get your best judgment about people by watching them very very closely and notes would distract you, I don't think you have to take notes, pay attention, watch them.  On the other hand, if notes will help you as to the who, what, where, then feel free to take notes.

(Passes out notebooks.)

You probably ought to put your names on those notebooks somewhere.  If they look a little dog-eared to you, I'm not apologizing for that, no one's ever going to see your notes, but we use the notebooks over and over, and when the trial's over, Ms. Gaudet will rip the notes out and destroy them.  No one ever gets to see the

1   notes.  She's the only one, other than you, who ever

2   touches them.  So if somebody else's name is there,

3   cross it out, put your name on it.

4        When we take a break, and we will take a break

5   each time we sit together, you can leave your notes

6   right there in the jury box.  No one comes in there.

7   When the day, the jury trial day is over, take them back

8   to the jury room, leave them there, she'll collect them,

9   lock them up, they'll be there the next day for you.

10  And as I say, when the trial is over, they'll be

11  destroyed, they're not part of the record of the case.

12  You don't have to take notes.  You may take notes.

13       If you don't take notes or if someone who does,

14  neither way makes one juror better than another juror.

15  If you have taken notes, don't pass your notes around in

16  the jury room, your notes aren't evidence, they're

17  yours, they jog your memory as to what went on.  So

18  they're for your use so that you can stay on top of what

19  the evidence is, if that suits you.

20       Second, you have the right to ask questions.  Now,

21  these are skilled lawyers, they know what they're doing,

22  they know how to discharge the lawyer's function.  So

23  your questions ought to pertain to something that you

24  think is important.  And in asking the question,

25  remember you're judges here, you're not sort of

 1    launching out on your own investigation.  If something

 2    is left -- if there's a gap here and you don't

 3    understand something that a witness is saying, by all

 4    means you can ask about that.  You can ask for

 5    clarification, you can ask questions like, "Well, how do

 6    you know that?" that type of thing.  But you just can't

 7    launch out because it occurs to you that it would be

 8    interesting to know something.

 9         I make asking the questions just as simple as

10    possible, you have to write them out, rip it out, pass

11    it down to the forelady.  Ms. Gaudet or I are watching,

12    one of us will come and get it.  And your question will

13    get to me.

14         Now I might not ask it.  It doesn't mean it's a

15    wrong question or anything, but I won't ask it if

16    legally I wouldn't let the lawyers ask it, but likewise

17    I won't ask it if I can't see how the witness who's

18    testifying could know the answer.  Witnesses can only

19    testify to what they know, what they saw, heard,

20    touched, tasted, smelled, their own senses.  And it may

21    be a very interesting -- I might be interested in the

22    answer, but I'm not a witness who can tell us, or I

23    don't think so.

24         So if I'm not going to ask it, I give it to

25    Ms. Gaudet, she puts it out on her bench, the lawyers

1   can look at it.  Anything that passes from you to me,

2   they can look at.  If I am going to ask it, I'll give it

3   to her, she will just -- so the flow of evidence doesn't

4   stop, she'll stand up, she'll walk around to the lawyer

5   who isn't asking questions, show the lawyer the

6   question, stop the lawyer who is asking questions, show

7   that lawyer the question, and that's the signal to them

8   that I'm going to ask it sometime.  And so they'll come

9   back.

10          And if we do that, they can't suddenly ask about

11   it -- I've had them say, "Well, here's a good question,"

12   but, no, I'm not allowing that.  But if you have a

13   question, it will get passed back to me and then I'll

14   ask it when I think it's courteous to ask it, the

15   lawyers turn to papers or we're off that topic or

16   something, and I'll ask it openended.  I'm still a

17   lawyer, I know how to ask questions.  So I'll ask a who,

18   what, where, when, how, describe question, and I may ask

19   a few follow-up questions just to see that you have the

20   information that a juror asked about.  Juror questions

21   are no better or more important than lawyer questions,

22   nor are they less important.  The testimony is what's

23   important.  So that's how we handle questions.

24          You have to hear everything that the witnesses

25   say, the acoustics are very good in this courtroom, but

 1    if a witness mumbles, drops his voice, and you don't

 2    hear, just raise your hand, I'll get it repeated right

 3    then.

 4         The lawyers are distinguished members of the bar

 5    and they have every right to move around in here.

 6    Sometimes they get intent on asking questions and they

 7    come up and they sort of plant themselves between the

 8    witness and you.  Now I ought to shoo them off to one

 9    side or another, but if I don't, raise your hand, I'll

10    get them out of the way so you can watch the witnesses

11    as the witnesses answer the questions.  Because an

12    essential part your function -- not mine, your function

13    is what do you believe here, what do you believe

14    actually happened?  And you want to observe these

15    witnesses as they testify.  So you have to hear, you

16    have to see.

17         Now I know Ms. Gaudet has told you you're welcome

18    to bring water out here.  We give witnesses water.  If

19    you'd like water, as we're going along, raise your hand,

20    we'll bring you a glass of water.  The temperature in

21    here seems a little cool, and it was cold the other day.

22    If you are at all uncomfortable, let us know, we will

23    immediately call the building management, nothing will

24    happen, but we will have the, um -- (Laughter.)  And I

25    don't mean to be unfair to them, but I do play that for

1    the laugh-line.  This is difficult, this is a huge,

2    magnificent big courtroom, and if they're going to heat

3    it up, they've got to heat it up more so that the

4    offices and the jury rooms on the outside are not

5    intolerable.  The truth is they'll get right to work and

6    things will be fine in the afternoon after we've let you

7    go.  So don't hesitate.

8         And I say these things because I heard that you've

9    also asked about a break.  I'll take a break every day,

10   um, some break during the course of the day.  But, look,

11   you're equally judges with me, we want you to pay the

12   closest possible attention so that you can truly be

13   fair.  I don't want you sitting there praying for the

14   judge to take a break, if you need a rest hall, raise

15   your hand, we can all troop out and troop back, it takes

16   5 to 7 minutes, and that's fine.  You're in charge here.

17   Be comfortable.

18        Now each day I'll tell you in advance, and I got

19   started -- and it was my responsibility, but late today,

20   so we're going to sit until 1:30.  But most days we're

21   not going to sit after 1:00, guaranteed, except for the

22   day we give you the case, and I'll give you plenty

23   advance notice of that.

24        Now I'm the judge of the law, you must take the

25   law the way I explain it to you, that is the essence of

1    my function, to teach you the law, and that's what

2    ensures that any case where this is the charge is tried

3    the same in every court throughout the land, the

4    Northern District of California, the Southern District

5    of Florida, the District of Kansas, in a case with this

6    charge the jury will be taught exactly the way I teach

7    you.  What's different, of course, in every case is the

8    evidence, the evidence is unique to this case, these

9    particular events or whatever it is that happened or

10   didn't happen.  That's for you.  And while I will teach

11   the law, I have nothing to say about the evidence.

12          Everything I do is law teaching, so it is also

13   part of my responsibility to preside over the case.  Now

14   really all that means is I have to be sure that the

15   rules are followed here.  The hardest job is the job of

16   the attorneys and I honor all of them.  The attorneys

17   not only must know the law in this case -- and in some

18   respects it's complicated, but also they must know their

19   case.  Like teachers themselves, they've got to present

20   things to you through competent evidence and that is a

21   challenging and difficult professional task.  And I want

22   you to know that it is absolutely appropriate for a

23   lawyer to object to what another lawyer asks or does,

24   and it's all quiet, we just go along and the lawyer says

25   "I object," so it's question, answer, question, answer,

1    question, "Objection," and I try to be quick, and I will

2    say, "Sustained," which means you can't ask that, ask

3    something else, or I'll say "Overruled," which means

4    that's all right, let's see what the witness has to say.

5    That's law teaching, that's a ruling of law.  But the

6    lawyers, they don't have to stand for that, they can ask

7    to be heard and they'll say, "May I approach the bench

8    or could we have a bench conference?"  Now I don't have

9    to, but usually I will.

10        And when we do that, you've already seen us do it,

11   we huddle down here, the Court Reporter comes over, and

12   in a very few words they explain why they think that

13   question is improper or proper.  If we do that, if we're

14   huddling over there -- and I could do it, back and

15   forth, in front of you, but it's distracting, so that's

16   why I don't do it that way.  Instead I huddle over

17   there.  So if we're in a huddle, you feel free to stand

18   up -- as a matter of fact I encourage you to stand up,

19   stretch, keep the blood flowing.  These are the biggest

20   jury boxes of any courthouse in the United States.  Walk

21   around in there.  But don't talk.  The ceiling is domed

22   and it will echo, it's part of the acoustics, so it will

23   distract me over there if you're talking.  So please

24   don't talk because I'm concentrating on what they're

25   saying.

1      I once had a lawyer tell me he always smiled at

2  the end of a bench conference because he hoped the jury

3  would think he was winning the case.  (Laughter.)

4  Wrong, the case is not won or lost over there.  You are

5  going to determine what the evidence in this case either

6  proves or does not prove beyond a reasonable doubt.

7      So before we get going, I want to say a few

8  words -- I will be more detailed at the end of the case,

9  but I do want to say a few words concerning what it is

10  that the government has to prove here beyond a

11  reasonable doubt.

12      Now there's one charge in this case, the charge

13  here is that Mr. Levin is charged with the knowing

14  possession of child pornography.  The, um -- that's what

15  the government has to prove.  So let me take a moment to

16  touch on what it is that they're going to have to prove.

17      "Possession" means -- it has a normal meaning, it

18  is the -- what you would think it means.  A person who

19  "possesses" something can exercise dominion over it,

20  they have it, they can stash it, they can deal with it.

21  If it's a -- if it's a tangible thing, they can carry it

22  around.  If it's images on a computer, they can pull

23  those images up.  An example I frequently use is I have

24  my notebook.  Well I possess it.  I carry it around.  I

25  bring it in here in court.  In my offices in the

1    courthouse here, I also have a briefcase, that's mine, I

2    put it there, I can take it when I want.  Possession.

3           Also, the possession has to be knowing possession.

4    They've got to prove that Mr. Levin knew what he had.

5    He doesn't have to know specifically the law and what

6    specifically violates the law, but he's got to know what

7    he's got there.  Knowing possession.

8           So if we're going to talk about images that are --

9    and I don't know what the evidence is.  I'm going to use

10   some examples, but I don't know what the evidence is.

11   Let's say the examples are pictures.  The pictures can't

12   just show up where he lives, he's got to know he's got

13   them.  Or let's say the images are on a computer.  Again

14   they can't just show up on the computer, he's got to

15   know he's got them.  He himself.

16          And then what he -- what we are dealing with here

17   is child pornography.  So here I want to be detailed,

18   and you'll give me a moment here.

19                 (Pause.)

20          THE COURT:  You can see I've misplaced

21   something, but I'm taking a moment because I want to get

22   this right.

23                 (Pause.)

24          THE COURT:  Now Congress defined what

25   constitutes child pornography and, um, that is images

1   that involve a prepubescent minor, that is a minor who

2   has not yet obtained puberty or a minor who has not

3   attained 12 years of age.  (Pause.)  He has to have at

4   least one such image.

5       Child pornography is any photograph, video,

6   picture, or computer image, of sexually-explicit

7   conduct, produced by using an actual person engaging a

8   minor -- now as I've defined it, engaging in

9   sexually-explicit conduct.  Sexually-explicit conduct is

10  conduct, whether it's actual conduct or simulated

11  conduct, of sexual intercourse, including genital-

12  genital, oral-genital, anal-genital, oral-anal, between

13  a person of the same or opposite sex, masturbation,

14  sadistic or masochistic abuse, or lascivious exhibition

15  of the genital or pubic area of any person.  We're

16  dealing with children here, as I have defined it.  I may

17  have to define those words into more detail, but I --

18  we'll see what the evidence is and I can do that at the

19  end of the case.  And so that's what the government has

20  to prove, they have to prove the possession of an

21  image -- well let me be specific.

22      First, possession of at least one or more images.

23  The possession has to be knowing and what you possess

24  has to be child pornography as I have just described it,

25  as the statute, the law passed by Congress describes it.

1   Remember it has to be of an actual child, it can't be a

2   drawing or some sort of computer simulation of a person,

3   it's got to be an actual child.  All right, I think

4   that's sufficient.

5        What happens now is we give the lawyers a chance

6   to make an opening statement, no more than 15 minutes,

7   and that's not an invitation for them to take 15

8   minutes, but they get a chance now to tell us what they

9   hope they can prove.  Remember, the lawyers aren't under

10  oath here, they weren't there, they don't know what went

11  on, they're teachers, but again to have you better

12  understand the evidence that you're going to see and

13  hear, we give them a chance to make an opening at this

14  time.

15       Ms. Paruti, do you wish to open?

16            MS. PARUTI:  I do, your Honor.

17            THE COURT:  You may.

18            MR. CARNEY:  Your Honor, may we see you at

19  sidebar before the openings?

20            THE COURT:  You may.

21

22            AT THE SIDEBAR

23            THE COURT:  Go ahead, Mr. Carney, briefly.

24            MR. CARNEY:  We filed a motion in limine.

25            THE COURT:  Yes, I've dealt with it, it seems

```
 1    to me an instruction will take care of it.  That there
 2    would be no suggestion -- it may come out that files
 3    have been deleted, but there's no suggestion that it was
 4    hidden or the like and that those files contained
 5    something.  It just is not probative of anything in this
 6    case.
 7              MR. CARNEY:  If it's speculative for the
 8    jurors to try to infer what was --
 9              THE COURT:  Well they won't, I'll tell them
10    not to.
11              MR. CARNEY:  Well if they can't infer what is,
12    then --
13              THE COURT:  What?
14              MR. CARNEY:  If they cannot infer that those
15    contained child pornography, then what relevance is it
16    to give them that that evidence, which will --
17              THE COURT:  Well for one thing, in order for
18    completeness, the fellow went through and he says well
19    those various things have been deleted.  Things have
20    been deleted, I'm sure, on your computer and on
21    Ms. Paruti's computer.  And at that time, um, I will
22    give them a cautionary instruction.  That's sufficient.
23        What else?
24              MR. CARNEY:  I also wanted to alert your Honor
25    that I intend to play the videos in my opening, short
```

```
 1   sections.
 2              THE COURT:  How long?
 3              MR. CARNEY:  3 seconds.
 4              MS. PARUTI:  Your Honor, I object to that.
 5              MR. CARNEY:  It's in the form that the
 6   government plans to offer, to which I have no objection.
 7              THE COURT:  No, I'm not going to allow that.
 8         You're not going to play them in your opening?
 9              MS. PARUTI:  Oh, no.  And actually, your
10   Honor, the reason why I object is that I've just learned
11   right now it was for 3 seconds.  Mr. Carney asked me, 2
12   minutes before 10:00, whether my paralegal could play
13   evidence for him.  Normally --
14              THE COURT:  You know, Ms. Paruti, I only rule
15   on stuff where I have disputes.  I mean no disrespect,
16   but I don't care about the background.  No, he's not.
17              MR. CARNEY:  Well, your Honor, may I be heard
18   on that?
19              THE COURT:  Yes, you may.
20              MR. CARNEY:  I think it is customary in this
21   court for a lawyer to be able to present things in an
22   opening that he knows will be presented during the
23   trial, and this can include a diagram or a document.
24   And in this case it's a --
25              THE COURT:  One, it's somewhat late to raise
```

1    this with me.  And, two, since I have a protective order

2    on how this stuff will be presented and in light of the

3    concerns expressed by the venire in picking a jury,

4    we're going to do it with a witness on the stand in a

5    controlled setting.  I'll give you full cross-

6    examination.  That's the order.  Your rights are saved.

7

8                    (In open court.)

9                    THE COURT:  Go ahead.

10                   MS. PARUTI:  Thank you, your Honor.

11

12   OPENING STATEMENT BY MS. PARUTI:

13            Good morning, ladies and gentlemen.  On August

14   12th of 2015, the Federal Bureau of Investigation

15   executed a search warrant at the home of this man, the

16   defendant, Alex Levin, in Norwood, Massachusetts.  And

17   based on what they found there, he has been charged, by

18   indictment here in federal court, with possession of

19   child pornography.  Over the next couple of days you

20   will hear evidence that I expect will prove to you,

21   beyond a reasonable doubt, that that man, Mr. Levin, is

22   guilty of that charge.

23            You will first hear from Sergeant Michael Sullivan

24   of the Boston Police Department, who in 2015 was acting

25   as an FBI Task Force Officer.  In that role he was

1   assigned to work on child exploitation cases.  On August

2   12th of 2015, Sergeant Sullivan was one of the agents

3   who knocked on Mr. Levin's door, found him inside, and

4   in fact interviewed him.  Sergeant Sullivan recorded

5   that interview and you will hear it, it's a brief

6   interview, it's less than 10 minutes in length, but

7   there are several important points that I will ask you

8   to look out for when you're hearing that, so listen

9   carefully.

10          In that interview you will hear the defendant

11   confirm that he was the only person who lived at that

12   two-bedroom apartment in Norwood, Massachusetts, except

13   for his young daughter, who came to visit every other

14   weekend, and for a girlfriend who stayed over

15   occasionally.  You'll hear that the defendant, Alex

16   Levin, admitted ownership of two HP laptop computers,

17   one newer, one older, both of which were located in and

18   around the same spot in Mr. Levin's living room, and he

19   confirmed that his girlfriend did not use that computer

20   when she accessed the internet, when she happened to be

21   at his home.

22          I'll ask you to listen carefully when Sergeant

23   Sullivan asked the defendant, in the course of that

24   interview, to characterize his level of computer

25   knowledge or experience.  The answer from Mr. Levin,

1    "average."  And when Sergeant Sullivan asked him what he

2    used the internet for?  The defendant told him simply

3    "e-mail."

4         Now agents found a couple of items on scene that

5    conflicted with what the defendant told them in that

6    interview.  For example, you'll hear that they located a

7    framed diploma showing that Mr. Levin had earned a

8    master's degree in Computer Science in 1993.  You'll

9    hear that they also located a resume that had been

10   printed out in which Mr. Levin touted himself as a,

11   quote, "seasoned IT professional."  And later, when FBI

12   staff examined his computer, they found evidence that he

13   had the TOR browser installed on his computer, which I

14   expect you'll hear is a way to access the dark web and

15   use the internet anonymously.

16        I suspect that you'll also hear from Sergeant

17   Sullivan that when members of the search warrant team

18   conducted a forensic preview of the older of the HP

19   laptops, which will be the key piece of evidence in this

20   case, that they found child pornography.  And that's why

21   we're here.

22        Because of that, the defendant was arrested and

23   his computer was taken back to the FBI where agents

24   found evidence that he had been using that computer for

25   a number of years before he was arrested on August 12th,

1    2015.  They also found evidence that demonstrated he was

2    more sophisticated than the average computer user, in

3    addition to what they found on the scene, such as

4    additional copies of his resume over the years which all

5    highlighted his computer capabilities, including

6    experience in network security and evidence of his use

7    or interest in, for example, in virtual currency, which

8    I expect that you'll hear is now basically an electronic

9    form of money.

10         Now Special Agent Clayton Phelps of the FBI, who's

11   a digital forensic examiner now in that agency, will

12   walk you through all of this evidence.  I suspect that

13   he'll tell you about some of those files I just

14   mentioned and he will explain that when examining

15   Mr. Levin's computer, the FBI also found further

16   evidence of his possession of child pornography.

17   Through his testimony you will hear about what was on

18   that computer, generally.

19         First, that there was only one user-defined

20   profile or account and that profile or account was named

21   "Alex."  You'll hear that within that user account named

22   "Alex" there were various folders.  You'll hear that in

23   those folders there was information or things that you

24   might expect to see in a person's personal computer,

25   such as pictures of his daughter or copies of his

1    resume.  But in some of the folders you'll hear that

2    there were things you would not expect to see,

3    specifically videos and pictures depicting the sexual

4    abuse of children by adults.  That is child pornography.

5        Some of those pictures and videos had exceedingly

6    graphic title file names that any person would leave no

7    question as to their content.  For example, one named "5

8    YO Sally gets f'ed by Daddy."  One with the term "New

9    Pedo" in the title.  And one with the term "Pedophilia"

10   in the title.  And some of those files, you'll hear,

11   included terms that investigators frequently see in

12   child pornography investigations, like "PTHC," which I

13   expect Sergeant Sullivan to explain to you stands for

14   "preteen hardcore."

15       I expect Agent Phelps to tell you about other

16   things he observed on Mr. Levin's computer that points

17   to his knowing possession of child pornography.  For

18   example link files, basically shortcuts to files that

19   were no longer on the computer, but whose names -- like

20   for example, "Pretty babysitter made sex with 3-year-old

21   little girl," speak for themselves.  I expect that Agent

22   Phelps will tell you about searches that he observed

23   that had been executed on the computer for that term I

24   mentioned, "PTHC."  And I expect that Agent Phelps will

25   talk to you about where he found some of those child

1   pornography files, specifically within folders that

2   appeared to be associated with file-sharing software,

3   that is programs that allow people using those programs

4   to share videos from one computer to another.

5        Now over the course of the next couple of days you

6   will see this evidence, you will hear some evidence, and

7   some of it, the child pornography obviously, will be

8   hard to see.  The government will warn you before it

9   intends to display a child pornography file.  The

10  government will have a witness describe whatever file it

11  intends to play and the government will limit the amount

12  of time that it displays the image to just 3 seconds or

13  so.  The government will not show you all of the child

14  pornography that was found in the defendant's computer,

15  but it will show you at least some of the files so that

16  you can make that determination that Judge Young talked

17  about as to whether or not the files actually are child

18  pornography, and as to whether or not the defendant knew

19  they were child pornography and were on his computer.

20       In the end I expect that the evidence will prove

21  just that, that on August 12th of 2015, this defendant,

22  Alex Levin, knowingly possessed child pornography,

23  depicting children of a range of ages, including

24  prepubescent children, children under 12.  And at the

25  end of this trial, after all the evidence has been put

```
 1    before you, I'll come back before you and at that point
 2    ask you to return the only verdict that will be
 3    consistent with that evidence.  Guilty.
 4              THE COURT:  Come to the sidebar.
 5

 6              AT THE SIDEBAR
 7              THE COURT:  We just talked about deleted files
 8    and I explained that I was going to say nothing can be
 9    mentioned about deleted files, and in your opening you
10    talk about deleted files and you give them inculpatory
11    titles.
12         Why do I make rulings?
13              MS. PARUTI:  I understood you to not -- I
14    understood you to not permit the government to present
15    that evidence.
16              THE COURT:  Well you misunderstood me and I
17    wished I had heard from you.  It does seem to me --
18         Are there other deleted files with titles?
19              MS. PARUTI:  Well some of the deleted files
20    are link files and are present on the computer, but that
21    the files themselves that are targets are not present on
22    the computer.  I do think they're admissible, I think
23    that the fact that the files themselves are not present
24    goes to the weight, not to the admissibility, especially
25    when the title names are obvious.  And I have a case
```

1    that I can cite to you or not, but I didn't bring it to

2    the sidebar.

3              THE COURT:  It would be wise to give it.

4         All right, I'm not going to do anything now, but

5    before any witness testifies to anything about any

6    deleted file, you come to the sidebar.

7         All right?

8              MS. PARUTI:  Yes, thank you.

9              THE COURT:  All right.

10        And you wish to open now?

11             MR. CARNEY:  Yes, I do, your Honor.

12

13             (In open court.)

14             THE COURT:  Mr. Carney.

15             MR. CARNEY:  Thank you, your Honor.

16

17   OPENING STATEMENT BY MR. CARNEY:

18        Good morning, ladies and gentlemen.  I first would

19   like to thank you for serving as jurors.  Not only have

20   you agreed to sit on this trial, which is going to take

21   place over the majority of this week and next week, and

22   for that I want to thank you.  You have probably better

23   things to do than sitting as a juror, whether it's work,

24   whether it's family, whatever.  But each of you has

25   taken the oath to be a juror and agreed to sit and

1    listen to this evidence, listen to it fairly and

2    impartially, and for that I'm sincerely grateful.

3         Now this case will be even more of a sacrifice to

4    you because you know what the case is about, child

5    pornography.  You saw many of your colleagues in the

6    venire line up to speak to the judge and then they were

7    excused.  You jurors indicated that the fact that it

8    involves a subject that is revolting, child pornography,

9    that you nonetheless could sit on this case impartially

10   and determine whether the government has proven, beyond

11   a reasonable doubt, that the defendant knowingly

12   possessed this evidence.

13        Now let me say one thing at the outset so that you

14   will know that it's not in dispute.  We heard from some

15   of you at the sidebar indicating that child pornography

16   is disgusting, horrible, vile, pure evil, and I agree,

17   it's all of that and more.  What you are going to see is

18   child pornography.  My client knows that I'm saying this

19   to you.  It is child pornography.  So you don't have to

20   worry about it, about whether it is or is not child

21   pornography, whether or not it does or doesn't meet the

22   definition you've been given of child pornography.  It

23   certainly does.  And I, on behalf of my client, agree

24   that it does.

25        Now what will be the issue in this case?  It will

1    be whether the government has proven to every one of

2    you, beyond a reasonable doubt, that the defendant

3    knowingly possessed this despicable information.

4         Well let me tell you a little bit about Alex

5    Levin.  He's 52 years old.  He was born in Russia.  He

6    came to the United States when he was 12 years old, in

7    1984, with his family.  He graduated from Doherty

8    Memorial High School in Worcester.  You'll hear that the

9    following year of his graduation -- he graduated in

10   1984, and the following year he became a United States

11   citizen.  So although he is technically an immigrant, he

12   has lived in the United States since 1979 and legally

13   did so until he became a citizen in 1985.

14        Alex's parents live in Massachusetts, they're in

15   an elder assisted living complex.  He's got a brother,

16   Edward.  He also was married at one time, but

17   unfortunately the marriage resulted in a divorce.  But

18   Alex has a 13-year-old daughter that he sees regularly

19   and his relationship with his ex is amicable.

20        You'll hear that he attended college, Central New

21   England College of Technology, got a degree in Computer

22   Science and Comparative Religions.  He then did get a

23   master's degree at Fitchburg State College and that was

24   in Computer Science as well.

25        When he began working he focused on business

1    systems, assisting businesses with like, um,

2    point-of-sale documentation.  We all take it for granted

3    that when you go to a register and the person screens or

4    determines what you are buying, that it just

5    automatically happens, that it goes to a central

6    computer, and that's the kind of thing that Alex worked

7    on.  He often would lead a team of people dealing with

8    business systems issues.

9         Now his primary responsibility, at one point in

10   his career, was computer security, and, yes, he would be

11   able to encrypt things so that no one could ever see

12   them.  But you'll hear that his computer had no

13   encryption on it.  Nothing.

14        Now Alex has no prior criminal record and the

15   government's got to prove to you beyond a reasonable

16   doubt that he knowingly possessed this information.

17   Well we intend to show you that Alex did not knowingly

18   download this child pornography and that he did not

19   knowingly possess it, and in fact there will be no

20   evidence whatsoever that he ever viewed these downloads.

21   The downloads were on a folder among, I think, more than

22   1,000 -- well more than 1,000 logs and files and

23   folders, but there will be no evidence that he ever

24   looked at these located in a particular spot on his

25   computer.

```
 1        At the end of this case I'll be appearing before
 2   you again, I will discuss the evidence.  But just so you
 3   know, we are saying that the government cannot prove to
 4   you, each one of you, beyond a reasonable doubt, that
 5   Alex Levin knowingly had these items on his computer.
 6   Thank you.
 7              THE COURT:  You may call your first witness,
 8   Ms. Paruti.
 9              MS. PARUTI:  The government calls Michael
10   Sullivan.
11              THE COURT:  He may be called.
12              MS. PARUTI:  Thank you, your Honor.
13              (SERGEANT MICHAEL SULLIVAN, sworn.)
14
15              *************************
16              SERGEANT MICHAEL SULLIVAN
17              *************************
18
19   DIRECT EXAMINATION BY MS. PARUTI:
20   Q.  Good morning, Sir.
21   A.  Good morning.
22   Q.  Would you please just introduce yourself to the
23   jury.
24   A.  My name is Michael Sullivan, my last name is spelled
25   S-U-L-L-I-V-A-N.
```

1          THE COURT:  Mr. Sullivan, the mic picks up
2    your voice fine, I just want you to understand it moves.
3    I moved it off to the side.
4          THE WITNESS:  Okay.
5          THE COURT:  So move it right there in the
6    center where it's comfortable for you so you can look at
7    the jury.
8          THE WITNESS:  Yes.  Thank you.
9          THE COURT:  Go ahead, Ms. Paruti.
10   Q.  Sir where do you currently work?
11   A.  I work for the Boston Police Department.
12   Q.  And what's your role there?
13   A.  I'm a Sergeant.
14   Q.  And how long have you been a Sergeant there?
15   A.  Since October of 2018.
16   Q.  Prior to assuming that role, what other roles have
17   you held within the department?
18   A.  I was a police officer assigned to District B-3,
19   which covers Mattapan and North Dorchester.  I was
20   assigned as a police officer to the Boston Police
21   Fugitive Unit for about 11 months.  In October -- excuse
22   me, in December of 2012, I was promoted to the rank of
23   Detective and assigned to the Crimes Against Children
24   Unit.
25   Q.  And in total, how long have been a police officer?

A.   In total 19 years, but the last 13 1/2 were with the
Boston Police Department.

Q.   Where did you work prior to joining the Boston
Police Department?

A.   I was a police officer in the City of Warwick, the
Rhode Island Police Department, for about 5 years.

Q.   And you said you became a detective in 2012?

A.   Yes, in December of 2012.

Q.   Okay.  Now, the, um -- you told us that somewhat
recently you became promoted to the role of Sergeant?

A.   Yes, I did.

Q.   Did that promotion change in what type of cases you
worked on within the Boston Police Department?

A.   Yes, I returned to uniform and was assigned again
back to District B-3 in Mattapan.

Q.   Okay.  Now you said that you worked within the
Boston Police Department's Crimes Against Children unit
for a number of years.  What types of crimes did that
unit investigate?

A.   We investigated physical child abuse, sexual abuse
of children, and the online exploitation of children.

Q.   Did you have a particular focus within the unit?

A.   Yes.

Q.   What was that?

A.   I primarily worked on the exploitation of children,

1    online exploitation of children.

2    Q.   Okay.  And when the police us that term, the "online

3    exploitation of children," what do you mean by that?

4    A.   I'm referring to child pornography, child

5    enticement-type of cases.

6    Q.   In the course of your role there in that unit, did

7    you have the opportunity to collaborate or work with

8    other agencies investigating the same types of crimes?

9    A.   I did.

10   Q.   Which ones?

11   A.   I worked with the Massachusetts State Police,

12   Homeland Security investigations, the FBI, and the

13   United States Secret Service.

14   Q.   Have you had any more particularized experience with

15   the FBI?

16   A.   Yes.

17   Q.   And what has that been?

18   A.   In February 2014 I became a Task Force Officer

19   assigned to the FBI's Child Exploitation Task Force.

20   Q.   Okay.  And who comprised -- who comprised or

21   comprises the Child Exploitation Task Force?

22   A.   Well there are several FBI agents assigned to it as

23   well as local and state police officers.

24   Q.   Okay.  And that was when again?

25   A.   In about February of 2014.

1   Q.   Okay.   And you said a "Task Force Officer."   What

2   does that mean?

3   A.   The FBI, and it's kind of a force multiplier, will

4   bring on local and state police officers and then

5   deputize them with federal law enforcement authorities

6   so they can, um, investigate the violations to which

7   we're assigned to investigate.

8   Q.   Okay.   Now on that particular task force as a member

9   of the FBI task force, how if at all did your duties as

10   a child exploitation investigator change?

11   A.   I was tasked with investigating federal violations

12   of child pornography laws as well as the state laws.

13   Q.   And how long -- well let me ask you, are you still

14   on the Child Exploitation Task Force?

15   A.   No, I am not.

16   Q.   At what time did that change?

17   A.   Upon my promotion in October.

18   Q.   Of 2018?

19   A.   Yes.

20   Q.   Okay.   Now over the course of your career working

21   both in the Boston Police Department's Crimes Against

22   Children unit and as a member of the FBI's Child

23   Exploitation Task Force, have you had experience

24   actually seeing child exploitation materials?

25   A.   Yes.

1    Q.   Have you received any training in addition to your

2    on-the-job experience?

3    A.   Yes.

4    Q.   Can you just briefly outline for the jury what some

5    of that training has been?

6    A.   I took classes offered through the Internet Crimes

7    Against Children Task Force, which is a national task

8    force that provides -- that works the same

9    investigations, they work child exploitation cases, so

10   the Internet Crimes Against Children offers various

11   classes.  So I attended a basic investigative technique

12   class which taught us basic internet investigations from

13   tracing IP addresses to conducting WIFI surveillance to

14   collecting and preserving digital evidence.  I've

15   attended the FBI basic online undercover school.  I've

16   attended the FBI advanced online undercover school.

17   I've attended classes on peer-to-peer file sharing.  And

18   things of that nature.

19             THE COURT:  Ms. Paruti, come to the sidebar.

20   And counsel.

21

22             AT THE SIDEBAR

23             THE COURT:  Now in his opening he made the

24   traditional admission that the exhibits that I am

25   letting you use are child pornography.  That being so,

```
 1    I'll surely allow him, if he viewed anything, or your
 2    other witnesses to say that File X, Title Y, is child
 3    pornography because there's no dispute about that.
 4              MS. PARUTI:  Uh-huh.
 5              THE COURT:  And I'm not going to let him argue
 6    to the contrary.
 7              MS. PARUTI:  Okay.
 8              THE COURT:  His defense appears to be this
 9    business about knowing possession.
10              MS. PARUTI:  Yes.
11              THE COURT:  So in my eyes the focus now in
12    this case is, um, on how computers work and how could he
13    have gotten this material without knowing and
14    potentially wanting to get this material.  You'll get
15    full range on that.  He'll get full range on that.  But,
16    um, I don't see any reason to play anything, just put it
17    in evidence and say this is the child pornography, and
18    if they want to watch it, they can.
19              MS. PARUTI:  I think the government here,
20    where the question is knowing, I think the government
21    does have the right to present its evidence.  I
22    understand he is making that stipulation and admission,
23    but --
24              THE COURT:  He can't make a stipulation
25    without your agreement and you haven't agreed.  He's
```

1    made a judicial admission.  And you're entitled to put

2    it in and I'm going to charge that it, exhibits

3    whatsoever, are child pornography, they meet the

4    definition of child pornography, and are available to

5    you.  I won't let him argue to the contrary.  So I think

6    we can shorten this.

7         I'm certainly not cutting this witness, who

8    testifies as an expert, nonetheless if he looked at any

9    of the exhibits that will be in evidence here, he can

10   say they're child pornography because Mr. Carney agrees.

11   But unless you persuade me, I don't see any reason to

12   play anything.

13         MS. PARUTI:  I don't intend to play anything

14   through this witness and I understand the rule.

15         THE COURT:  Thank you.

16         MS. PARUTI:  But can I just raise -- the

17   reason why I'm going down this road is because I expect

18   him, based on his experience, to be able to identify

19   certain terms that regularly appear in child pornography

20   files as he's seen them.

21         THE COURT:  Well has he seen them, did he look

22   at the computer?

23         MS. PARUTI:  He looked at the files on the

24   computer, but just based on his experience as a child

25   exploitation --

1          THE COURT:  Well you mentioned one in your

2    opening and I would think you would get that.

3          MS. PARUTI:  The other reason why I'm asking

4    him these sort of foundational questions is because the

5    expert disclosure I got from Mr. Carney says that

6    Mr. Nicholls -- well the expert disclosure said he

7    intends to offer his opinion as to how the files got

8    onto his computer.  When I pressed further I was told

9    that it was from file-sharing software.  So -- and

10   that's the extent of the expert disclosure.

11         THE COURT:  Well I'll take it step by step.

12   You can have your, um -- there were four letters and I

13   will allow them because I think that's akin to the

14   abbreviations and personal advertisements that are

15   generally understood by those people who are viewing

16   those advertisements.

17         MS. PARUTI:  Right.

18         THE COURT:  And it's not some private code.

19         MS. PARUTI:  Right.

20         THE COURT:  I'm just trying properly to manage

21   the case.

22         MS. PARUTI:  I understand.  Thank you.

23

24         (In open court.)

25   Q.  Sir, you mentioned you had training in computers

1    here, namely file-sharers.  Have you also spent some

2    time, in your experience as a child exploitation

3    investigator, in actually using that type of software?

4    A.  Yes.

5    Q.  And very generally what is that?

6    A.  Peer-to-peer file-sharing software is software you

7    can download to your device and it allows you to share

8    digital files with other users for use in seeing

9    file-sharing software.

10   Q.  So are there different kinds of like brands of file-

11   sharing software that people can download so that they

12   can share files with other people using the same

13   software?

14   A.  Yes.

15   Q.  What are some examples of ones that you've worked

16   with in your career?

17   A.  That I've worked with?  Bit Torrent and Data Tribe.

18   Q.  Are there other ones that you're familiar with by

19   name based on your experience in the area?

20   A.  Yes.

21   Q.  What are some of those?

22   A.  Aries.  Frostwire.  Limewire.  Shiraza.  Freenet.

23   Q.  Okay.  Now, were you working as a member of the FBI

24   task force around August of 2015?

25   A.  Yes.

```
1    Q.   Okay.  And, um, at that time, um, did you
2    participate in the execution of a search warrant at a
3    particular address in Norwood, Massachusetts?
4    A.   Yes.
5    Q.   Do you recall what that address was?
6    A.   64 Plymouth Drive, Apartment C, in Norwood.
7    Q.   Okay.  Prior to executing that search warrant, were
8    you aware who the resident of that location was?
9    A.   Yes.
10   Q.   Okay.  And who did you know that to be?
11   A.   Alex Levin.
12   Q.   Were there other people, um, other agents or law
13   enforcement who were involved in a search warrant
14   execution on that date?
15   A.   Yes.
16   Q.   And just generally who were those people?
17   A.   There were FBI agents assigned to the Child
18   Exploitation Task Force, there were FBI computer
19   examiners, and there were members of Norwood Police
20   Department.
21   Q.   Was anyone on scene with you there to, um -- was
22   anyone on scene with you there to photograph anything
23   that was happening or was there during the course of the
24   execution of the search warrant?
25   A.   Yes, there was an FBI photographer on scene.
```

1    Q.   Okay.   Now could you tell us just basically what

2    that address looked like and how you entered that

3    address from the outside?

4    A.   It's a three-floor brick apartment building with a

5    front door and a rear entrance to the main apartment

6    building.   We entered through the rear of the apartment

7    building and downstairs to the defendant's apartment.

8    Q.   Thank you.

9            MS. PARUTI:   Madam Clerk, could I have the

10   witness's monitor turned on, please.

11        And, Ms. Johnson, would you please display what

12   has been marked as Exhibit 1.

13           THE COURT:   And I take it if they have

14   numbers, there's no objection.   Is that right?

15           MR. CARNEY:   Yes, that's correct, your Honor.

16   Thank you.

17           THE COURT:   Again the lawyers dispute certain

18   things, and it's clear from their opening, but other

19   things they don't dispute.   And to save our time they've

20   premarked certain exhibits.   And all these exhibits will

21   go with you to the jury room.   If they have a number on

22   them, you're going to be able to take it with you to the

23   jury room and there is no objection to your viewing it.

24   Others, if we're going to have a dispute about it,

25   they'll have letters and I'll have to make up my mind.

 1   But the ones with numbers, you're going to take back to

 2   the jury room.  Now all that means is the lawyers agree

 3   you can look at it.

 4        All right, this is Exhibit 1.  Go ahead,

 5   Ms. Paruti.

 6             MS. PARUTI:  Thank you, your Honor.  Since

 7   it's been admitted as an exhibit, may I please have that

 8   published to the jury as well?

 9             THE COURT:  Yes.

10             (Shown to jury.)

11             THE COURT:  Oh, yes.  Yeah, the way this works

12   is you get like -- well those of you in the back row,

13   between each two of you there's like -- it's like an old

14   school desk and the little screens come up and you can

15   turn them on.  Thank you.  I guess I'm dating myself,

16   it's like an old school desk to me.  Yes, there we are.

17             (Jurors take out screens.)

18             THE COURT:  All right.  So this is Exhibit 1

19   in evidence.

20             (Exhibit 1, marked.)

21   Q.  All right.  Describe what is shown here in Exhibit

22   1, please?

23   A.  This is the rear of 64 Plymouth Drive in Norwood,

24   Massachusetts.

25   Q.  Is that the door that you entered through?

1    A.   Correct.

2    Q.   And when you went in that entry, where did that take

3    you to?

4    A.   To a common stairwell.  We proceeded down the

5    stairwell.  The defendant's apartment would be on the

6    left hand of the stairwell as you proceed down the

7    stairs.

8    Q.   And that was Apartment C, you said?

9    A.   That's correct.

10   Q.   Did you, and other members of the team, actually

11   enter the apartment?

12   A.   Yes.

13   Q.   And how did you do that?

14   A.   With a key.

15   Q.   Okay.  What did you do before you used that key?

16   A.   We knocked on the door several times.

17   Q.   Okay.  Did you announce your presence?

18   A.   We may or may not have.

19   Q.   Okay.  When you knocked on the door, did anybody

20   come to the door?

21   A.   No.

22   Q.   Okay.  When you opened the door with the key, did

23   you see anybody in the apartment?

24   A.   Yes.

25   Q.   Who did you see?

1    A.  Mr. Levin was walking towards the door as we

2    entered.

3    Q.  Now, you're referencing Mr. Levin by name.  Do you

4    see him here in the courtroom?

5    A.  I do.

6    Q.  Who is he?  Please give a description.

7    A.  He's the gentleman in the dark suit with the glasses

8    on and to my left of the table.

9    Q.  Okay.

10              MS. PARUTI:  Your Honor, may the record

11   reflect the identification of the defendant?

12              THE COURT:  It may.

13              MS. PARUTI:  Thank you.

14   Q.  Was there anyone else in the apartment besides

15   Mr. Levin?

16   A.  No.

17   Q.  And where was he in relation to you as you entered

18   the apartment?

19   A.  He was walking towards the door that we had entered

20   through.

21   Q.  Okay.  Now what was the first thing you did when you

22   got into the apartment?

23   A.  We secured him and ensured that there were no other

24   occupants in the apartment.

25   Q.  Okay.  And did you in fact find that to be true?

1    A.   I did.

2    Q.   Okay.  And you said you "secured him," what does

3    that mean?

4    A.   We just secured him, seated him at a table, I

5    believe in the dining room, at that time.

6    Q.   Okay.  After you did that, what did you do?

7    A.   We allowed him to get -- we provided him a copy of

8    the search warrant, allowed him to put some clothes on,

9    and then we escorted him out to a patio area.

10   Q.   Okay.

11             MS. PARUTI:  Ms. Johnson, could I please have

12   Exhibit 2, please.

13             (On screen.)

14   Q.   Sergeant Sullivan, do you see the picture in front

15   of you?

16   A.   Yes.

17   Q.   And what does that show?

18   A.   This is the living room at 64 Plymouth Drive,

19   Apartment C.

20   Q.   You said you escorted him out to a patio.  Can you

21   see the entrance to that patio in this exhibit?

22   A.   Yes, it's off to the left.

23             MS. PARUTI:  Could I have Exhibit 3, please.

24             (On screen.)

25   Q.   Do you have the exhibit before you, sir?

1    A.  I do.

2    Q.  And what does this picture show you?

3    A.  It's a picture of the living room that displayed a

4    desk, some computers, and a sliding glass door that

5    leads out to the patio.

6              MS. PARUTI:  Okay, Exhibit 4, please.

7              (On screen.)

8    Q.  And finally, what does Exhibit 4 show?

9    A.  This is the exterior patio of the apartment.

10   Q.  Is that pretty much the way it looked on -- well let

11   me ask you this.  Was the picture taken on that day?

12   A.  Yes, it was.

13   Q.  And is that the way it looked on that day?

14   A.  Yes, it does.

15   Q.  Do you remember specifically where you were staying

16   when you spoke with him?

17   A.  Yes.

18   Q.  Where was that?

19   A.  On those railroad ties.

20   Q.  So the wooden beams sort of in the center?

21   A.  Yes, ma'am.

22   Q.  Okay, thank you.  Now you said -- well what did you

23   do when you went outside with him to that patio area?

24   A.  We sat down and I provided him his constitutional

25   rights.

1    Q.  Are those the so-called **"*Miranda* rights"**?

2    A.  They are.

3    Q.  And how was it that you administered those rights to

4    him?

5    A.  I provided him a copy of those rights and I read

6    them to him out loud.

7    Q.  You read them to him out loud?

8    A.  Yes.

9    Q.  And you gave him a form to read from as you read

10   them?

11   A.  Yes.

12   Q.  Was that interview recorded, sir?

13   A.  Yes.

14   Q.  And was that advisement very commonly recorded?

15   A.  Yes.

16              MS. PARUTI:  Exhibit 5, please.

17              (On screen.)

18   Q.  Can you see the exhibit on your screen, sir?

19   A.  I can.

20   Q.  And what is that?

21   A.  These are the ***Miranda*** rights I read to him that he

22   signed.

23   Q.  Is your signature on this form?

24   A.  It is.

25   Q.  And is Mr. Levin's signature on this form?

A.   Yes.

MS. PARUTI:  Your Honor, with the Court's permission, may I play Exhibit 6, which is a recording.

THE COURT:  Exhibit 6 may be played.

Let me explain.  One of the reasons she's just asked these questions about how this all worked and that he provided the constitutional rights, is if she's going to play this interview and we're going to hear what purports to be Mr. Levin saying things, I mean that's evidence, and so you'll have that evidence, you'll have it back in the jury room.  But you have an added finding, you have -- before you can consider them, that you'd have to make.

Do not consider anything Mr. Levin may have said during this interview unless you, the jury, find, make a factual finding in your own minds, that it was voluntary.  Yes, they have to give the *Miranda* rights, yes, and if you believe this witness, you can believe that -- and the exhibit that they were given.  But still, as an added protection to the individual, it's up to the jury to conclude whether what he said was voluntary.  So -- and we'll listen.  And Exhibit 6 may be played.

MS. PARUTI:  Your Honor, may I also, with the Court's permission, distribute transcripts of the

1    recording -- it's not objected to, and I've marked it as

2    E for Identification just for the clarity of the record.

3              THE COURT:  You have no objection to them

4    having those?

5              MR. CARNEY:  No, your Honor.  Thank you.

6              THE COURT:  All right, so we'll mark those

7    really as 6B and they can have them.

8              MS. PARUTI:  Thank you.

9              (Plays recording.)

10   Q.  All right.  Sergeant Sullivan, apart from the

11   redaction, was that a complete and accurate recording of

12   the interview that you conducted of the defendant on

13   that particular day?

14   A.  Yes.

15             THE COURT:  Now just let me say.  Now we've

16   given you what has been marked as Exhibit 6B.  You can

17   tuck it in your notebook.  We'll have an original --

18   well they're all the same.  We'll have a copy for you in

19   the jury room, but you can keep those.

20        Go ahead, Ms. Paruti.

21             MS. PARUTI:  Thank you, your Honor.

22   Q.  All right.  Mr. Sullivan, the various devices that

23   Mr. Levin mentioned, were any of them seized by agents

24   on the scene?

25   A.  Yes.

1   Q.  Can you tell us what devices were seized as part of

2   that search warrant?

3   A.  Yes.  Two HP laptops.  Two tablets.  Two MP-3

4   players.  Two thumb drives.  Two external hard drives.

5   And a Samsung cell phone.

6   Q.  Did employees on the scene also see anything else

7   that they photographed or drew your attention to?

8   A.  Yes.

9   Q.  And what specifically?

10  A.  They photographed a graduate degree which I

11  purported to Alex Levin at Fitchburg State College,

12  awarding him a graduate degree in Computer Science.

13           MS. PARUTI:  Now, Ms. Johnson, may I have

14  Exhibit 7, please.

15           (On screen.)

16  Q.  Okay.  Do you see the degree that you're describing

17  in that exhibit, sir?

18  A.  I do.

19  Q.  Could you just circle it on your monitor.

20  A.  (Circles on screen.)

21  Q.  Thank you.

22           MS. PARUTI:  May I have Exhibit 8, please.

23           (On screen.)

24  Q.  Is this a close-up of that degree?

25  A.  Yes.

```
 1    Q.   What else did you find on the scene?
 2    A.   We found a resume in the name of "Alex Levin" on it.
 3              MS. PARUTI:  Exhibit 9, please.
 4              (On screen.)
 5    Q.   Is this a copy of that resume?
 6    A.   Yes.
 7              MS. PARUTI:  Ms. Johnson, could I have Page 2,
 8    please.
 9              (On screen.)
10    Q.   And is that his name up top?
11    A.   Yes.
12    Q.   Did you go through and look at the pages to this
13    exhibit?
14    A.   Yes.
15              MS. PARUTI:  Turn to Page 6, please.
16              (Turns.)
17              MS. PARUTI:  Ms. Johnson, can you just blow up
18    the section that says "Education development."  (Blows
19    up.)  Yes.
20    Q.   And can you see his degree confirmance there in a
21    Master's in Computer Science and a Bachelor's in
22    Computer Science?
23    A.   I can.
24              MS. PARUTI:  And could I see Page 6 of the
25    section that says "Technical Skills."
```

```
 1              (On screen.)
 2              MS. PARUTI:  And, Ms. Johnson, on Page 2,
 3   please, could I have the section titled "Professional
 4   Profile" blown up.
 5              (Enlarged on screen.)
 6   Q.  And do you see in that paragraph, sir, um, where he
 7   identifies himself as a "seasoned IT professional"?
 8   A.  I do.
 9   Q.  Is that in fact the opening line?
10   A.  Excuse me?
11   Q.  Is that in fact the opening line?
12   A.  It is.
13   Q.  Okay.  Thank you.
14              MS. PARUTI:  And on Page 2, finally, could you
15   please blow up the last line saying "Accomplishment."
16              (Enlarged on screen.)
17   Q.  Can you read that last line for us.
18   A.  "Secured corporate assets from active cyber
19   attacks."
20   Q.  Okay, thank you.  Now what about, in your interview,
21   made you take notes of those items?
22   A.  I asked about his computer knowledge or experience,
23   and his reply was "Average."
24   Q.  And when speaking of computers, um, you said that
25   you had seized two computers.  Were those the two HP
```

 1   laptops that he described to you in his interview?

 2   A.  Yes.

 3             MS. PARUTI:  Ms. Johnson, may I have Exhibit

 4   10, please.

 5             (On screen.)

 6   Q.  And what are we looking at, sir?

 7   A.  We are looking at a desk in the living room of the

 8   apartment.

 9   Q.  And is that the same slider door there that we saw

10   earlier?

11   A.  Yes, it is.

12   Q.  Now, you talked about a newer laptop and an older

13   laptop.  Do you know which of the two computers there is

14   the newer laptop?

15   A.  Yes, the one on top of the desk is the newer laptop.

16   Q.  And what about the older laptop?

17   A.  It's below the desk to the right.

18   Q.  And could you just circle that so the jurors can see

19   what you're referring to with your words?

20   A.  (Circles on screen.)

21   Q.  Thank you.

22             MS. PARUTI:  Exhibit 12, please.

23             (On screen.)

24   Q.  And what is this, sir?

25   A.  This is a close-up view of the older laptop.

1    Q.   The older laptop?

2    A.   Correct.

3    Q.   Okay.  Now, um, were there other forensic people on

4    the scene with you?

5    A.   Yes.

6    Q.   And what was their function there at the scene?

7    A.   Their function is to ensure that we safely preserve

8    the digital evidence and to conduct an onsite

9    examination of the digital evidence.

10   Q.   Okay.  And was that on-scene -- to your knowledge,

11   um, was that on-scene examination a full-blown exam?

12   A.   No, it's a preliminary onsite exam.

13   Q.   Okay.  To your knowledge did the on-scene examiners

14   find any, um, child pornography or -- well actually were

15   they able to preview or do that preliminary exam with

16   the new laptop?

17   A.   No, they were not.

18   Q.   Okay.  Why is that?

19   A.   They were unable to get the hard drive out of the

20   laptop.

21   Q.   Okay.  What about the older HP laptop that was on

22   top of the printer on the desk?

23   A.   They were able to preview that device.

24   Q.   Okay.  Did, um, to your knowledge -- well was

25   anything brought to your attention that was present on

1    that particular device?

2    A.   Yes.

3    Q.   What was that?

4    A.   They located child pornography on that device.

5    Q.   Okay.  Have you actually viewed the content of those

6    files?

7    A.   I have.

8    Q.   Okay.  And do you remember any of the -- anything

9    specifically about the terms in the names of those

10   files?

11   A.   Yes, some of the terms or abbreviations used in the

12   file names are consistent with child pornography files.

13   Q.   And what are some of those terms?

14   A.   "PTHC."

15   Q.   "PTHC," what does that mean?

16   A.   "PTHC" is an abbreviation for "Preteen Hard Core."

17   Q.   And what are some of the other terms that you saw in

18   the files that drew your attention?

19   A.   One of the file names was "kiddie porn pedo."

20   Q.   Uh-huh.

21   A.   "File YO, 10 YO, 11 YO."

22   Q.   And that "YO" -- well just to backtrack a minute.

23   You said you had worked for years as a child

24   exploitation investigator and you said that you had

25   viewed child pornography.  About how many examples of

1   child pornography have you viewed in the course of your

2   career?  Just give an estimate for me.

3   A.  Thousands.

4   Q.  All right.  Are there any similarities in the naming

5   conventions of those files that you found in your

6   experience?

7   A.  Yes.

8   Q.  Explain that to me.

9   A.  So the file names typically describe the content of

10  the file.

11  Q.  Why is that?

12  A.  So the user knows what the file contains.

13  Q.  So in the course of -- so, excuse me.  You said that

14  you had experience using file-sharing software.  Um,

15  have you noticed anything -- well, strike that.

16  Let's go back.

17      What was the first term that you saw or recognized

18  in the file?

19  A.  "Pedo."

20  Q.  Uh-huh.

21  A.  It's short for "pedophilia" or "pedophile."  "5 YO,"

22  typically indicates the age, so 5 years old.  "10 YO,"

23  10 years old.  And "kiddie porn" is pretty self-

24  explanatory.

25  Q.  Okay.

```
 1              (Interruption by Juror.)

 2              MS. PARUTI:  And then -- I'm sorry, your

 3    Honor, the juror --

 4              THE COURT:  Oh, I'm sorry.

 5         Yes?

 6              THE JUROR:  I'm a diabetic and --

 7              THE COURT:  Oh, you want to take a break?

 8              THE JUROR:  Yes.

 9              THE COURT:  Yes, of course.

10         Actually let's take the morning recess now.  We'll

11    take a full 15-minute recess.

12         Do not discuss the case either among yourselves

13    nor with anyone else and keep your minds suspended.

14    We'll stand in recess for 15 minutes.  Thank you,

15    Ms. Paruti.

16              THE CLERK:  All rise for the jury.

17              (Jury leaves, 11:40 a.m.)

18              (Recess, 11:40 a.m.)

19              (Resumed, 11:55 a.m.)

20              THE COURT:  Ms. Paruti, you go ahead.

21              MS. PARUTI:  Thank you, your Honor.

22    Q.  Sergeant, before the break you were telling us about

23    some of the file portions or words or terms that drew

24    your attention.  Let me just go back for a second to

25    your experience with peer-to-peer file-sharing software.
```

1            Now, in your role as a law enforcement officer,

2    have you used peer-to-peer file-sharing software to

3    receive child pornography from other people?

4            THE COURT:  Has he himself used it to receive

5    child pornography from other people?

6            MS. PARUTI:  In the course of his role as a

7    law enforcement officer.

8            THE COURT:  Yes.

9            MS. PARUTI:  Yes, your Honor.

10   A.  I have used law enforcement peer-to-peer software to

11   receive files of child pornography used in peer-to-peer

12   transfers.

13   Q.  Okay.  And are you aware generally how peer-to-peer

14   software works from the user's perspective?

15   A.  In general terms, yes, I do.

16   Q.  Okay.  And generally how does a person using peer-

17   to-peer file-sharing software get a particular file or

18   files?

19   A.  A user would have to conduct a search, um, for key

20   words or terms of the file they're seeking.  For

21   example, if I want the movie "Titanic," I'll search for

22   "Titanic," and search it, and then a window will

23   populate with all the users on the network that have

24   "Titanic."  And then I'd have to click on the file to

25   download the file to my device.

1    Q.   Okay.  And you said you could use key terms.  Is it

2    possible to search by a specific title?

3    A.   Yes.

4    Q.   Okay.  And what have you observed, in the course of

5    your experience using the file-sharing software, with

6    respect to the terms you talked about with us a little

7    earlier?

8    A.   Those terms are currently contained in the file name

9    of files that contain child pornography.

10   Q.   And why is that?

11   A.   It provides the user with a description of the file

12   they're receiving or opening.

13   Q.   Okay.  Now you said that certain files containing

14   some of those terms were found on the scene.  You've

15   viewed them?

16   A.   I did.

17   Q.   Okay.  And following the execution of the search,

18   what happened?

19   A.   We seized the devices, you know, and we placed

20   Mr. Levin under arrest.

21   Q.   What happened to those devices after you received

22   them?

23   A.   Those devices were transported to the FBI and placed

24   into evidence.

25   Q.   Okay.  Apart from the older HP laptop, was there

1    child pornography found on-scene during that preview on

2    any of the other devices?

3    A.  No.

4             MS. PARUTI:  I have no further questions at

5    this time.

6             MR. CARNEY:  May I have one moment, please,

7    your Honor?

8             THE COURT:  You may.

9             (Pause.)

10             MR. CARNEY:  I have no questions for Sergeant

11    Sullivan, your Honor.  Thank you.

12             THE COURT:  You may step down.  Thank you.

13             THE WITNESS:  Thank you, your Honor.

14             THE COURT:  Call your last witness.

15             MS. PARUTI:  Thank you.

16             (Pause.)

17             MS. PARUTI:  Your Honor, while he's entering,

18    may we approach sidebar?

19             THE COURT:  You may.

20             MS. PARUTI:  Thank you.

21

22             AT THE SIDEBAR

23             THE COURT:  Yes.

24             MS. PARUTI:  Thank you.  I just wanted to

25    clarify your earlier ruling that you wouldn't permit the

1    government to display any actual videos.  I wanted to

2    clarify that if the government can describe how the list

3    described the videos using descriptions that were

4    previously conceded to --

5            THE COURT:  Well I don't know if they were

6    conceded, but he admits there is child pornography, so

7    briefly, yes.

8        I'll tell you, I have another problem here -- so

9    the answer to your question is "Yes."  If we're talking

10   about the -- I take it there's some agreement now as to

11   which exhibits, which are the actual videos and the

12   picture, will be exhibits in the case, right?

13       We know what the exhibits are?

14           MR. CARNEY:  Correct, your Honor.

15           THE COURT:  So we're not going to play them.

16   But as to Exhibit 18, this shows -- briefly it shows

17   this and that.

18           MS. PARUTI:  Uh-huh.

19           THE COURT:  But while we're getting into the

20   computer back and forth business, there's an affirmative

21   defense witness.  On reflection I think I was too broad

22   on the deleted files, I think that a more nuanced and

23   proper ruling is that where they've got the computer and

24   where the file name -- though not an exhibit, because

25   it's deleted, the file is inculpatory in the fashion

 1    that has been described by the witness, the government

 2    is entitled to that.  There will be no mention of any

 3    other file, any file having been deleted other than the

 4    ones that have inculpatory titles.  Here's the line I'm

 5    walking.

 6         It may be we'll see what the -- Phelps is your

 7    computer guy and Nicholls is theirs.  Maybe Phelps will

 8    make something out of the fact that files were deleted,

 9    you have to do something to delete them or something,

10    and maybe Nicholls will, but even files that have

11    inculpatory names can be argued to the extent that the

12    evidence warrants.  Other files, which have been

13    deleted, will not be mentioned, they haven't been, and

14    will not be mentioned at all by anyone.

15         You don't want Nicholls to mention them, do you?

16              MR. CARNEY:  No, I don't.

17              THE COURT:  Fine.

18         So are we clear?

19              MS. PARUTI:  Yes, thank you.

20              THE COURT:  All right.

21              MR. CARNEY:  Your Honor, I of course

22    completely accept your ruling, I would just, for the

23    record, note that I still object to the government being

24    able to offer files for which they have no idea what the

25    content is and they're basing it solely on the title.

1           THE COURT:  I recognize that, I think it's

2    circumstantial, but I stand on my ruling.

3           MR. CARNEY:  Thank you.

4

5           (In open court.)

6           (CLAYTON PHELPS, sworn.)

7

8           * * * * * * * * * * * * * *

9           CLAYTON PHELPS

10          * * * * * * * * * * * * * *

11

12   DIRECT EXAMINATION BY MS. PARUTI:

13   Q.  Good morning, sir.  Would you please introduce

14   yourself to the jury.

15   A.  Good morning, my name is Clayton Phelps,

16   C-L-A-Y-T-O-N, P-H-E-L-P-S.  Phelps.

17   Q.  Where do you work, sir?

18   A.  At the FBI.

19   Q.  And what's your job there?

20   A.  I'm a Special Agent.

21   Q.  Do you have any other designation?

22   A.  I do, I'm a digital forensic examiner.

23   Q.  And how long have you been a Special Agent for the

24   FBI?

25   A.  Since March of 2006.

1  Q.  About 13 years or so?

2  A.  Correct.

3  Q.  And what do you do currently in your role -- is it

4  the Boston FBI?

5  A.  It is the Boston Division of the FBI.

6  Q.  How long have you been in the Boston division?

7  A.  Since 2009.

8  Q.  And prior to that, where were you?

9  A.  I was in the Springfield division and I worked out

10  of a two-person --

11  Q.  And was that for the duration of your time as an FBI

12  agent prior to Boston?

13  A.  Correct, from 2006 to 2009.

14  Q.  Okay.  Now, as an agent now, what do you do?

15  A.  As I mentioned, I'm a digital forensic examiner and

16  so that involves handling digital evidence that we

17  receive typically from, um, executions of search

18  warrants or sometimes even consent.  And so, um,

19  frequently what we're asked to do is to extract data

20  from them.  The process involves imaging which creates

21  an exact bit for bit copy of that data that's on these

22  devices.

23  Q.  So how long have you been working as a digital

24  forensic examiner in the Boston office?

25  A.  Since May of 2015.

1   Q.   Okay.   Before you became a digital forensic

2   examiner, what kinds of cases had you investigated as a

3   Special Agent of the FBI?

4   A.   I worked a wide variety of federal violations to

5   include health care fraud, counterterrorism, public

6   corruption, gangs and drugs, um, and organized crime.

7   Q.   In the course of your experience as an agent, um,

8   were you ever assigned to or did you have the

9   opportunity to work on investigations involving child

10  exploitation or child pornography?

11  A.   Yes, I have.

12  Q.   In the course of your working as a FBI digital

13  forensic examiner, have you had the opportunity to

14  review child pornography cases?

15  A.   I have.

16  Q.   Now, how is it that you went from being a Special

17  Agent investigating that fraud-type of crime to becoming

18  a digital forensic examiner?

19  A.   Oftentimes when we're placed on a squad you might be

20  assigned to work a particular violation, um, there's

21  also additional opportunities that are collateral duties

22  in our divisions and, um, I'm trying to think of the

23  exact years, I believe it was 2008 through 2012, I was

24  also a member of our evidence response team.   And so

25  frequently if there's an even larger search or a more

1    detailed search warrant execution, our evidence response

2    team will be called upon to assist with handling the

3    evidence on those investigations.

4    Q.  And so how is it that you went from that prior job

5    to the current job that you held?

6    A.  And so, um, over the course of many years and you

7    determine interests and -- which is what led me to

8    counterterrorism and then I went down to headquarters

9    for the stint, um, that was 18 months, and then upon

10   returning I went back to my health care fraud squad, and

11   then ultimately an opening occurred in our digital

12   forensics lab and I submitted an application and

13   received the position.

14   Q.  So, um, did you have to -- when you transitioned to

15   that particular role, did you have to go through any

16   sort of training to enable you to do that job?

17   A.  I did.  Our --

18   Q.  Could you describe that?  Thank you.

19   A.  Our headquarters has a, um, pretty exact curriculum

20   that any forensic examiner would have to attend, it's

21   approximately 11 weeks of training, but it's not all

22   back to back.  Um, typically upon taking the first

23   two-week session of training, you go back to your

24   division and you can start extracting digital devices.

25   So it's some on-the-job training as well as additional

1  courses that we take.
2  Q.  And what types of, um -- you said you could start to
3  extract, we'll talk about those particular terms a
4  little bit later --
5  A.  Sure.
6  Q.  -- but basically what are you learning?
7  A.  We're learning how to, um, how to view the data
8  without making any alterations to the original.
9  Q.  And when you say you review the data, on what?
10  A.  On the evidence that we receive from said search
11  warrants or consent searches.
12  Q.  Okay.  During the course of your training did you --
13  were you trained in any capacity about different types
14  of other aspects of computer forensics?
15  A.  I was.
16  Q.  What other aspects of computer forensics were you
17  trained in?
18  A.  Sure.  Amongst those other weeks, um, we attend
19  classes involving operating systems, file systems, Linux
20  command lines, um, mobile devices, which includes
21  tablets or cell phones, um, and then there's
22  additionally two commercial courses that are required,
23  um, Comp T's A-plus certification, which is related to
24  hardware and troubleshooting, and Sams 408, which is
25  Windows in-depth forensics.

1    Q.  You just said a lot of words.  What are the words

2    that you said in terms of the operating systems, what do

3    you mean when you say that?

4    A.  An operating system for a computer basically allows

5    you to get the computers to do what you want.  We

6    frequently think of Windows, um, when we think of

7    computers and Windows is an operating system.

8    Q.  Okay.  You also talked about, um, like "hardware" in

9    general.  What's "hardware" when you used it in your

10   field?

11   A.  So, it's, um, any -- as it relates to a computer, so

12   the computer itself is hardware.  And then there's

13   specific internal components such as a hard drive, which

14   is the main storage, location or RAM, which is the

15   memory that the computer uses to do functions.

16   Q.  Now, during the course of all that training have

17   you, um, been -- have you received any particular

18   certifications or anything in that line that documents

19   the training you received?

20   A.  I have, I received several certifications and I

21   described some of the courses and typically there would

22   be a test at the end of several of those courses.  Um,

23   the very first one, the digital extraction technician,

24   um, is put on by the FBI and there is a certification at

25   the end of that that allows us to handle digital

1    devices.  Linux command line, there was a certification.

2    And the Sams 408 class, there's a GEAC Windows certified

3    forensic examiner at the end of that training.

4    Q.  Let me just stop you for a second.  When you say

5    GEAC, what is that?

6    A.  It's an acronym the SAMS institute came up with.  I

7    don't recall the exact acronym off the top of my head.

8    Q.  Is that one of the commercial vendors that you're

9    talking about that issued those classes?

10   A.  Correct, it is.

11   Q.  So it was your computer forensic examiner

12   certification that is through a commercially-available

13   course that was offered?

14   A.  Correct.

15   Q.  Do you also hold a certification along those lines

16   with the FBI?

17   A.  I do.  Following all of that training I am now

18   considered an FBI certified forensic examiner.

19   Q.  Okay.  Now, you talked about extracting data, um,

20   and then sort of learning how to look at it.  Is there,

21   um -- are you trained or have you been trained in that

22   course of time that you described as to how to use

23   different programs, different software to do that

24   extracting?

25   A.  Yes, we are.

1    Q.   Okay.   Now, just talking about forensic, um --

2    "forensics," are you familiar with that term?

3    A.   I am.

4    Q.   Okay.   When we talk about "forensics" in a courtroom

5    like this, what are we talking about?

6    A.   "Forensics" relates to the science of doing

7    something so it's systematic method or procedure to go

8    through so that it is reproduceable and without altering

9    the original data, in our case, or evidence.

10   Q.   Sorry.   So when we talked about like a "computer

11   forensic examination," what do we mean by that?

12   A.   Um, so exactly that.   We have a set of guidelines

13   that we follow, um, from when we first receive the

14   evidence item and we document its condition, and then we

15   disassemble it so that we can remove that hard drive,

16   which does contain the data from the computer, and then,

17   um, we move on to, um, I mentioned extraction earlier.

18   So we would then go on to do what's called "creative

19   forensic image," and that image is what I mentioned is a

20   bit-for-bit copy of the original data and it's done

21   using what's called a "write blocker."   The write

22   blocker allows me to get the data from the evidence hard

23   drive without altering the contents.   It doesn't allow

24   writing back to that hard drive.

25   Q.   Okay.   So when you have a piece of evidence that the

1    computer -- you said sometimes you have to disassemble

2    it, do you always have to take a device apart to be able

3    to extract data from it?

4    A.   Not always.  The one that I can think of frequently

5    that does not require disassembly would be cell phones

6    or tablets, um, an sometimes McIntosh computers, Apple

7    McIntosh.

8    Q.   Okay.  So you said then you attach it to a write

9    blocker and that prevents you from writing information

10   to the original.  What do you mean when you say "writing

11   information"?

12   A.   It prevents me from altering it in any fashion, um,

13   not putting anything back onto that source device.

14   Q.   Okay.  So then you said you created an image and you

15   returned bit-by-bit copy -- excuse me, copy.  What's a

16   "bit"?

17   A.   A "bit" is the smallest piece of information on a

18   computer.

19   Q.   Okay.  So once you create that image of a computer

20   -- would you call it a "forensic image"?

21   A.   Yes.

22   Q.   Okay.  Once you create that forensic image of a

23   computer, are you then analyzing or touching the hard

24   drive itself to analyze anything else typically?

25   A.   No, we work off of the image once it's created.

Q.  Okay.  So at the FBI, um, when you created those

images, so an image of a computer, where did that image

go?

A.  We have a forensic network that is only in-house,

that's not outside to the public, um, and that is

where -- we have a large amount of storage and we can

store our data on that and do our work and analysis on

that storage network.

Q.  Okay.  Now, is there a way to view, um, where you

can view the contents of a device without taking that

stuff and making a forensic image of the device?

A.  There is, and so again we would first disassemble

the computer to retrieve the hard drive and then we can

plug that hard drive into one of the write blockers and

do what's called a "preview."  We would use our forensic

software to be able to view the contents of the hard

drive again without altering it, just seeing what's

there.

Q.  Okay.  And are you, um, able to use the same amount

of information on a preview as you are from examining

the forensic image of the machine?

A.  Not exactly, we're seeing just the folders that are

still present on that machine.

Q.  Okay.  Now once you have a forensic image of a

computer, how is it that you actually search it or look

1    through it?

2    A.   We use another one of our, um, forensic tools and

3    it's software based and we're able to do what's called

4    "processing," and depending on the type of case there

5    are things that we would tell the software items of

6    interest.

7    Q.   Let me stop you for a second.  You're talking about

8    software that you use to actually look through the image

9    of the hard drive, sort of the meat and potatoes, right?

10   A.   Yes.

11   Q.   Okay.  Does your lab use a particular brand or make

12   of forensic software?

13   A.   We frequently use a product called AV Lab, which is

14   made by a company called Access Data.

15   Q.   Are there other types of forensic tools that do the

16   same thing or similar things?

17   A.   There are.  Another is called N-case, it does a

18   similar thing, it can analyze the images.  Another is by

19   a company call Magnet Forensics which makes a product

20   called IEF or Internet Evidence Finder.

21   Q.   Okay.  So as you were starting to use that forensic

22   tool to look at the forensic image of the computer, how

23   do you know first off what you're looking at, the image,

24   is the same as what was actually on the hard drive?

25   A.   Part of the imaging process also generates what's

1    known as a hash value and it's a series of letters and

2    numbers, it's a unique identifier that's a series of

3    letters and numbers, and it's also known as a digital

4    fingerprint, it basically ensures -- I can have that

5    hash value at the beginning and at the end of the

6    examination to confirm that none of the data changed

7    over the course of that exchange.

8    Q.   Okay.  And is that generated as part of that

9    process?

10   A.   It is.

11   Q.   Okay.  Can you, um -- can you generate a hash or

12   hash the image as you're going forward after you've done

13   additional types of exams to make sure you're still

14   looking at the same stuff?

15   A.   You can, you can verify it as often as you want.

16   The only problem with verifying it is time.

17   Q.   What do you mean by that?

18   A.   It just takes, um, depending on the size of your

19   data set, um, it could take anywhere from 8 hours to

20   overnight.  So you might not have an instantaneous

21   answer.

22   Q.   Okay.  Is the hashing of, um, forensic images of

23   hard drives part of the standard procedure at the FBI?

24   A.   Yes, it is.

25   Q.   Is that standard within the traditional procedures

1    of the community?

2    A.  Yes, it is.

3    Q.  Now I'd like to talk about your involvement in this

4    particular investigation.

5         So in August of 2015, were you working as a

6    digital forensic examiner in the Boston group?

7    A.  Yes, I was.

8    Q.  And were you personally involved in an investigation

9    involving a search warrant execution at 64 Plymouth

10   Drive in Norwood, Massachusetts?

11   A.  Yes, I was.

12   Q.  Okay.  What was your role on the scene on that day?

13   A.  I was there in the capacity of a forensic examiner

14   and the purpose was to preview digital devices that the

15   search team found on-site.

16   Q.  Okay.  Were you the only digital forensic examiner

17   there?

18   A.  I was not.

19   Q.  Who was the other or others there?

20   A.  Megan Hartwell.

21   Q.  Okay.  Does she still work at the FBI?

22   A.  She does not.

23   Q.  Okay.  Apart from Ms. Hartwell, were there -- you

24   said there were search teams.  Who else was there?

25   A.  There were additional FBI agents and task force

1    officers from local police departments.

2    Q.  Now you said you were there to preview some of the

3    devices.  Did you actually do that while you were there?

4    A.  I did.

5    Q.  And were you assigned to preview any particular

6    devices on the scene?

7    A.  I was.

8    Q.  And what were those devices generally?

9    A.  Sure.  There were two thumb drives, two external

10   hard drives, an HP Envy laptop, a Toshiba tablet, three

11   DVDs, and an MP 3 player.

12   Q.  Okay.  Were those the only devices that were, um,

13   found on-scene by the search team?

14   A.  No, there were others.

15   Q.  Did Ms. Hartwell, to your knowledge, preview any of

16   the other devices?

17   A.  Yes, she did.

18   Q.  And when you two were working, can you describe for

19   us sort of where you were working in the apartment

20   during the time periods of the search?

21   A.  Sure.  There was a coffee table in the living room

22   and that's where we were kind of stationed and set up

23   for the day.

24   Q.  Okay, so the two of you were there together in the

25   same place?

1    A.   Yes.

2    Q.   And were you communicating with each other

3    throughout the course of your work there on the scene?

4    A.   Yes, we were.

5    Q.   And, I'm sorry, did you tell us what Ms. Hartwell

6    had to do on the scene?

7    A.   I did not.

8    Q.   What did she do?

9    A.   I would be happy to.

10        Ms. Hartwell, she previewed an HP Pavilian laptop,

11   a Motorola cell phone, a Toshiba tablet, and a Verizon

12   tablet.

13   Q.   Okay.  So let's talk about the devices that you

14   yourself previewed, um, starting with the laptop that

15   you previewed.

16   A.   Sure.

17   Q.   Well I should say were you able to preview it?

18   A.   I was not.  Oftentimes on a scene the disassembly of

19   a computer may be more involved than we would

20   necessarily want to get involved with on-site, so we

21   brought that back to the lab to preview and examine.

22   Q.   Okay.  Were there any other devices that you were

23   unable to preview?

24   A.   Um, the Toshiba tablet and we were -- the interview

25   team learned from the subject that it was broken.  So I

1    was unable to preview that as well.

2    Q.   Okay.   Were you able to preview the other devices

3    that you mentioned?

4    A.   I was.

5    Q.   And did you find anything, um, let's say of concern

6    given the nature of your investigation there?

7    A.   I did not.

8    Q.   Okay.   To your knowledge was Ms. Hartwell able to

9    get the hard drive out of the laptop that she had been

10   assigned to preview?

11   A.   Yes, she was.

12   Q.   And was that disassembly photographed?

13   A.   Yes, it was.

14              MS. PARUTI:   Could I have Exhibit 12, please.

15              (On screen.)

16   Q.   Okay.   And do you have that on your screen, sir?

17   A.   I do.

18   Q.   And what is that in that picture?

19   A.   That was the, um, HP laptop.

20              THE COURT:   Wait.   Wait.

21              (Jury turns on screens.)

22              THE COURT:   It's on now?

23              THE JUROR:   Yes, it is now.

24              THE COURT:   And thank you for bringing it to

25   our attention.

1            Go ahead.

2    Q.   Which laptop is that, sir?

3    A.   That was the HP laptop that Ms. Hartwell previewed.

4    Q.   Okay.

5            MS. PARUTI:  Exhibit 15, please.

6            (On screen.)

7    Q.   And what does this exhibit show you?

8    A.   It shows us after the back panel has been removed

9    from the laptop.

10   Q.   Okay.  Can you see where the hard drive is actually

11   in that photograph?

12   A.   I can.

13   Q.   Okay.  If you could actually touch your screen, draw

14   a circle or some other indication of where it is, could

15   you do that?

16   A.   (Draws.)

17   Q.   Perfect.

18            MS. PARUTI:  And for the record it's in the

19   bottom portion of the image.

20   Q.   And is that --

21            MS. PARUTI:  And it's Exhibit 13, please.

22            (On screen.)

23   Q.   Now, was the hard drive actually, um, was

24   Ms. Hartwell able to get to the hard drive?

25   A.   She was.

 1   Q.  And what does the photograph show?

 2   A.  And so it shows -- at the top of that exhibit it

 3   shows where the battery was and it shows at the bottom

 4   in that same location that the hard drive is now

 5   removed.

 6   Q.  Okay.

 7          MS. PARUTI:  Exhibit 14, please.

 8   Q.  Now this is just a close-up of the top of that, is

 9   that correct?

10   A.  Yes.

11   Q.  Is there a section here where you can see the serial

12   number where the battery is -- the compartment where the

13   battery is stored?

14   A.  Yes.

15          MS. PARUTI:  And can you pull that up, okay,

16   Ms. Johnson ?  Thank you.

17   Q.  And can you read the serial number there?

18   A.  I can.

19   Q.  Okay, go ahead.

20   A.  It's CNF 0486 LTZ.

21   Q.  Okay.  So the last three letters "LTZ," that's the

22   serial number of the, um, older HP laptop, correct?

23   A.  Correct.

24   Q.  And when you, um -- as you -- well we'll come back

25   to that.

1          Can you also see in this exhibit where the laptop
2     was manufactured, is it typically written on the machine
3     itself?
4     A.  Um, yes, it is.
5              MS. PARUTI: Ms. Johnson , can I have you just
6     zoom in on that same section where you were earlier.
7              (Zooms in.)
8     Q.  Can you see there this product, the serial number?
9     A.  Yes, I can.
10             MS. PARUTI:  Your Honor, at this point the
11    parties have a stipulation that's been marked as Exhibit
12    15.  I don't know if the Court prefers us to just read
13    it or just refer to it there?
14             THE COURT:  No, that's fine.  Maybe I can read
15    it, because I'm going to give an instruction about it
16    and I believe I have a copy here.  Let's see.
17             MS. PARUTI:  Thank you, your Honor.  I'm happy
18    to approach if you need an additional copy.
19             THE COURT:  Why don't you.
20             MS. PARUTI:  Sure.
21             (Hands to judge.)
22             THE COURT:  Yeah.  So I told you that there
23    are different sources of evidence.  One source is the
24    testimony of witnesses.  It's entirely up to you whether
25    you believe a witness, disbelieve a witness, believe

1    part of what a witness says.  Another source of evidence

2    is exhibits, and we've seen photographs and the like,

3    but again it's up to you whether you believe them or

4    disbelieve them.

5          A stipulation is different, a stipulation is an

6    agreement of the parties that certain facts are in fact

7    facts, and here there is a stipulation.  And while I'm

8    going to read it, remember I'm not a source of the

9    evidence, but since they agree, it's permissible for me

10   to read this.  And you will have this exhibit, this is

11   Exhibit 16.  This is a special exhibit because no one

12   disputes this.  This is agreed.  And here it is.

13         "Stipulation of the parties concerning interstate

14   or foreign commerce.  The United States of America and

15   the defendant, Alex Levin, hereby stipulate and agree

16   that the HP laptop computer lawfully seized from the

17   defendant's residence was manufactured outside the

18   Commonwealth of Massachusetts and therefore moved

19   through interstate commerce."

20         So stipulated, Ms. Paruti?

21               MS. PARUTI:  Yes, thank you, your Honor.

22               THE COURT:  So you do.

23         So stipulated, Mr. Carney?

24               MR. CARNEY:  Yes, sir.

25               THE COURT:  Very well.  So that's a

1   stipulation, they agree to it, and it's part of the

2   evidence that everyone agrees.

3        At the same time so central and powerful is your

4   role as jurors, I tell you you can disregard this if you

5   wish.  But I'm also telling you everyone agrees to this.

6        Now, why is this important, why does the

7   government especially want to pin this down?  Because

8   Congress, under its commerce clause in the Constitution,

9   can legislate the limits of the commerce clause.  So I

10  didn't say this before and I should have.  So when they

11  are defining "child pornography," it's got to be child

12  pornography that moves or has moved or, through the

13  instrumentalities of the internet , moves in interstate

14  commerce.  That's why the agreement.

15       Go ahead, Ms. Paruti.

16            MS. PARUTI:  Thank you, your Honor.

17  Q.  So once that hard drive has been removed from the

18  computer, what were the next things that happened to it?

19  A.  In the imaging that --

20  Q.  In the preview.

21  A.  I'm sorry.  Um, so she would have used one of our

22  forensic tools to preview or to start looking at the

23  contents of that hard drive.

24  Q.  Okay.  Um, and on-scene what is the software that

25  you use?

1    A.   Frequently we will use what's called FTK Imager or

2    Forensic Tool Kit, also made by Access Data.   Another

3    tool that we'll use on-site is called OS Triage.

4    Q.   And to your knowledge did Ms. Hartwell find anything

5    relevant to the investigation on the scene on that

6    preview?

7    A.   Yes, she did.

8    Q.   What specifically?

9    A.   There were seven videos and one picture file

10   depicting child pornography.

11   Q.   And what did she do with those files?

12   A.   She exported them from the data sets and copied them

13   to a DVD.

14   Q.   Okay.   So when you say "exported them," what do you

15   mean?

16   A.   Um, when a device is connected to our forensic

17   laptop, um, you do a process called "exporting," which

18   is basically copying it from that hard drive to another

19   device, in this case a DVD.

20   Q.   Okay.   Um -- excuse me.   After that on-scene

21   preview, what happens to that device in particular?

22   A.   It was seized by the search team.

23   Q.   Okay.   And where did it go?

24   A.   It went back to the Boston division in our evidence

25   control room.

Q.  Okay.  Now, um, were the other devices that you
mentioned on-scene also seized?

A.  Yes, they were.

Q.  And were those also transported to the lab and
logged as evidence?

A.  Yes, they were.

Q.  Now, at some point following that on-scene preview,
was that LTZ, the older laptop, was that further
examined by members of the FBI?

A.  Yes, it was.

Q.  Okay.  Who are the individuals who further examined
that laptop?

A.  Megan Hartwell examined it.  I, as well, examined
it.  And then members of the investigative team also
reviewed data on that to include Task Force Officer
Michael Sullivan, whom you just heard from.

Q.  Okay.  Was anyone else given access to the image of
that hard drive?

A.  Um, defense counsel and their expert, their forensic
expert as well.

Q.  Okay.  Now have you done -- in the course of your
review of that or further examination of the data on
that image, have you done anything to verify that what
you have looked at in the course of your role was the
same that was taken from the scene on that day?

1    A.  Yes, I also had gone through that hashing process

2    that I talked about earlier to verify that the same data

3    set exists and nothing has been changed since back in

4    2015.

5    Q.  Okay.  Now, um, Special Agent Phelps, would it be

6    fair to say that you -- well why don't you tell me.

7    When did you actually, what year or years, did you

8    actually review evidence from that image?

9    A.  2019.

10   Q.  Okay.  So when you examined it in, um, 2019, did you

11   use any particular forensic tools or software to do

12   that?

13   A.  I did.  I followed up on what Ms. Hartwell had done,

14   which she used a number of tools to include AV Lab,

15   Internet Evidence Finder, and Registry Viewer.

16   Q.  Okay.  So, um, when you went to view the image, you

17   had told us about the processing, how you hook it up to

18   the write blocker and then you mount -- well, and then

19   you use the forensic tool.  Had that already been done

20   by Ms. Hartwell?

21   A.  Yes, it had been done.

22   Q.  Okay.  So when you came to examine it, what did you

23   do to be able to actually look through the data that was

24   there?

25   A.  The case still existed on our forensic network so I

1    was able to view the data in AV Lab and her processing

2    also existed for IEF, so I was able to just open the

3    data set and continue analyzing it.

4    Q.  So what does this forensic tool you're talking

5    about, the AV Lab, what does it actually do so that you

6    can look at the data or information that's on that

7    image?

8    A.  Um, so within data sets, um, the files have

9    categories, oftentimes it's by file extension, and so it

10   can, um, separate based on file extension and make it

11   easy to review specific types of files.  In this

12   particular case obviously we were interested in child

13   pornography, so of interest would be picture-type of

14   files or video-types of files, and the software makes it

15   easier for us as examiners to be able to go to specific

16   data sets.

17   Q.  Okay.  Are you also able to see general information

18   about the computer itself?

19   A.  We are, and within registry files, so, Windows, um,

20   generates what are known as registry files, and it

21   contains information about users, um, devices plugged

22   into that computer.  When Windows was installed, um,

23   network information -- all of that is kept track of

24   within these registry files, and Windows does so to

25   enhance the user experience, to make it easier for when

1   the user wants to go back to data.

2   Q.   Okay.   In the forensic tool that you used in the AV

3   Lab, is there a way for the program or the tool to be

4   able to sort of flag things that are of interest to you

5   like pictures or videos or other data?

6   A.   There is.

7   Q.   What do you call that in that program?

8   A.   We call that creating a bookmark.   So similar to if

9   you use a browser and you would create a bookmark to be

10  able to go back to a specific website, it allows us to

11  go back to a specific location within the data set to

12  view that file again.

13  Q.   Okay.   So I want to be very clear.   When you're

14  using the AV Lab or the forensic tool to look at this

15  stuff and to create bookmarks, are you changing anything

16  on the image of the computer?

17  A.   We are not.

18  Q.   Okay.   You're just creating it in your program?

19  A.   Correct.   It uses what's called a database, um, and

20  all of the data that we do, such as creating a bookmark,

21  is housed within that database, and not the original

22  date set.

23  Q.   If multiple people are using or working in that same

24  tool to look at, um, the data that's contained in the

25  forensic image of your computer, um, are they able to

1   see what each other has bookmarked?

2   A.  Yes, they are.

3   Q.  Okay.  Can you -- and you said you examined the

4   computer in 2019.  Is it fair to say Ms. Hartwell

5   examined it before you?

6   A.  Yes, she did.

7   Q.  Were you personally able to see things that

8   Ms. Hartwell bookmarked in the program?

9   A.  Yes, I was.

10  Q.  Okay.  So let's walk through some of the data of the

11  image that you actually saw.

12       First off, did you see anything in the, um, in the

13  information of the image that pointed to the user of

14  this computer?

15  A.  Yes, I saw that there was one user-defined user and

16  that was titled Alex.  There were three other user

17  accounts on the machine, but those are generated by

18  Windows as you're installing it, one is an administrator

19  user, a guest user, and, um, a home user group.

20  Q.  Okay.  So let's back up for a second.  Where is it

21  that you actually saw that image?

22  A.  My first indication was in a folder called "users"

23  and within that folder was Alex.

24  Q.  But -- so you had mentioned earlier registry files

25  --

1    A.   Uh-huh.

2    Q.   -- and you said that was dated as the computer

3    generates it to keep track of what's going on?

4    A.   Sure.

5    Q.   Was that information typically within any of those

6    particular registry files?

7    A.   It was.

8    Q.   What was the name of that particular registry file?

9    A.   There is a file called "Sam," which is a security

10   accounts manager and it keeps track of accounts on that

11   particular computer.

12   Q.   Okay.  Now, um, are you able to, or were you able

13   to, I should say, export any data from your exam related

14   to that particular registry file?

15   A.   I was.

16   Q.   And how did you do that?

17   A.   So within Registry Viewer we're able to select

18   information of interest, and so I was able to, um,

19   select those user accounts and display that information.

20   Q.   Okay.  And when you display that, can you then print

21   the information?

22   A.   Yes.

23   Q.   And is that wholly computer generated?

24   A.   Yes, it is, it's generated by the program.

25   Q.   Okay.

1        MS. PARUTI:  Madam Clerk, could we please show

2   an item just for the witness please.

3        And, Ms. Johnson , could we please have Item 17,

4   which is marked b for identification.

5             (On screen.)

6   Q.  Sir, do you recognize this?

7   A.  I do.

8   Q.  What do you recognize it to be?

9   A.  That is the registry report of the Sam file.

10  Q.  And is that the one that was generated by the

11  computer?

12  A.  By my computer, yes, ma'am.

13  Q.  Thank you.

14             MS. PARUTI:  Your Honor, at this point I'd

15  offer this registry report as the next numbered exhibit.

16             THE COURT:  Any objection?

17             MR. CARNEY:  May we see you at the sidebar,

18  please?

19             THE COURT:  Yes.  Bring a copy.

20

21             AT THE SIDEBAR

22             THE COURT:  All right.  Now, um, I'm paying

23  attention but I don't see -- let's just start with why

24  this is relevant?

25             MS. PARUTI:  It's relevant because it is a

1    report that was generated by a computer that documents

2    certain information about the particular computer, which

3    is relevant to this case, including --

4              THE COURT:  What?

5              MS. PARUTI:  So, for example, the information

6    about the user, about when it was --

7              THE COURT:  Well, where's that?

8              MS. PARUTI:  So I would have the witness walk

9    through it, but there are portions, um, which I have

10   written down in my notes, that show the user accounts

11   and actually -- so the one named "Alex," he mentioned,

12   as you heard, but other user accounts that were in

13   there, there's documentation in here that shows, for

14   example, when they were logged onto, when they were

15   installed, and things like that, which is relevant here

16   given that knowing -- that knowing element is what

17   Mr. Carney is primarily challenging.

18             THE COURT:  No, I'm following.

19        So for on Page 3 of 6, you've focused me on

20   something called "Sam domains account users"?

21             MS. PARUTI:  Uh-huh.

22             THE COURT:  And down below the user name is

23   "Alex"?

24             MS. PARUTI:  Uh-huh.

25             THE COURT:  I see the relevance of that.

```
1                    MS. PARUTI:  Uh-huh.

2                    THE COURT:  And that's what you want here?

3                    MS. PARUTI:  So if there's --

4                    THE COURT:  Whenever you set up a computer --

5      believe me I don't know, but I -- but my impression is,

6      having done this a few times, you have to set up a few

7      accounts to get your computer to work, and he so

8      testified.

9                    MS. PARUTI:  Uh-huh.

10                   THE COURT:  Now what you're interested in is

11     the data that's in the accounts that work?

12                   MS. PARUTI:  Uh-huh.  That were accessed.

13                   THE COURT:  That were accessed, that were

14     used?

15                   MS. PARUTI:  Uh-huh.

16                   THE COURT:  So I agree that whatever those

17     user names, it's relevant.

18                   MS. PARUTI:  Uh-huh.  There's other

19     information that -- and I don't realize -- and I

20     understand if you think other things should be redacted,

21     and we haven't had that specific conversation, but, um,

22     there are other portions of this where I would expect,

23     for example, the witness to say that there was never any

24     logon to the computer under any of the other user

25     accounts, only the Alex user accounts.  So, for example,
```

1    you can set up a guest account, but that was --

2              THE COURT:  And he's so testified.

3              MS. PARUTI:  Uh-huh.

4              THE COURT:  All right.  Well it's Mr. Carney's

5    objection, so we ought to hear his objection.

6              MS. PARUTI:  Uh-huh.

7              THE COURT:  And let's hear his objection.

8              MR. CARNEY:  Mr. Gaudet will be handling it.

9              MR. GAUDET:  Yes.  My primary objection is to

10   what we raised yesterday, which is the fact that this

11   exhibit, as well as several others, were late

12   disclosures, and so we're renewing the objection to it.

13             THE COURT:  And that's perfectly appropriate.

14             MR. GAUDET:  I don't disagree with the

15   relevance having been explained to me.

16             THE COURT:  I understand.  Why don't we let

17   him -- are you okay with this?  I'll let him take C for

18   identification, but because it's confusing.  Now I'll

19   let him explain it, and that will get her where she

20   wants to go, subject to your cross-examination, but we

21   won't introduce it, it will just be C.

22             MR. GAUDET:  Understood.

23             THE COURT:  And that will focus us on what's

24   relevant there.

25             MS. PARUTI:  Can it be just read to the jury?

1           THE COURT:  No, let him explain it and we'll

2    see.  You're having everything pretty much your own way.

3    So we'll do it like that.

4           MS. PARUTI:  Thank you.

5

6           (In open court.)

7    Q.  Okay, sir, so you said that there were -- there's

8    multiple accounts that you can see in that Sam registry

9    file.  You mentioned a user-defined account and what was

10   that user-defined account named?

11   A.  "Alex."

12   Q.  When we say a "user-defined account," what do we

13   mean by that?

14   A.  That the person who's setting up Windows at that

15   time actually entered that as the user name.

16   Q.  Okay.  And were there any other user-defined

17   accounts?

18   A.  No.

19   Q.  You mentioned some other nonuser-defined accounts.

20   Do you remember what the name of those were?

21   A.  I do.

22   Q.  What were those again?

23   A.  "Administrator," "Guest," and "Home User Group."

24           THE COURT:  Do I understand that those names

25   are supplied by the computer manufacturer and are set up

1    when you set up your computer originally?

2             THE WITNESS:  Yes, your Honor, by Windows.

3             THE COURT:  By Windows?

4             THE WITNESS:  Yes.

5             THE COURT:  So here we're talking about --

6    this is a Microsoft Windows application?

7             THE WITNESS:  Yes.

8             THE COURT:  All right.

9    Q.  And are those ones that are set up by Windows

10   typically used?

11   A.  No, they're typically not used.

12   Q.  Okay.  Do you recall what you could see about the

13   Alex profile -- do you recall generally certain

14   information you could see about the Alex profile?

15   A.  Yes.

16             MS. PARUTI: Ms. Johnson , could I have it just

17   for the witness.

18             (On screen.)

19   Q.  What do you see -- what do you see about the Alex

20   profile?

21   A.  Um, I can see the last password change time, the

22   last logon time, um --

23   Q.  Can you see whether it was -- the account was

24   password protected?

25   A.  Yes, at the very bottom where it says "password

1  required," it says "true."

2  Q.  Okay.  So this was password protected?

3  A.  Correct.

4  Q.  Okay.  What else could you tell -- what else could

5  you tell about, um, using the password on this

6  particular machine?

7  A.  Windows also gives the ability to provide a hint in

8  case you can't remember your password.

9  Q.  Okay.  And were you able to see whether there was a

10  password hint included in that registry data?

11  A.  Yes, I was.

12  Q.  Okay.

13        THE COURT:  Let me just explain to the jury,

14  so there's no mystery here.  The lawyers and I have

15  looked at this report.  I find it confusing.  So my

16  ruling just in administering the case is that this

17  fellow can testify about it and we'll see what data she

18  wants out of this larger, and in my mind, confusing

19  report, and we'll get that before you, and we'll see

20  what the cross-examination is.

21        Now if I go back to it and think that you have to

22  look at the reports yourself, well, they can argue that.

23  But for now let's follow what the witness says rather

24  than going page by page through this report.  What I do

25  is not rocket science, I do the best I can.  But that's

1    why.  Don't think anything's being withheld from you.

2          Go ahead, Ms. Paruti.

3                MS. PARUTI:  Thank you, your Honor.

4    Q.  What do you see about the other profiles?

5    A.  On it -- excuse me.  On it it says right in

6    "description" that they're built-in accounts.

7    Q.  Okay.  And could you see whether or not there had

8    ever been any login under those accounts?

9    A.  Yes.

10   Q.  Okay, and was there or not?

11   A.  There were not.

12   Q.  Okay.

13   A.  Could you tell --

14               THE COURT:  Well, again, just so -- and I'm

15   slow.

16         You said usually these accounts are set up when

17   the computer's set up and usually people don't use them,

18   and in this case, on this computer that we're concerned

19   with, it appears that they were never used?

20               THE WITNESS:  That is correct.

21               THE COURT:  Go ahead.

22   Q.  Could you tell when the Alex profile, or when it was

23   installed in this particular machine?

24   A.  Yes, I can.

25   Q.  Could you tell us what date that was?

1    A.   On December 11th, 2011 -- no, 2010.  I'm sorry.

2    Q.   Okay.  Now within the Alex, um, profile, the user

3    profile on that machine, um, were you able to see data

4    that had been registered?

5    A.   Yes, I was.

6    Q.   Okay.  Generally what types of data could you see

7    under the Alex profile?

8    A.   There were documents, um, Word documents, PDF files,

9    there were --

10   Q.   What other types of files or data did you see on

11   there?

12   A.   There were, um, some personal pictures, there were

13   also child pornography pictures and videos, as well as,

14   um, like his resumes and, um, information related to

15   bitcoin money.

16   Q.   Okay.  Could you see any programs that had been

17   installed on the machine?

18   A.   I could.

19   Q.   Let's focus first on the pictures and videos.  Where

20   generally within the user account Alex did you find

21   pictures and videos?

22   A.   Under "Documents."

23   Q.   So --

24            THE COURT:  Well, let's just -- the stuff

25   that's on a computer, in my ignorant approach to it,

1    you've been listing the categories of "stuff," if that's

2    a fair way to say it, right?

3                THE WITNESS:  Yes.

4                THE COURT:  All right.  Now when she says

5    pictures in one category, your conclusion was that some

6    of these files are child pornography, but you also said

7    there's photographs of his children and personal

8    photographs, things like that?

9                THE WITNESS:  Yes, that's correct.

10               THE COURT:  When she uses the word "pictures

11   and video," what do you think she's -- I'm unclear as to

12   the question and the jury needs to know, "pictures and

13   videos" are what type of files to you?

14               THE WITNESS:  Ones that either show a picture

15   on the screen or that it's, you know, a series of

16   pictures linked together that strung together makes a

17   video, a moving picture.

18               THE COURT:  All right.  So under that broader

19   -- this computer now, under that broader, um, statement

20   is the depictions that you say are child pornography and

21   also are the personal photos, is that right?

22               THE WITNESS:  Yes, sir.

23               THE COURT:  Go from there, Ms. Paruti.

24               MS. PARUTI:  Thank you.

25   Q.  Did you observe a certain file structure within the

1    user account wherein different pictures and videos were

2    contained?

3    A.  Yes, I did.

4    Q.  Okay.  And you mentioned that you saw certain files

5    that you thought contained child pornography, correct?

6    A.  Yes, I did.

7    Q.  Did you see those files that you thought were child

8    pornography in any particular folders?

9    A.  I did.

10   Q.  Okay.  Can you just list the different folders, if

11   you recall them, where you found evidence of what you

12   thought was child pornography?

13   A.  I can.  One was Frostwire, one was Shiraza, another

14   was Incomplete.

15   Q.  Okay.  Thank you.

16        While reviewing the contents of the image drive

17   using that forensic tool, um, have you captured exactly

18   what you were looking at?

19   A.  I did.

20   Q.  How did you do that, make that exact picture

21   captured?

22   A.  I used screen shots from within the forensic tool

23   that I was using to show the exact file path to make it

24   easier for everyone here today to be able to see what

25   that path looked like.

1   Q.   And what's the specific tool, what's that?

2   A.   It's called Sniffing Tool, which again is within

3   Windows, and it's just taking exactly that, a screen

4   shot showing exactly what I saw on my own screen.

5   Q.   Okay, so when you're using your forensic tool to

6   view the, um, the data that's in that image to the

7   computer, um, are you looking at it in a particular

8   format?  How does the tool set it up for you to view it?

9   A.   Yes, it views it as it looked like on the user's

10  computer and I can click through the folder structure

11  exactly as I would on my own computer.

12  Q.   Okay.  So --

13              THE COURT:  In other words the structure is

14  identical to the computer that we're concerned with

15  here?

16              THE WITNESS:  Yes, that's correct.

17              THE COURT:  Let me also say generally, um, I

18  told you I didn't know anything about this case until it

19  starts and that is in fact true.  Well one of the things

20  we find out from the openings, though their openings

21  aren't evidence, is that Mr. Carney admits that certain

22  data here is child pornography.  Now he's got every

23  right to admit that, after talking with his client, and

24  I'm taking him at his admission.  So I've told the

25  lawyers we don't really have to view those exhibits

1   which he admits are child pornography, they're going to

2   be exhibits, you're going to have them, you have every

3   right to view them, but I don't need to get into the

4   careful definitions because he admits they're child

5   pornography.  What's disputed here is knowing

6   possession.  So I'm taking it that he admits that we've

7   got certain exhibits that are child pornography.

8        Now, we're going to give everyone a chance to put

9   on every bit of evidence that has to do with knowing

10  possession, so we may need to learn and we are learning

11  about computers and the like.  Understand you'll have

12  the actual exhibits that I take it are admitted to be

13  child pornography under the legal definition, but I

14  think we can save some time, we don't have to go over

15  each one.

16       Go ahead, Ms. Paruti.

17            MS. PARUTI:  Thank you.  Could I please show

18  just to the witness, um --

19  Q.  I'm showing you what's been marked for

20  identification as d.  Do you recognize what's before

21  you?

22  A.  I do.

23  Q.  Okay.  What does this screen show?

24  A.  That is a screen shot depicting the folder that I've

25  described, Frostwire.

Q.   Okay.  And is this screen shot a screen shot that
you took when you were looking, um, at the data as you
would see it reviewing it from your computer?

A.   Yes.

Q.   Is this an exact copy of what you saw when you were
looking through?

A.   Yes, it is.

Q.   And, um, you told us that this actually, what you're
looking at here, actually reproduces how the folder
structure looked in the user's computer, correct?

A.   That is correct.

          MS. PARUTI:  At this point I move to admit
what's been marked d as the next numbered exhibit.

          THE COURT:  Um, I'm not -- it's in this folder
here, d?

          MS. PARUTI:  It is.  I can bring it up, your
Honor.

          THE COURT:  No, no, it may not be necessary.

          (Pause.)

          MR. GAUDET:  Your Honor, we have no objection.

          THE COURT:  No objection to d.  What's the
next number?

          (Pause.)

          THE COURT:  All right.  Thank you.  The Clerk
knows, it's 18.  All right, d for identification, is 18

1  in evidence.

2                (Exhibit 18, marked.)

3                MS. PARUTI:  Thank you.  May it be published

4  to the jury, your Honor?

5                THE COURT:  It may be.

6                (On screens.)

7  Q.  Okay.  Now that everybody has it on their screen.

8       Now, can you just explain to us all what we're

9  actually looking at here?  And if you need to circle

10  certain areas, you can do that so we know what to look

11  at.

12  A.  Okay.  So upon looking at that and some of the items

13  have been bookmarked and so this showed me that these

14  are in the Frostwire folder.

15  Q.  Let me back up for a second.  I'm circling something

16  here which is the upper left-hand.

17  A.  Yes.

18  Q.  Do you see that?

19  A.  Yes.

20  Q.  What does that actually show us, what are we looking

21  at here?

22  A.  That shows us the folders that are actually on the

23  user's computer.

24  Q.  Okay.

25                MS. PARUTI:  So if we could just blow up the

1    left panel, please.  Okay.

2    Q.  Now you see it a little bit closer.  I see a file or

3    a name that says "Frostwire" that's highlighted.  Is

4    that the name of a folder?

5    A.  It is.

6    Q.  Okay.  And these other names, there's folder icons,

7    is it fair to say that those are also folders?

8    A.  Yes.

9    Q.  Okay.  Did all of these folders exist on the image

10   of the hard drive that you saw?

11   A.  Yes, they did.

12   Q.  Okay.

13             MS. PARUTI:  You can take that down now.  Now

14   if we blow up the bottom panel.

15             (Blows up.)

16   Q.  What is this that we're looking at?

17   A.  These are files that are within the Frostwire

18   folder.

19   Q.  Okay.  And so what in this particular view, what can

20   you see about these files?

21   A.  Um, so I can see the file extensions.

22   Q.  Okay, is that over on the right-hand side?

23   A.  Yes, over on the right-hand side.

24   Q.  Okay.  And what's a file extension?

25   A.  A file extension is what the computer system uses to

1    determine what the file type is and what program it

2    might use to open that file.

3    Q.  Okay.  So, for example, the first one there is AVI.

4    What kind of a file is an AVI file?

5    A.  That is a video file.

6    Q.  What about JPG?

7    A.  That is a picture file.

8    Q.  What about MPG?

9    A.  That is also a video file.

10   Q.  Okay.  So do you see the file extension?  Can you

11   see the file name?

12   A.  I can.

13   Q.  Okay.  And then you'll see on the left-hand side

14   there's a number of check-offs.  What do the checks in

15   the boxes indicate?

16   A.  Those are ones that we selected and, um, by

17   selecting them it allows us to export them, and that was

18   done in this case, they were exported and copied to the

19   DVD.

20   Q.  Okay.  So --

21            MS. PARUTI:  Now we can clear that.

22   Q.  Now is there a place on this screen, the screen you

23   were looking at when you were examining the computer,

24   where you can see the file path of the particular folder

25   that you've highlighted?

1  A.  I can.

2          MS. PARUTI:  Blow that up, please.

3          (Blows up.)

4  Q.  And starting from the end, with the password, so

5  Frostwire, is that the name of the folder you have

6  highlighted?

7  A.  That is the name of the folder.

8  Q.  What does that backslash indicate?

9  A.  That indicates that it's another folder, a subfolder

10 within a folder.

11 Q.  Okay.  So the folder inside is called "program

12 files"?

13 A.  Yes.

14 Q.  Okay, and then it keeps going like that until you

15 get to the drive essentially?

16 A.  Exactly.

17 Q.  Okay.  Now, um, are you familiar with, um, the word

18 "Frostwire," the name "Frostwire"?

19 A.  Yes, I am.

20 Q.  Okay, what do you recognize that to be?

21 A.  As a peer-to-peer file-sharing program.

22 Q.  Okay.  And what's just basically -- what's a peer-

23 to-peer file-sharing program?

24 A.  It allows users to have that same program on their

25 computer, um, to be able to selectively share or

1  download, um, files from other users, also using that

2  same program.

3  Q.  Okay.  And were these the items that we blew up the

4  files, were those all of the files that were contained

5  within the Frostwire folder on the image of the hard

6  drive?

7  A.  Yes, that is correct.

8  Q.  Okay.  And you said you had checked some of them and

9  that you could export them -- not export them, excuse

10 me.  Did you in fact export all of the checked files

11 there?

12 A.  Yes, I did.

13 Q.  And what generally is contained within the checked

14 files?

15 A.  Child pornography.

16 Q.  Okay.  And when you exported them, did you

17 subsequently copy them to a disk that we could use for

18 purposes of this trial?

19 A.  Yes, I did.

20          MS. PARUTI:  May I approach, your Honor?

21          THE COURT:  You may.

22 A.  (Hands.)

23 Q.  Sir, I'm handing you a disk.  Could you just look at

24 it if you need to take it out to see what it is.  But

25 can you tell us what that is?

1    A.   This is a disk that, um, was created at the U.S.

2    Attorney's Office, it's a copy of the disk that I

3    entered into evidence after copying the files over, and

4    I know it to be so because I initialed the disk when we

5    generated that at the U.S. Attorney's Office.

6    Q.   Okay, and did you view all of those -- it's fair to

7    say there's 13 files on here?

8    A.   That's correct.

9    Q.   Did you review all 13 of the files?

10   A.   Yes, I did.

11   Q.   And are those the same files that you copied from

12   the image of the hard drive?

13   A.   Yes, I did.

14             MS. PARUTI:   Your Honor, at this point I'd

15   move what's been premarked as e for identification into

16   evidence as a numbered exhibit.

17             THE COURT:   Which is 90?

18             MS. PARUTI:   17.

19             THE COURT:   17.

20             MR. GAUDET:   No objection.

21             THE COURT:   E for identification is admitted

22   as Exhibit 17.

23             (Exhibit 17, marked.)

24             MS. PARUTI:   Could we have that exhibit for

25   the witness, please.

1              (On screen.)

2    Q.  Okay.  Do you see that on your screen, sir?

3    A.  Yes, I do.

4    Q.  And what is that, I should say?

5    A.  This is another screen shot, it's within the

6    Frostwire folder again.

7    Q.  Okay.  And this has been, for the record, marked for

8    identification as f.

9         And is this an exact copy of what you were viewing

10   on your screen as depicted information to the AV Lab?

11   A.  Yes, it is.

12              MS. PARUTI:  Your Honor, at this point I'd

13   move to admit this as the next numbered exhibit.

14              THE COURT:  And that is?

15              MS. PARUTI:  19.

16              MR. GAUDET:  No objection.

17              THE COURT:  No objection.  It's admitted in

18   evidence as Exhibit 19.

19              MS. PARUTI:  May it be published?

20              THE COURT:  It may be published.

21              (Exhibit 19, marked.)

22   Q.  Okay.  We're looking at the first checked file, if

23   you would look at that.

24              MS. PARUTI:  Blow that up.  Thank you.

25   Q.  Do you see the highlighted title?

1    A.   I do.

2    Q.   Okay, and is that one of the files that you exported

3    to the disk that was just marked as Exhibit 17?

4    A.   Yes, it was.

5    Q.   Would you read us the name of that file please.

6    A.   "2010 PTHC baby shivid frifam 5 YO Sally gets fucked

7    by Daddy (very excellent).AVI".

8    Q.   Did you read -- excuse me.  Did you view that

9    particular file?

10   A.   Yes, I did.

11          MS. PARUTI:  With the Court's permission, at

12   this point I would ask to have the witness read a

13   description of the file rather than playing it.

14          THE COURT:  Well he may read a description

15   briefly.

16          MS. PARUTI:  May I approach, your Honor?

17          THE COURT:  You may.

18   Q.   This video is 1 minute and 20 seconds in length, it

19   begins with text that reads, "wild and only 5."  The

20   video then shows a prepubescent girl using two sex toys

21   on and in her genitals.  Another screen appears with

22   text that reads "my daughter at 5."  The video then

23   shows an adult male straddling and apparently having

24   intercourse with the child from behind.  Another screen

25   appears with text that reads "slamming a 6 year old."

1    The video then shows an adult male having sexual

2    intercourse from behind with a young female child laying

3    face down on a bed.  Another screen appears to read,

4    "daddy and me at 6."  The video then shows a naked adult

5    male laying on his back having sexual intercourse with a

6    young girl who he positioned on top of him.  Another

7    screen appears with text that reads, "my niece at age

8    4."  The video then shows an adult male having sexual

9    intercourse with a prepubescent child -- child.  Excuse

10   me.  Another screen displays text that reads "my

11   daughter at 5."  The video then shows an adult male

12   having sexual intercourse with a prepubescent child

13   while they're lying on their sides.

14   Q.  Okay, sir, if we could have you look at the exhibit

15   that's on the screen.

16          MS. PARUTI:  We'll just blow up all the file

17   names.

18   Q.  As you were going through your examination of all of

19   these files in the computer image on the computer, what

20   if anything did you notice about the names of the files

21   that you --

22   A.  There are frequently, um, words for or acronyms

23   associated with, um, whether pictures or videos

24   depicting child pornography, in this case "PTHC,"

25   "falco," "kiddie porn," "Lolita," and those are

```
 1   frequently, like I said, things associated with the
 2   child pornography files.
 3   Q.  And in the course of your work as a regular Special
 4   Agent and a digital forensic examiner, have you had the
 5   opportunity to see and review other files of child
 6   pornography outside of the context of this
 7   investigation?
 8   A.  Yes, I have.
 9   Q.  And through that experience have you come to
10   understand what the abbreviations, for example, "yo"
11   when it's paired with a number means?
12   A.  "Years old."  Or PTHC, "preteen hard core."
13   Q.  Okay.  So let's move on.
14        You mentioned another folder where you found
15   images or videos, um, that appear to depict child
16   pornography, um, and you called it "Shiraza"?
17   A.  Yes.
18   Q.  Are you familiar with, um, "Shiraza" generally?
19   A.  Yes, ma'am.
20   Q.  What does that mean to you?
21   A.  "Shiraza" is another peer-to-peer file-sharing
22   software.
23   Q.  Okay.  When you were reviewing that folder that had
24   "Shiraza" in the title of it, did you take screen shots
25   of what you were viewing?
```

1    A.  I did.

2              MS. PARUTI:  Can we show just the witness

3    please that.  For the record, this is g for

4    identification.

5              (On screen.)

6    Q.  What is that exhibit, sir?

7              THE COURT:  Well, you haven't offered it yet.

8    Go ahead.

9              MS. PARUTI:  Thank you.

10   Q.  So what is this document that's labeled g for

11   identification?

12   A.  This is another screen shot and it is of the

13   incomplete folder within Shiraza.

14   Q.  Okay.  Is that an exact copy of what you were

15   looking at as you were reviewing the data from your --

16   A.  Yes, it is.

17             MS. PARUTI:  At this point I would mark in

18   evidence as the next numbered exhibit or actually as the

19   Exhibit 20.

20             THE COURT:  G is admitted in evidence as

21   Exhibit 20.

22             MS. PARUTI:  And may it be published?

23             THE COURT:  It may be.

24             MS. PARUTI:  Thank you.

25             (Exhibit 20, marked.)

Q.  Okay.

            MS. PARUTI:  If we could blow up the left

panel please.

Q.  Is this the folder structure, sir?

A.  Yes, it is.

Q.  Okay.  And, um, you can see a highlighted folder

that says "Incomplete," correct?

A.  Correct.

Q.  Is that Incomplete folder within another folder?

A.  Yes, it's within the Shiraza folder.

Q.  Okay.  Now, um, did that -- seeing that Incomplete

as a subfolder of this folder that's located with the

file-sharing software, was that significant to you in

any way?

A.  It tells me that potentially the program could not

download the entire file, for whatever reason, whether

the user machine shut off or the machine where the file

was being retrieved from was shut off or it lost

connection and was not able to download the entire

thing.

Q.  Okay.  Now, despite that, were you able to actually

view any files within that folder?

A.  Yes, I was.

            MS. PARUTI:  If we could blow up the bottom

panel, please.

1              (Blows up.)

2   Q.  Okay, we've blown up the bottom panel.  Are these

3   the files that were included in that Incomplete folder

4   within the Shiraza folder?

5   A.  Yes, they are.

6   Q.  And now could you see the file extensions in this

7   screen?

8   A.  Yes, I can.

9   Q.  And is that in the same location?

10  A.  Yes.

11  Q.  Okay.  Do you see the, um, pink files?

12  A.  I do.

13  Q.  Okay.  The first one starts with ED 2k?

14  A.  Yes.

15  Q.  And then there's one down at the bottom that's also

16  checked that starts with TTR?

17  A.  Correct.

18  Q.  Okay.  What is the file extension for those?

19  A.  .partial.

20  Q.  Okay.  And what does that mean?

21  A.  Um, again that the entire file was not downloaded.

22  Q.  Okay.  Would the fact -- well let me ask you this.

23  Were you able to actually play those videos?

24  A.  Yes, I was.

25  Q.  Or those files, I should say?

```
 1    A.   Yes.

 2    Q.   Um, and what kind of files were those .partial

 3    files?

 4    A.   They were video files.

 5    Q.   Were you able to actually view the videos within the

 6    file?

 7    A.   Yes, I was.

 8    Q.   Okay.  And what did you do note, um, when you viewed

 9    those two, the ED 2k and the TTR file?

10    A.   Um, they appeared to be the same file and they were

11    at various stages of download.

12    Q.   Okay.  What makes you say that they appeared to be

13    the same file?

14    A.   They both start the same way, um, and I could see --

15    and it depicted the same girl in the file.

16    Q.   Okay.  And you said they both started the same way.

17    Do you remember how long that file was?

18    A.   It was about 40 -- I don't recall it, have a -- I

19    don't know if I'm able to look at the sheet?

20    Q.   We'll get to that.  But again about how much?

21    A.   About 49 minutes, I believe it was.

22    Q.   Okay.  And were both of the files the same length?

23    A.   They did both have the same time on the timer.

24    Q.   Uh-huh.

25    A.   I don't know if they played exactly the same
```

1    amounts.

2    Q.   Okay.  Were you able to see, um, the content or

3    significant portions of the content of both of the

4    files?

5    A.   Yes, I did.

6    Q.   Okay.  Now --

7              MS. PARUTI:  Yes, please.

8              (On screen.)

9    Q.   Is there anything on this screen that you're looking

10   at, um, that your forensic tool shows you, um, that

11   tells you whether or not they were actually the exact

12   same file?

13   A.   The hash value, as we talked about earlier, if they

14   were the exact same file, then you'd expect it to have

15   the same hash.

16   Q.   Okay.  And did these have the same hash?

17   A.   They did not.

18   Q.   Okay, and what did that tell you?

19   A.   That they were not exactly the same.

20   Q.   Okay.  Now did the two checked files, the ED 2k and

21   the TTR files, um, did you export those files as well?

22   A.   Yes, I did.

23   Q.   Okay, and are they included on the disk that we've

24   marked as Exhibit 17?

25   A.   Yes, they are.

```
1    Q.  Okay.
2            MS. PARUTI:  Your Honor, at this point may the
3    witness just describe one of the files that are labeled
4    "TTR"?
5            THE COURT:  He may, briefly.
6    Q.  Okay, sir, briefly you can read your description.
7    A.  This video is 49 minutes and 22 seconds in length.
8    It depicts a young girl who begins fully clothed and
9    then undresses over the course of several minutes.  When
10   she undresses, a gloved adult hand removes her g-string
11   underwear and the camera focuses on her prepubescent
12   genitals.  At various points in the video the adult and
13   the child use their fingers and various objects on and
14   into the child's genitals including a glass object and a
15   hot dog.  A portion of the video is unplayable, several
16   minutes into it, but the video later resumes.  After the
17   adult continues manipulating the child's genitals, he
18   inserts the hot dog into her anus.  At the end of the
19   video, the child urinates and defecates over a tub.
20   Q.  Let's move on, sir, to this -- excuse me, the next
21   file over that you identified earlier in your testimony,
22   um, that you identified as the Incomplete folder as one
23   that you found that you believed to be child
24   pornography?
25   A.  Correct.
```

1    Q.  Okay.

2            MS. PARUTI:  Yes, that one.  And just for the

3    witness, please.  Thank you.

4    Q.  Sir, do you see what's marked h for identification

5    on your screen?

6    A.  I can.

7    Q.  And what is that?

8    A.  That is the Incomplete folder.

9    Q.  But what is the actual --

10   A.  Oh, I'm sorry, it's a screen shot of my screen in

11   the lab showing the Incomplete folder.

12   Q.  Okay.  And is that an exact duplication of what you

13   saw?

14   A.  Yes, it is.

15           MS. PARUTI:  Your Honor, at this point I would

16   ask to move it into evidence as Exhibit 21.

17           THE COURT:  No objection?

18           MR. GAUDET:  No objection.

19           THE COURT:  It may be received as Exhibit 21.

20           MS. PARUTI:  And may it be published please?

21           THE COURT:  It may be.

22           (Exhibit 21, marked.)

23   Q.  Okay.

24           MS. PARUTI:  So please blow up the upper left

25   panel.

1    Q.   Okay.  Can you describe the whole structure here

2    about where you found it?

3    A.   This was also in the user's Alex folder and then,

4    um, I don't have the exact path up there.

5    Q.   Okay.  What do we see in the visualized folder

6    structure, what can we see about where it is?

7    A.   It's under virtual storage, yes.

8    Q.   Okay.

9                MS. PARUTI:  So just highlighting, um, on the

10   screen.

11   Q.   Is that just one folder that you've marked on your

12   screen and submitted as the Frostwire folder?

13   A.   Correct.

14   Q.   Okay.

15   A.   But not within the Frostwire folder.

16   Q.   Okay, thank you.

17        What do you notice about the other folders that

18   you can see here on the screen, about what types of, um

19   -- strike that.

20        You said that Frostwire is a program, correct?

21   A.   Correct.

22   Q.   Okay.  And do you recognize the names of other

23   programs that have folders in this particular area?

24   A.   I do.

25   Q.   Okay, what are some of the ones you recognize as

1    being related to this program?

2    A.  I recognize Leapfrog as like a child-learning

3    device, um, Motorola, um, frequently associated with

4    either cell phones or possibly tablets or communication

5    devices, um, and the TOR browser.

6    Q.  Okay, what is TOR browser?

7    A.  Um, TOR is used to access the dark web, it's a

8    browser, um, and it uses Mozilla's Firefox to access the

9    dark web.

10   Q.  Okay.  So reviewing some terms here, just to be

11   clear for the record.

12       So "browser," that's a browser, but could you give

13   some examples of some we might be familiar with?

14   A.  Sure, there's several, Explorer, Mozilla Firefox,

15   um, Google Chrome, um, ways that we would access the

16   internet.

17   Q.  Okay.  And what's different about the TOR browser as

18   compared to those other browsers?

19   A.  The TOR browser allows users to access the internet

20   anonymously.

21   Q.  Okay, and it also allows users to access the dark

22   web?

23   A.  Correct.

24   Q.  Okay.

25              MS. PARUTI:  So let's collapse that please and

1    blow up the file please.

2              (On screen.)

3              MS. PARUTI:  Thank you.

4    Q.  So this is the file path that you had mentioned,

5    sir, correct?

6    A.  Correct.

7    Q.  Okay.  So you can -- so this is within the Alex

8    profile, correct?

9    A.  Yes.

10   Q.  All right.

11             MS. PARUTI:  Let's take that down.  Now this

12   one.

13   Q.  These blown up within the bottom panel of the

14   screen, are these all of the files that were within that

15   Incomplete folder under the program file?

16   A.  Yes, they are.

17   Q.  Okay, and have some of them been checked?

18   A.  Yes, they have.

19   Q.  Have you viewed all of the files that have been

20   checked?

21   A.  Yes, I have.

22   Q.  And did you export those files?

23   A.  Yes, I did.

24   Q.  Are those all contained on Exhibit 17?

25   A.  Yes.

1   Q.   Thank you.  And why is it that you exported those

2   particular files?

3   A.   They contained child pornography.

4   Q.   Okay.  And now just look at one of them.

5           MS. PARUTI:  If I could have the screen just

6   for the witness please.

7           (On screen.)

8   Q.   So I'm explained to you what's been marked 5 for

9   identification, sir.  Do you recognize, um, what has

10   been laid before you?

11   A.   Yes, I do.

12   Q.   What is it?

13   A.   It's a screen shot of my screen of my computer in my

14   lab.

15           MS. PARUTI:  And at this point, your Honor,

16   I'd like to move this into evidence as Exhibit 22.

17           THE COURT:  No objection?

18           MR. GAUDET:  No objection.

19           THE COURT:  It may be received, Exhibit 22.

20           MS. PARUTI:  May it be published please?

21           THE COURT:  It may be.

22           (Exhibit 22, marked.)

23           MS. PARUTI:  And just blow up the file.

24   Excuse me.  Highlighted by this.

25           (Blows up.)

1    Q.  And so we've enlarged there the name of one of the

2    files there that you have reviewed, could you read the

3    file name for the record, please.

4    A.  I can, it's "t-484550766-new pedo PTHC 6 YO 2011

5    friend 3 (excellent) trade only for ultraprivate (great)

6    Three exclamations."

7    Q.  Okay.  And what kind of a file is that?

8    A.  It's a video file.

9    Q.  And did you watch that video file?

10   A.  I did.

11          MS. PARUTI:  And with the Court's permission

12   would you please just read a very brief description of

13   that video.

14          THE COURT:  Well he doesn't have to read it,

15   he can characterize it.  Use your own words

16   characterizing it.

17   A.  Um, it is child pornography.

18   Q.  All right.  And what does it include?

19   A.  It's a 4- to 6-year-old girl sitting on top of an

20   adult male masturbating his erect penis.  It's about 53

21   seconds in length.

22   Q.  Okay.  Now that particular folder, um, that file is

23   within Incomplete -- it's within the Incomplete folder,

24   correct?

25   A.  That is correct.

1   Q.  All right.  Were you able to -- I think you said it

2   went for about 53 seconds.  Did it appear to you that

3   that was the complete file?

4   A.  It did not, it appeared there was more.

5   Q.  But nonetheless you were able to see what you just

6   described?

7   A.  Correct.

8   Q.  And could you tell how long the actual file appeared

9   to be?

10  A.  I could not.

11  Q.  Okay.  Thank you.

12       Now apart from, um, all these child pornography

13  files, did you observe any other evidence of child

14  pornography that existed on the hard drive image when

15  you viewed it?

16  A.  I'm sorry, did you say other pictures?

17  Q.  You talked about the files.  Were those 13 files,

18  those were the child pornography files that you

19  exported, correct?

20  A.  Correct.

21  Q.  Did you find additional items or data on the

22  computer that, um, were somewhat related to child

23  pornography?

24            MR. GAUDET:  Objection.

25            THE COURT:  No, overruled.  You may answer.

1    A.   Yes, I did.

2    Q.   What was that?

3    A.   Link files.

4    Q.   Okay.   What is a "link file"?

5    A.   A "link file" is basically a shortcut.   So again

6    earlier I mentioned how Windows tries to enhance the

7    user's experience while they use Windows, and if you

8    open a file, Windows thinks you may want to open that

9    again at a later time, so it creates what's known as a

10   "link time" which points to that original file's

11   location.   And it will show up in a recent folder.   So

12   if you click the recent folder, that item will be there

13   with the title of the file name allowing you quicker

14   access to it.

15             THE COURT:   So let me see if I understand.

16   This link file gets you to a folder that gives you the

17   title of a folder you may be looking for, is that --

18   that's not accurate, correct?

19             THE WITNESS:   It's not accurate.

20             THE COURT:   All right, that's fine, your

21   testimony is the testimony.

22        So tell me again then what kind of file this is.

23   Tell the jury.

24             THE WITNESS:   It is actually known as a

25   shortcut file, so it is just a pointer to that file, and

```
 1   by clicking the link file it will cause that file to
 2   open.
 3   Q.  And --
 4              THE COURT:  So --
 5              MS. PARUTI:  Go ahead.  Sorry, your Honor.
 6              THE COURT:  I just want to try to get up to
 7   date here.
 8          So when you click on this link or shortcut folder,
 9   the folder that the machine thinks you're -- the machine
10   doesn't think, but mechanically the folder to aid the
11   user takes you to the linked file and opens it?
12              THE WITNESS:  That is correct.
13              THE COURT:  Thank you.
14          Ms. Paruti, go ahead.
15   Q.  So by way of example, um, can you give us an example
16   of how this works with a Word document or something
17   we're all familiar with?
18   A.  That's exactly the one I was thinking of, um,
19   because Word documents frequently do that.  So if you
20   have a Word document open and are working on it, um, and
21   you save it, Windows will remember that file name and
22   allow you to easily get back to it from the recent
23   folder.
24   Q.  Okay.  So you have your actual document that's saved
25   somewhere and then you said the shortcut is generated,
```

1    and the link file is the shortcut?

2    A.   That is correct.

3    Q.   Okay.  And people -- can you see the link file, if

4    you're just a regular user, on your computer or do you

5    see the document itself?

6    A.   You can see link files on your computer.  There is a

7    folder titled "recent" and it will have link files

8    within it.

9    Q.   So when you open that up and you click on a link

10   file, it would bring you or it should bring you to the

11   actual document, correct?

12   A.   Correct.

13   Q.   So what does the existence of a link file tell us

14   about a particular document in that?

15   A.   It tells us that that file was open on that

16   particular computer.

17   Q.   Okay.  Were there specific link files that drew your

18   attention?

19   A.   Yes, there were.

20   Q.   Okay.

21              MS. PARUTI:  Can we show just the witness, um,

22   24, please.

23              (On screen.)

24   Q.   Okay.  You have what's labeled k for identification

25   in front of you, is that the defendant's screen shot?

```
 1    A.  Yes, it is.

 2    Q.  Is that an exact duplication of what you observed

 3    when you were looking at this particular part of the

 4    computer?

 5    A.  Yes, it is.

 6              MS. PARUTI:  Your Honor, at this point I would

 7    move to admit this as Number 24.

 8              THE COURT:  Is there any objection?

 9              MR. GAUDET:  Yes, we object.

10              THE COURT:  All right, I think this is a good

11    place to stop and we'll talk about it.

12              Ladies and gentlemen, I said we'd stop now and we

13    will.  You have not heard all the evidence, but we're

14    right on track.  And tomorrow now we'll start right at

15    9:00 and hopefully we can get through the evidence.  But

16    it's pretty clear we're not going to get through that

17    and the arguments and charge, so we're looking to next

18    Wednesday the 29th.  But we'll need you here tomorrow

19    now, the 22nd, at 9:00 and we'll run the normal morning

20    session.

21              You have not heard all the evidence, please

22    therefore keep your minds suspended, do not discuss the

23    case either among yourselves nor with anyone else.  You

24    may stand in recess until tomorrow at 9:00 a.m.

25              The jury may recess.
```

```
 1                THE CLERK:  All rise for the jury.

 2                (Jury leaves, 1:30 p.m.)

 3                THE COURT:  You may step down, sir.  Thank

 4      you.

 5           Is it K for identification?

 6                MS. PARUTI:  I'm sorry, your Honor.

 7                MR. GAUDET:  Yes, it's K, KL and portions of

 8      M.

 9                THE COURT:  All right.  And, um, is it

10      "Gaudet" or "Gaudet," how do you --

11                MR. GAUDET:  "Gaudet."

12                THE COURT:  "Gaudet."  You're "Gaudet."  All

13      right.

14                MR. GAUDET:  People have been pronouncing it

15      that way for years.

16                THE COURT:  Well, that's, um -- (Looks.)  All

17      right.  So I have K here.

18           And let me -- so now we have this shortcut file

19      and the file itself, um -- oh, I see, over here in the

20      lower, um, the right -- no, the left-hand corner,

21      there's at least, um, one title that I suppose you could

22      argue is, um, inculpatory of child pornography.  Is that

23      right?

24                MR. GAUDET:  Right, it's the second and third

25      items in the list.
```

```
 1              THE COURT:  Right.
 2              MR. GAUDET:  The one that's highlighted and
 3    the one directly below it.
 4              THE COURT:  Right, that's what I was looking
 5    at.  All right.  And why ought she not get that?
 6              MR. GAUDET:  Essentially it's the same
 7    objection we raised earlier, which is that the actual
 8    contents of the whatever file that the link file is
 9    linked to are unknown.  I mean at best we can infer or
10    guess based off of what the name in the file is, but the
11    government cannot establish what the contacts of the
12    original file were.
13              THE COURT:  That's what I wanted to be sure
14    of.
15         And that's right, Ms. Paruti, all we know is we
16    have this somewhat ambiguous, um, title, but arguably it
17    refers to child pornography?
18              MS. PARUTI:  And I think that's the key, I
19    think it's arguable.
20              THE COURT:  No, I understand.  I think I've
21    got the argument.
22         Now let's see.  He -- and I appreciate you all
23    being ready here.  So we have another -- do you want to
24    get L in too?
25              MS. PARUTI:  Yes, and L -- and if it's easier,
```

1   I know the type is really small and --

2              THE COURT:  No, no, I'm not embarrassed to

3   pore over it with my poor eyes.  But so over here in the

4   same area we have one that has -- again it would be in

5   the same position and the same two files have suggestive

6   titles, correct?

7              MS. PARUTI:  Correct, there's actually four

8   titles there, just for clarity sake.

9              THE COURT:  Oh, yes.

10             MS. PARUTI:  Then I would draw the jury to --

11             THE COURT:  Oh, yes.  And skipping down to the

12  one that begins "pretty."

13             MS. PARUTI:  Yes.  So incest set --

14             THE COURT:  Right, I see two of those.  And

15  then down to "pretty"?

16             MS. PARUTI:  And then also there's one that's

17  titled "Alex," underscore, "Current 2014," which I would

18  anticipate is similar in naming convention to other

19  resumes and WORD documents that were found on his

20  computer, and I think that's important to draw the

21  jury's attention to because it shows -- again it's the

22  element that's being challenged here is knowing -- um, I

23  think the fact that there's a file open named "Alex"

24  and, um --

25             THE COURT:  No, your point is you want to

```
 1    argue that this tends to show he went to that file and
 2    it's logical he'd go to a file that his resume on it?
 3                  MS. PARUTI:  Correct.
 4                  THE COURT:  All right.  And a portion of M?
 5                  MR. GAUDET:  Yes, and I can identify the
 6    specific pages.
 7                  THE COURT:  And I appreciate it.  Mr. Gaudet,
 8    where is it here?
 9                  MR. GAUDET:  The pages in M are Pages 1, 2, 3,
10    and 5.
11                  THE COURT:  (Looks.)
12                  MR. GAUDET:  And specifically on Page 1 at the
13    very bottom, the very last line.  And Page 2 there are a
14    number of examples.
15                  THE COURT:  Well, Page 2, I see some that I
16    would look at -- I don't -- the very last line?
17                  MR. GAUDET:  The very last line on Page 1, it
18    says "P3 W0 M3 image" -- I think it could perhaps be a
19    woman or women.
20                  THE COURT:  Oh, I see.  All right, I see it.
21    And then what's on the third page?
22                  MR. GAUDET:  On the third page in the middle?
23                  THE COURT:  Oh, yeah, where it says
24    "4-year-old son" and then the --
25                  MR. GAUDET:  Correct.
```

1           THE COURT:  Well really the middle section has

2    --

3           MR. GAUDET:  Right, there are several.

4           THE COURT:  All right.

5           MR. GAUDET:  And then the final example is on

6    Page 5, um, it's in the middle, "pretty babysitter," et

7    cetera.

8           THE COURT:  Yes, thank you.

9        Well I'm disposed to admit only those pages, but

10   to admit those pages, um, and naturally save your

11   rights.  I think it goes to the weight, not the

12   admissibility.

13          MR. GAUDET:  If the Court --

14          THE COURT:  I'll hear you.

15          MR. GAUDET:  No, no, I understand.  I'm just

16   asking that our objection be noted.

17          THE COURT:  It may be noted.

18       So that's all we're getting are those particular

19   pages.

20          MS. PARUTI:  Can I be heard further on that?

21          THE COURT:  I thought you were doing pretty

22   well there.  What else do you want?

23          MS. PARUTI:  So those -- and I appreciate

24   that.

25       There are other portions of this, um, that

```
 1    document information that I expect Agent Phelps to
 2    testify about at a different point in his testimony, he
 3    doesn't have much further to go, but, for example, on
 4    Page 6, you'll see and he would explain that the
 5    registry file actually it breaks it out into text files,
 6    and then on Page 6, the bottom category, the bolded one,
 7    it says "word wheel query."  And so that's a section
 8    where the system documents searches that are performed
 9    on the hard drive.  And so I think that that also is
10    highly relevant of knowledge and again I --
11              THE COURT:  But what do we learn from those
12    searches?
13              MS. PARUTI:  So, for example, you'll see each
14    number, in the left-hand column there's a number, and
15    then it has --
16              THE COURT:  Wait a minute, I was with you, and
17    on the bottom --
18              MS. PARUTI:  Let go to page -- I think what
19    probably makes the most sense is if you look at Page,
20    um, 7, for example, and this is obviously not an
21    inculpatory search term, but if you look at about the
22    middle of the page you see "Twitter."  So I expect Agent
23    Phelps would say that this information from the system
24    registry tells me that a user of this computer searched
25    -- one of the more recent searches was for Twitter.
```

```
1              THE COURT:  Actually I don't see it, so I need
2     to see it.  Page 7?
3              MS. PARUTI:  On Page 7, if you look at the
4     left-hand column there's numbers.
5              THE COURT:  I see them.
6              MS. PARUTI:  Do you see the number is 54?
7              THE COURT:  I -- um --
8              MS. PARUTI:  You see it goes down?
9              THE COURT:  Oh, I see.  Yes.
10             MS. PARUTI:  And then you see, um, it just has
11    representations in it.
12             THE COURT:  Oh, "Twitter."  I see it.  I see
13    it.
14             MS. PARUTI:  That means somebody searched the
15    computer for "Twitter," for that term.
16             THE COURT:  Can't you find that same protocol
17    on one of the pages I have admitted?
18             MS. PARUTI:  No, because that information is
19    only documented in that section.  And I realize it's a
20    lot of text and I'm happy to have -- I mean I think he
21    can testify to that, that's fine, um --
22             THE COURT:  Then let's stick with the pages
23    I've admitted and I will let him testify to that.
24             MR. GAUDET:  If I may?
25             THE COURT:  Wait.  Wait.  Wait.  I want to see
```

```
 1        that she's satisfied and then you can detract from it.
 2                MR. GAUDET:  All right.
 3                MS. PARUTI:  So my preference obviously is to
 4        be able to refer to an exhibit itself, so when I'm
 5        showing -- I think there's one thing about hearing
 6        information, but for some people it's much easier to see
 7        it written down.
 8                THE COURT:  The problem is, um, you know,
 9        under 403, the material is confusing, so I've given you
10        each of the pages on which there is circumstantial
11        evidence from which you can argue.  Also, he can testify
12        rather simply as to the protocol.  I think that's the
13        most understandable way.  So we'll stick with that for
14        the moment.
15            What's the matter with that, Mr. Gaudet?  I've
16        saved your rights, but what am I missing now?
17                MR. GAUDET:  So I don't have a specific
18        objection to the portions Ms. Paruti's referring to.
19                THE COURT:  Oh, you don't.
20                MR. GAUDET:  No.  And if the Court's going to
21        admit --
22                THE COURT:  So I take back what I said.  So
23        you get Page 7 because --
24                MS. PARUTI:  Well, I mean I don't think we
25        care if he searched for Twitter, what's more important
```

1    is other search terms that he used.  I was just using

2    that as an example for the Court.

3                THE COURT:  Well how many pages am I going to

4    put in here, how many pages do you want?

5                MS. PARUTI:  Honestly, your Honor, for me the

6    visual is more important, so as long as I'm able to

7    reproduce those words in an exhibit -- not in an

8    exhibit, but in a demonstrative aid to use in closing

9    for the jury, then it doesn't matter to me that those

10   portions, the "WORD wheel query" portion of this report

11   is actually admitted.  But there are several -- there

12   are words like "PTHC" on Page 12 which --

13               THE COURT:  Well then I guess I should admit

14   the whole thing.

15       And you have no objection to that?

16               MR. GAUDET:  No, I would suggest that if the

17   Court's going to admit a portion of it, then the entire

18   document should go in.

19               THE COURT:  Therefore, um, hearing those

20   representations, I'm admitting Exhibit M in its

21   entirety.  So I'm admitting K.  I'm admitting L.  And

22   I'm admitting M in its entirety.

23       Now, what numbers go with these exhibits?

24               (Pause.)

25               THE COURT:  The Clerk knows.  We'll let the

```
1    Clerk announce them, so my notes --
2               THE CLERK:  K is Exhibit 24.
3               THE COURT:  All right.
4               THE CLERK:  L is Exhibit 25.  And M is Exhibit
5      26.
6               (Exhibits 24, 25, and 26, marked.)
7               THE COURT:  All right, we'll follow that
8      protocol.  And the defense's rights are saved, saved for
9      its concession that having -- its rights are saved to my
10     admitting anything, but since I admit or ruled that part
11     of M, now Exhibit 26, is in evidence, it suggests that
12     the whole thing come in.
13          Correct, Mr. Gaudet?
14              MR. GAUDET:  Correct.
15              THE COURT:  So that's the Court's ruling.
16     9:00 tomorrow.
17              MS. PARUTI:  Can I just raise one thing that
18     might streamline it tomorrow?
19              THE COURT:  Well I would too, and while I
20     didn't say it to the jury, I'm probably going to have to
21     bail out of the here tomorrow at 12:15, 12:20, but it
22     shouldn't be a problem, and I'm not crowding you.
23          But how can you streamline it?
24              MS. PARUTI:  Okay.  The other exhibits that I
25     have identified by letter are other screen shots of what
```

```
1   Agent Phelps saw and/or items that were exported from
2   the computer.  I noted that counsel didn't object to any
3   of those today.  So if we can agree that they won't be
4   objected to, that way we can get sort of that beginning
5   step.
6              THE COURT:  Well why don't -- we come back on
7   the bench at 2:00 p.m., so why don't you talk to him.
8   If it's agreed, you can convey that to Ms. Gaudet with
9   the numbers and we'll just proceed that way.
10             MS. PARUTI:  Okay.  But I have to be in front
11  of Judge Burroughs at 2:00, so can we work out our
12  problems --
13             THE COURT:  Oh, but that's what I meant.
14             MS. PARUTI:  Oh, great.
15             THE COURT:  Much as I enjoy a trial, and I'm
16  certainly enjoying you wonderful attorneys, I didn't
17  expect you to come back.
18             MS. PARUTI:  Thank you.
19             THE COURT:  I'll come back.
20             MS. PARUTI:  Yes, thank you.
21             THE COURT:  All right.  We'll stand in recess
22  until 9:00 tomorrow morning.  We'll recess.
23             (Adjourned, 1:45 p.m.)
24
25
```

1            C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5    hereby certify that the forgoing transcript of the

6    record is a true and accurate transcription of my

7    stenographic notes, before Judge William G. Young, on

8    Tuesday, May 21, 2019, to the best of my skill and

9    ability.

10

11

12

     /s/ Richard H. Romanow 06-25-20
13   _____
     RICHARD H. ROMANOW   Date
14

15

16

17

18

19

20

21

22

23

24

25