1                   UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3                                No. 1:15-cr-10271-WGY

4

5

6    UNITED STATES OF AMERICA

7

8    vs.

9

10   ALEX LEVIN

11

12                        *********

13

14

15                 For Jury Trial Before:
                   Judge William G. Young

16

17

18                 United States District Court
                   District of Massachusetts (Boston.)
19                 One Courthouse Way
                   Boston, Massachusetts 02210
20                 Wednesday, May 22, 2019

21                        ********

22

23             REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
24                 United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
25                   bulldog@richromanow.com

```
1                     A P P E A R A N C E S

2

3    ANNE PARUTI, ESQ.
         United States Attorney's Office
4        One Courthouse Way, Suite 9200
         Boston, Massachusetts 02210
5        (617) 748-3310
         E-mail: Anne.paruti.lohnes@usdoj.gov
6        For the United States of America

7

8    J.W. CARNEY, JR., ESQ.
     DANIEL J. GAUDET, ESQ.
9        J.W. Carney, Jr. & Associates
         20 Park Plaza, Suite 1405
10       Boston, Massachusetts 02116
         (617) 933-0350
11       Email: jcarney@carneydefense.com
         for the defendant
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3   WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

 4
     CLAYTON PHELPS  (Continued.)
 5
        By Ms. Paruti:          6               71
 6
        By Mr. Gaudet:                 45                 77
 7

 8   JOSEPH NICHOLLS

 9      By Mr. Carney:          81              132

10      By Ms. Paruti:                 99                133

11
     ALEX LEVIN
12
        By Mr. Carney:         135
13
        By Ms. Paruti:
14

15
                         E X H I B I T S
16

17         EXHIBIT 24 .....................   7

18         EXHIBIT 27 .....................  28

19         EXHIBIT 28 .....................  30

20         EXHIBIT 29 .....................  34

21         EXHIBIT 32 .....................  35

22         EXHIBIT 34 .....................  37

23         EXHIBIT 36 .....................  39

24         EXHIBIT 37 .....................  40

25         EXHIBIT 38 .....................  44
```

```
 1                P R O C E E D I N G S
 2               (Jury enters, 9:00 a.m.)
 3               THE COURT:  Good morning, ladies and
 4     gentlemen, thank you so very much for being here right
 5     on time.  I know the traffic's bad.  I deeply appreciate
 6     it.  Because you're right here right on time, they're
 7     all ready to go.  And we can proceed.
 8          Would you remind the witness.
 9               THE CLERK:  I'd like to remind you, sir, that
10     you're still under oath.
11          Do you understand?
12               THE WITNESS:  I do.
13               THE COURT:  And, Ms. Paruti, you may proceed.
14               MR. CARNEY:  Your Honor, may we see you
15     briefly at sidebar?
16               THE COURT:  You may.
17
18               AT THE SIDEBAR
19               MR. CARNEY:  Your Honor, I would ask you to
20     reconsider the ruling that you made allowing the
21     government to show the, um, videos to the jury and have
22     them go to the jury room.  I base my objection on the
23     well-known Supreme Court case of *Old Chief* where the
24     Court held that a district judge abused his discretion
25     when he spurned the defendant's offer to admit evidence
```

1    or stipulate that one of the elements of the crime was

2    met, but instead allowing evidence to go into what was

3    the prior --

4            THE COURT:  I'm familiar with **Old Chief** and I

5    stand on my ruling.  It is an appropriate ruling.  Your

6    rights are saved.

7            MS. PARUTI:  May I ask your Honor that at some

8    point, it occurred to me -- my only concern is that the

9    jury heard me in my opening and I don't want them to --

10           THE COURT:  I'll take care of it.

11           MR. GAUDET:  Your Honor, if I might?

12           THE COURT:  Everybody wants to talk.

13           MR. GAUDET:  I want to clarify something we

14   discussed yesterday.

15           I stated, in the discovery item that's been

16   entered as Exhibit 26, the registry report, that we did

17   not have a specific objection to the search warrant

18   terms in this report.  I would like to clarify that we

19   do still object to this, that we received it late, it

20   was received on Thursday.

21           THE COURT:  I understand it, and the record

22   should show it, but I stand on my ruling.  And your

23   rights are saved.

24           You're going to cross-examine this witness?

25           MR. GAUDET:  Yes.

```
 1                 THE COURT:  It's a little previous.
 2                 MR. CARNEY:  What?  I'm sorry.
 3                 THE COURT:  My comment this morning is a
 4      little previous.
 5           Is Mr. Levin going to testify?  What do you think?
 6      Is he go to testify, um, Mr. Levin?
 7                 MR. CARNEY:  Yes, your Honor.
 8                 THE COURT:  All right.
 9
10                 (In open court.)
11                 THE COURT:  Now go ahead, Ms. Paruti.
12                 MS. PARUTI:  Thank you, your Honor.
13
14      DIRECT EXAMINATION BY MS. PARUTI:  (Continued.)
15      Q.  Good morning.
16      A.  Good morning.
17      Q.  When we left off yesterday we were talking about --
18      you were just going to explain to the jury what a "link"
19      file is.  So just to start us off today, would you
20      remind us what a "link" file is?
21      A.  It's basically a shortcut file that Windows creates
22      that points back to the original file and you can click
23      it and it will go back to that file.
24      Q.  Okay.  And what's the significance of a link file
25      with respect to the name of the document -- the target
```

1  document, or what does it tell us about a target
2  document?
3  A.  Um, it will be named the same, but it will have
4  ".lrk" at the end instead of the original target file
5  extension.
6  Q.  And are link files created for every single document
7  that resides on a computer?
8  A.  No, they're created for the ones that were open on
9  the computer.
10  Q.  Okay.
11          MS. PARUTI:  Could we show the witness and all
12  parties actually what's been marked and admitted as
13  Exhibit 24, please.  And it should have been put up on
14  your screens.
15          (Jurors pull screens up.)
16  Q.  Okay.  Mr. Phelps, do you see what's on the screen
17  before you?
18  A.  I do.
19          MS. PARUTI:  And it's marked now as k for
20  identification.  I'd like to have it moved into evidence
21  as Exhibit 24.
22          (Exhibit 24, marked.)
23  Q.  What is it that we're looking at here?
24  A.  This is a screen shot from when I was viewing the
25  recent folder on my exam machine.

1    Q.  Okay, and, um, where did you locate --

2              MS. PARUTI:  Can we blow up the bottom half

3    please, the bottom panel, please.

4              (Blows up.)

5              MS. PARUTI:  Okay.

6    Q.  Now the highlighted file there in blue, can you read

7    the title?

8    A.  "1.pedowoman-ampersand herdoggie.lnk."

9    Q.  ".lnk," what does that mean?

10   A.  That is the file extension for link files.

11   Q.  Okay.

12             MS. PARUTI:  You can collapse that.

13   Q.  And were you able to -- can you tell us please, by

14   the file path, where you found this link file?

15   A.  This was in the Alex profile ap, data roaming

16   Microsoft Windows recent, and then the file name for

17   that link file.

18   Q.  Okay.

19             MS. PARUTI:  And collapse that.

20   Q.  Now, are you able to tell from this view of the data

21   what kind of a file this is?

22   A.  In the right panel where it says the file extension

23   of the local path of the target file, it's .avi, which

24   is a video file.

25   Q.  Okay.  So .avi means it's a video file?

```
 1    A.  Yes.

 2    Q.  Okay.  And were you able to actually locate the

 3    target file --

 4              (Interruption by juror.)

 5              THE COURT:  All right, you would like a

 6    recess?

 7              THE JUROR:  Yes.

 8              THE COURT:  We will take a recess.  Ms. Gaudet

 9    will go with you.

10         Now keep your minds suspended, do not discuss the

11    case either among yourselves nor with anyone else.  And

12    the jury may recess.  Thank you.

13              THE CLERK:  All rise for the jury.

14              (Jurors leave.)

15              (Recess, 9:50 a.m.)

16              (Jury returns, 10:00.)

17              MS. PARUTI:  I'm sorry, your Honor, may we

18    have a sidebar?

19              THE COURT:  You may.

20

21              AT THE SIDEBAR

22              THE COURT:  I thought you were about done with

23    him?

24              MS. PARUTI:  I have just those files to go

25    through that we talked about.
```

1        The reason I asked for the sidebar is because

2    Ms. Johnson, who is running the technology, is pregnant

3    and left the courtroom to use the bathroom when

4    Mr. Carney left.

5              THE COURT:  And she's not here?

6              MS. PARUTI:  She's not here yet.  Somebody

7    just ran to go get her.

8              (Ms. Johnson enters courtroom.)

9              THE COURT:  Okay.  Fine.

10

11             (In open court.)

12             THE COURT:  We have all you people, but it

13   turned out we didn't have the one person we need, the

14   person running the machine.

15        Okay, now go ahead, Ms. Paruti.

16             MS. PARUTI:  Thank you, your Honor.

17        Could we have Exhibit Number 24 on the screen.

18             (On screen.)

19   Q.  Were you able to locate the target document

20   referenced in the open file?

21   A.  I was not.

22   Q.  Why is that?

23   A.  The folder and subsequent folders and documents were

24   no longer on the image.  So following downloads, so

25   starting with "bitcoin poolstaffs," backslash,

1    "kitchens," backslash, "kitchens," backslash,

2    "1.pedawoman and her doggie," was no longer on the

3    machine.

4    Q.   Okay, so the folder downloads were there?

5    A.   Correct.

6    Q.   But none of the folders for that actual file

7    following that folder was there?

8    A.   That is correct.

9    Q.   Okay.  Was there another link file that you saw with

10   a title that was, um, indicative of child pornography?

11   A.   In the recents folder?

12   Q.   Yes.

13   A.   Yes.

14          MS. PARUTI:  Could we have Exhibit A, please.

15   It was formerly marked as "l" for identification.

16          THE COURT:  This is now in Evidence as 25?

17          MS. PARUTI:  Yes.

18          THE COURT:  Go ahead.

19          MS. PARUTI:  Thank you.

20   Q.   Now, sir, what was --

21          MS. PARUTI:  If we could just blow up the

22   bottom panel.

23          (Blows up.)

24   Q.   Looking on this, at the left here, it starts with

25   "PTHC"?

1    A.   Um-hum.

2    Q.   Could you read that file name, please?

3    A.   I can.   "PTHC" is bracketed and then "pretty

4    babysitter makes sex with 3yo little girl," parentheses,

5    "pt-br subtitles," tilda, "pedamom opva 2014 .lnk."

6    Q.   Okay.   And was that in the same location as the link

7    file you just talked to us about?

8    A.   Yes, it is.

9    Q.   Okay, and what folder was that?

10   A.   That is the recents folder.

11   Q.   Okay.

12            MS. PARUTI:   And I think actually if we can

13   open up that bottom panel again.

14   Q.   Did you see any other titles that, in your

15   experience, were indicative of child pornography in that

16   same folder?

17   A.   I do, I see two others.

18   Q.   And which ones are those?

19   A.   "Incest, set pedowoman 2010.lnk."   And the one that

20   starts with the "O" equals, equals, equals,

21   "8p3dowom3n," which I believe the threes were like Es.

22   Q.   So "pedomen"?

23   A.   Yes.

24   Q.   Okay.   Were you able to view those particular files?

25   A.   No, I was not.

Q.  Okay.  Um -- let's move on.

      Was there another place in the imaged drive, so a
copy of the computer, um, where you could see the
existence of the linked file other than in that folder
structure itself?

A.  Yes.

Q.  And where was that?

A.  In the NT user dot dat register file for a path with
the Alex profile.

Q.  Okay, so let's break that down.  So "NT user,"
what's that?

A.  It's another -- we spoke yesterday about some
registry files and it's another registry file that keeps
track of specific things per user on the machine when
there's a defined user account.

Q.  Okay, so what's the defined user account we're
talking about here?

A.  Alex.

Q.  "Alex," okay.  And so is that something that is
system-generated?

A.  It is.

Q.  Okay.  And what type of, um, information were you
able to view in that registry file?

A.  I viewed recent files that were open as well as
searches that were conducted on that actual machine, not

1    via the internet, but searches that he searches his hard

2    drive for.

3    Q.  Okay, and were you able to generate or was the

4    computer able to generate any sort of report documenting

5    that information that you saw?

6    A.  Yes, with our forensic tools it's able to generate a

7    report, and so I did so in that case.

8              MS. PARUTI:  May we have Exhibit 26, please.

9    So Exhibit 26 was previously marked m for

10   identification.

11   Q.  What is this, sir?

12   A.  This is the registry report of the NT user dot dat.

13   Q.  And does it contain that information that you just

14   told us about, the documents?

15   A.  Yes, it does.

16   Q.  In recent files?

17   A.  Recent files and the search further down.

18   Q.  Okay, let's start with the recently-opened file.

19   A.  Yes.

20   Q.  So, um -- and looking at this let's just explain, so

21   everybody's on the same page about what we're actually

22   looking at here.

23       If we're looking at that, what appears to be a

24   file path, um --

25              MS. PARUTI:  Could you blow that up, please,

1    the top of the page.

2    Q.   What does that tell us about the information that's

3    displayed in the category?

4    A.   That tells us where that -- as we get into it, there

5    will be link files, and that's where those link files

6    would have been stored.

7    Q.   Okay.  And it says "recent docs" in it.  What does

8    "recent" mean in the context of this information?

9    A.   Sure.  So, um, when you hit the "Start" button and

10   there was a folder that is "recent," and so that is what

11   that is referring to.

12   Q.   Okay.  So are those --

13              THE COURT:  Well, I heard you, I didn't

14   understand it.

15              THE WITNESS:  Okay.

16              THE COURT:  And since I didn't, maybe the jury

17   didn't.

18        Can you explain that?

19              THE WITNESS:  Sure.  Within the Windows

20   operating system there is a start button, so when you

21   hit the "start" button on Windows 7, there is a folder

22   there that is called "Recents."  And so all the talk

23   that we've been doing about linked files over the last

24   day and a half, um, that is where some of those link

25   files would be located, giving you quick access to that

1    file again.

2              THE COURT:  And does that term mean anything

3    in terms of the operation of Windows 7?

4              THE WITNESS:  (Silence.)

5              THE COURT:  Well here's what I'm getting it.

6              THE WITNESS:  I don't understand.

7              THE COURT:  Does that suggest a time within

8    which folders were in that recents, um, the folder named

9    "Recent"?  That question.

10        Do you understand mine?

11             THE WITNESS:  I do.

12             THE COURT:  Yeah.

13             THE WITNESS:  So in that recents folder, it

14   would keep the last 10 files opened, it does not specify

15   a specific time for each of those.  However, um, there

16   is a last written time to that file which would indicate

17   when the last one was open.

18             THE COURT:  Let me say it back to you, see if

19   I understand it.

20        The way Windows 7 works, it maintains the last 10

21   files opened without regard to when they were opened,

22   but it gives you the time the most recent one had been

23   open.

24        Is that accurate?

25             THE WITNESS:  It is.

1          THE COURT:  Go ahead, Ms. Paruti.

2     Q.  Okay, so you can see on this first page of this

3     report "Last Written Time" right under the file path.

4     What's the last written time that the most recently

5     opened document was opened on this particular -- in this

6     particular folder?

7     A.  March 23rd, 2015.

8     Q.  Okay.  Now you said that, um, it logs sort of the 10

9     most recent files.

10         What do these numbers mean on the left-hand column

11    here?

12    A.  When -- excuse me.  When a file is opened and it's

13    entered into the registry, it's assigned a number, and

14    so -- and they're assigned chronologically.  And so if a

15    file is opened again, Windows does not give it a new

16    number if it's already in the registry.  So hence the

17    second one listed as Number 24, but it's the second in

18    the list.  And so if you see "MRU ordered list," it

19    shows the order in which these files were recently

20    opened.  So it goes 0, 24, 4, 16, and down the line.

21    Q.  Okay.  So what you're saying is the order in which

22    they appear --

23              MS. PARUTI:  And if we flip to the next page,

24    please.  And the next page.

25    Q.  We can see that there's more than 10 files in this

1    particular file path?

2    A.   Correct.   The Windows registry, in this instance,

3    keeps track of the most 30 recently opened.   However in

4    that -- in the, um, interest of space, when it displays

5    them, when you click "start" and then "recent," it will

6    display 10.

7    Q.   Okay.

8              MS. PARUTI:   Let's go back to Page 1.

9    Q.   So these are, as we're looking at each category, the

10   top one is going to be the most recently-opened file?

11   A.   Correct.

12   Q.   Okay.   And then the numbers, um, tell us again?   I

13   just want to make sure it's clear, why are the numbers

14   not in order?

15   A.   Because Windows just recognizes that that path was

16   opened previously and does not give it a new number, it

17   just keeps it in the registry and reorders it.

18   Q.   Okay.   So, for example, the second one down, which

19   has the Number 24 --

20   A.   Right.

21   Q.   -- associated with it, at one point in time that had

22   been opened previously, correct?

23   A.   Correct.

24   Q.   Okay.   But instead of giving it a new number, it

25   just keeps the old one and moves it up the list?

1    A.   Yes.

2    Q.   Okay.  So let's look at, um -- and looking at this

3    view, so in this, just the recent docs folder, can you

4    tell what type of files these files there listed as link

5    files actually were or are?

6    A.   These do not have the file extensions there.

7    Q.   Okay, and again when you're using the term

8    "extensions," what do you mean by that?

9    A.   The characters following the dot at the end of the

10   file name.

11   Q.   Which tell you what?

12   A.   Which indicates what type of file or what program

13   would open them.

14   Q.   Okay, so, for example?

15   A.   ".doc," which is like a word file.

16   Q.   Okay.

17   A.   Or a ".avi,", which is a video file.

18   Q.   Okay.

19        Based on your review of the information contained

20   in the computer image and what you've already testified

21   to, do you know just looking at these -- do any of these

22   files on the first page stand out to you as far as

23   telling you sort of what type of file they might be?

24   A.   Um, I -- in my review of the computer I know that

25   Alex's docs is a folder.  Um, "Downloads" is a folder.

1    Um, we spoke earlier about the "pedowomen" that's at the

2    bottom of the page being a video file.

3    Q.  Okay, so we're highlighting downloads and you know

4    that to be a folder on the computer.  And that in fact

5    was the most recently-opened file, correct?

6    A.  Right.

7    Q.  And then you know Alex's docs to be a folder as

8    well?

9    A.  Correct.

10   Q.  And that one on the bottom, that "pedowoman" with

11   the "3," that's the link file you just described for the

12   jury?

13   A.  Yes, it is.

14   Q.  Okay.

15            MS. PARUTI:  Let's move on, please, to Page 2.

16   Q.  Now, looking at Page 2 of the most recently-opened

17   documents or files on this computer, um, did any of

18   these particular file names stand out to you?

19   A.  They did.

20   Q.  Okay, which ones?

21   A.  So it's a continuation of the first page, it's the

22   finish of "pedowomen" at the top, with the 3s.

23   Q.  Uh-huh.

24   A.  "Falco pics."  "Falco girl and three women."

25   "Incest set pedowoman 2010."

1    Q.   Okay, and why did those stand out to you?

2    A.   They all have either "pedo" or "falco" in the title,

3    which are files that I have scene associated with child

4    pornography.

5              MS. PARUTI:  And in fact could we have,

6    please, Exhibit 18.  And can we blow up the bottom

7    panel, please.

8              (Blows up.)

9              MS. PARUTI:  We just need to go down.

10   Q.   Okay.  And this is from the Frostwire folder,

11   correct?

12   A.   Correct.

13   Q.   And do you see the word "falco" in one of the

14   titles?

15   A.   I do.

16   Q.   Okay, thank you.

17        Now does this report -- you told us about

18   different file types.  Does this report sort the most

19   recent files opened on the computer by file type?

20   A.   It does.

21   Q.   Okay.

22              MS. PARUTI:  And can we go to Page 3, please.

23   Q.   And what is this first file type that we're looking

24   at?

25   A.   ".avi".

```
1    Q.  Okay.

2              MS. PARUTI:  Blow it up.

3    Q.  Okay.  And in this particular -- you said that the

4    Windows registry saves, um, or registers the top left 10

5    accessed files of any file type?

6    A.  Right.

7    Q.  In this .avi file type, why is it that we only see

8    6?

9    A.  Because the user may not have opened 10 files, they

10   may have only opened 6 avi files.

11   Q.  Okay.  And you told us that avi is a video, correct?

12   A.  Yes.

13   Q.  Could you just highlight the names of these linked

14   files here for the jury so they know what we're talking

15   about.

16   A.  (Highlights.)

17   Q.  And do any of these stand out to you, sir?

18   A.  They do.

19   Q.  Okay, which ones are those?

20   A.  The ones that have "po" in the title or "PTHC."

21   Q.  Okay.  And to be clear, the fact that these are in

22   this registry tells us that they were opened on this

23   computer?

24   A.  Correct.

25   Q.  Okay.  Now looking at the next file, extension
```

1    ".doc," what kind of files are those?

2    A.   Word document files.

3    Q.   Okay.  And do any of these on the first page, um,

4    mean anything to you?

5    A.   They do.  I did observe the Levin_alex to be

6    Mr. Levin's resume.

7    Q.   Okay.  So that first file,

8    "Levin_alex_current_2014january15_1.length."

9    A.   Yes.

10   Q.   Is that a file you actually found on the computer?

11   A.   I did.

12   Q.   Okay, we'll come back to that one in just a minute

13   or two.

14            MS. PARUTI:   Now let's go to Page 5, please.

15   Q.   Do you see the .rmvb file type?

16   A.   Yes, I do.

17   Q.   What kind of file is that?

18   A.   A video file.

19   Q.   Okay.  Do you happen to know what the rmvb stands

20   for?

21   A.   It associates with the real media player, the video

22   player.

23   Q.   Is that just another media player like Windows media

24   player?

25   A.   Yes, but it would need to be downloaded, it's not

1    part of Windows.

2    Q.  Okay.  How many RMV or video files were opened of

3    that type?

4    A.  One.

5            MS. PARUTI:  And can we just highlight the

6    title, please.

7    Q.  And does that stand out to you?

8    A.  Yes, it does.

9    Q.  In fact it's -- well why does it stand out to you?

10   A.  It has both "pthc" and "pedo" in the title.

11   Q.  Okay, and is that the same link file that you just

12   looked at a couple of screens ago?

13   A.  Yes, it is.

14   Q.  Okay.  Now you said that the -- that this particular

15   registry file also tracks searches that were done on the

16   computer?

17   A.  Correct.

18           MS. PARUTI:  Okay, can we have Page 6, please.

19           (On screen.)

20   Q.  Which of the sections here tell us where the

21   searches are?

22   A.  Yes, the one entitled "word wheel query."

23   Q.  Okay.

24           MS. PARUTI:  And let's go to the, um --

25   Q.  So what is the -- I just want to be very clear.

1   When you say it "tracks searches," searches of what?

2   A.   The hard drive within the computer.

3   Q.   So it's not internet or Google searches?

4   A.   Correct.

5            MS. PARUTI:   So let's go to Page 11, please.

6   Q.   What are some of the search terms that you, um, saw

7   that were significant to you as you were reviewing this

8   content?

9   A.   Um, "Pthc" stood out.   "Incomplete" stood out.

10   "Tara TOR."

11   Q.   Okay, so on Page 11 here we see "pthc" and then we

12   see "Incomplete."   So the items that are highlighted --

13   now looking to the left, are these numbers -- does that

14   have the same significance that we've been talking about

15   with respect to the organization?

16   A.   In the order that they were opened, yes.

17   Q.   Okay.   Why was the term "pthc" significant to you?

18   A.   Because I know it to be associated with child

19   pornography files.

20   Q.   Okay, and did you see that particular term in files

21   that were located on the machine?

22   A.   I did.

23   Q.   Okay.   And what about "Incomplete," why was that

24   significant to you?

25   A.   That was one of the folders that we highlighted

1    where some of those videos were located.

2    Q.  Okay, so the videos that were in evidence as Exhibit

3    17?

4    A.  Correct.

5    Q.  Okay.  You just mentioned the name "Tara"?

6            MS. PARUTI:  Can we go to Page 13, please.

7            (On screen.)

8    Q.  And is that at Line 21?

9    A.  Yes.

10   Q.  Okay, why was "Tara," why did that catch your

11   attention?

12   A.  That is a known file series of child pornography.

13   Q.  Okay.  And then you also said, um, TOR?

14           MS. PARUTI:  Can we go to Page 10, please.

15   And highlight it as Number 13.

16   Q.  And why did that catch your attention?

17   A.  That is the browser that we spoke of, um, which

18   anonomizes user activity online and is used to access

19   the dark web.

20   Q.  Okay.  Now I just want to ask you lastly a few more

21   questions about other things you found on the computer

22   that, um, you saw and maybe exported.

23       Did you see anything on the imaged drive of that

24   computer that was indicative of the user's, um, level of

25   computer knowledge or expertise?

1    A.   I did.

2    Q.   Okay, what types of things did you see?

3    A.   We did see his resume, um, as well as items related

4    to bitcoin money.

5    Q.   Uh-huh.   Okay.   Let's start with the resume.

6              MS. PARUTI:   Could I have, just for the

7    witness, um, Exhibit 7, please.

8              (On screen.)

9    Q.   Okay.   Can you, um -- do you recognize what's on the

10   screen?

11   A.   I do.

12             MS. PARUTI:   And for the record it's marked n

13   for identification.

14   Q.   So what are we looking at here?

15   A.   This is a screen shot again of my screen as I viewed

16   the data in preparation.

17   Q.   All right, I'm going to stop you right there.   Is

18   this an exact copy of what you were looking at?

19   A.   Yes.

20             MS. PARUTI:   At this point, your Honor, I move

21   to admit this as Exhibit 27.

22             THE COURT:   No objection?

23             MR. GAUDET:   No objection.

24             THE COURT:   It may be admitted, Exhibit 27.

25             MS. PARUTI:   May it please be published to the

```
 1    jury?
 2              THE COURT:  It may be.
 3              (Exhibit 27, marked.)
 4    Q.  So it looks like the jury has that up on their
 5    screen.
 6         So what are we actually looking at here?
 7    A.  This is a document titled "Alex Levin bio doc."
 8              MS. PARUTI:  Can we just blow up the left
 9    panel, please.
10    Q.  Okay, so we're looking at the folder structure.
11    What folder was that document, Alex Levin bio, in?
12    A.  That was in Alex's docs, which was in the documents
13    folder.
14    Q.  Okay.
15              MS. PARUTI:  And we'll now just look at the
16    right panel.
17    Q.  So here this is a little different than the other
18    screens or screen shots that we've seen.
19         What are we actually looking at here in this right
20    panel of your viewer?
21    A.  As you can see at the top of that, where it says
22    "file content," so AV lab has several viewers built into
23    it to try to make sense of what a file is and it happens
24    to be able to display Word documents, and so that is a
25    preview of that document.
```

1    Q.   Okay.  Did you find that document?

2    A.   I did.

3    Q.   Okay.  And were you able to export that document?

4    A.   Yes, I was.

5    Q.   Okay.

6              MS. PARUTI:  Could I have, just for the

7    witness please, what has been marked as 28, or Item 28.

8              (On screen.)

9    Q.   Do you see this, sir?

10   A.   Yes, I do.

11   Q.   Okay, it's marked O for identification.  What is

12   this?

13   A.   This is the Alex Levin bio document.

14   Q.   Okay, the actual document?

15   A.   The actual document.

16   Q.   And that was taken off his computer?

17   A.   Correct.

18   Q.   Is this exactly what you found on the computer?

19   A.   Yes, it is.

20             MS. PARUTI:  At this point I move to admit

21   this as Exhibit 28.

22             THE COURT:  No objection?

23             MR. GAUDET:  No objection.

24             THE COURT:  Exhibit 28, in evidence.

25             MS. PARUTI:  Thank you.  May it be published,

```
 1  please?
 2              THE COURT:  It may be.
 3              (Exhibit 28, marked.)
 4  Q.  Now we won't go through all of it, just a couple of
 5  general questions about this bio and some upcoming
 6  exhibits.
 7              MS. PARUTI:  Could we have, just for the
 8  witness, please, 29.
 9              (On screen.)
10              MS. PARUTI:  Okay.
11  Q.  Sir, did you see the other iterations of what you
12  called the resume?
13  A.  Yes, I did.
14  Q.  Okay.  Do you see P for identification on the screen
15  in front of you?
16  A.  Yes, I do.
17  Q.  Do you recognize it?
18  A.  I do.
19  Q.  What is it?
20  A.  This is one of those resume documents.
21  Q.  The actual thing that you're looking at though is?
22  A.  This is my screen shot.  I'm sorry.
23  Q.  And does this depict exactly what you saw as you
24  were looking through the data?
25  A.  Yes, it does.
```

 1              MS. PARUTI:  At this point I'd ask to admit

 2     this as Exhibit 29.

 3              THE COURT:  No objection?

 4              MR. GAUDET:  I object.  May we approach?

 5              THE COURT:  You may.

 6

 7              AT THE SIDEBAR

 8              THE COURT:  What is this?

 9              MR. GAUDET:  Your Honor, this is essentially

10     -- I'll let Ms. Paruti explain it.

11              THE COURT:  How is it explained?

12              MS. PARUTI:  It's just these resumes and then

13     there are two other, um, screens.  I didn't bring my

14     list up, but I can tell you.

15              (List is handed to her.)

16              THE COURT:  What does it -- we've got resumes

17     already, don't we?

18              MS. PARUTI:  Well, no, there's a picture at

19     his house, but from his computer there are none that

20     have been admitted as exhibits.  So I think it's highly

21     relevant to his -- the use of the computer and to his

22     expertise.

23              THE COURT:  Because he says he's --

24              MS. PARUTI:  I'm sorry?

25              THE COURT:  He's says he's swell with

1    computers on his resume and this is an admission.

2                MS. PARUTI:  Yes.

3                THE COURT:  So that's why it's relevant.

4        So what's the matter?

5                MR. GAUDET:  It's cumulative, the evidence has

6    just been admitted, a biography describing his computer

7    expertise was just put into evidence, and this is really

8    just -- it's a professional resume that summarizes the

9    evidence that's already admitted.

10               THE COURT:  I think there's something to that,

11   we seem to be going round and round.

12               MS. PARUTI:  Well I think that the content may

13   -- if we're talking about the content, okay, however the

14   fact that we're talking about -- his whole defense is --

15   I presume, because I have no idea, but is that he never

16   accessed anything on his computer, so a document that he

17   accessed I think is relevant.

18               THE COURT:  Well of course.  But I will

19   sustain the objection on the ground that it's

20   duplicative.  If he -- if he gets on the stand and you

21   cross him, it's without prejudice if there's a necessity

22   to bring in something specific here.  But you've got his

23   bio.

24               MS. PARUTI:  But the bio is just a Word

25   document, there are no resumes that outline -- I don't

1   need to put every single resume in, but I think the most

2   recent resume where it lists his job areas --

3              THE COURT:  You're telling me we have no

4   resumes?

5              MS. PARUTI:  Not on the computer, just his bio

6   and other documents.

7              THE COURT:  Okay.  And how is the bio

8   different?

9              MS. PARUTI:  Because it doesn't talk about his

10  specific jobs, he talks about networking and security.

11             THE COURT:  Suppose I give her one resume.

12  Since the objection is duplicative, we'll whittle it

13  down to one resume, the most recent.

14             MR. GAUDET:  It should be the most recent one.

15             THE COURT:  Yes, it should be the most recent

16  one.  And that's it for the resumes.

17             MS. PARUTI:  Sure.

18             MR. GAUDET:  Note my objection.

19             THE COURT:  Noted.

20

21             (In open court.)

22             THE COURT:  So we'll admit one of these

23  resumes, what purports to be the most recent, and you

24  should call that out to Ms. Gaudet so we're clear what

25  it is.

 1          Now go ahead, Ms. Paruti.

 2               MS. PARUTI:  Your Honor, may I admit "P,"

 3     which is the screen shot showing where the resume was

 4     located?

 5               THE COURT:  You may, and that is Exhibit 29.

 6               MS. PARUTI:  Thank you.

 7               THE COURT:  The screen shot that was marked

 8     "P" for identification is admitted in evidence, Exhibit

 9     29.

10               (Exhibit 29, marked.)

11               MS. PARUTI:  Could I have it displayed to the

12     jury, please.

13     Q.  Okay, sir, you see on the highlighted file on the

14     bottom panel?

15     A.  Yes, I do.

16               MS. PARUTI:  Would you blow that up, please,

17     for the jury.

18               (Blows up.)

19               MS. PARUTI:  Okay.

20     Q.  Is that one of the resumes that you saw in the

21     information that is in the --

22     A.  Yes, it is.

23     Q.  And did you actually export this resume?

24     A.  I did.

25               MS. PARUTI:  Could I have 32, please.

```
 1                    (On screen.)
 2                    THE COURT:  Okay, so you have no objection to
 3       that one, Mr. Gaudet, correct?
 4                    MR. GAUDET:  I do object but --
 5                    THE COURT:  You do object, and we discussed it
 6       at sidebar, and your rights are saved.  But I let her
 7       have one and it will be --
 8             And the number again?
 9                    MS. PARUTI:  So it's "S" for identification.
10                    THE COURT:  In evidence as?
11                    MS. PARUTI:  It's not in evidence yet, the
12       next open exhibit is 30, but we can use 32.
13                    THE COURT:  You want to jump to 32?
14                    MS. PARUTI:  I'll leave it to the Clerk's
15       discretion.
16                    THE COURT:  We do.  So it's in evidence as
17       Exhibit 32, in evidence.
18                    MS. PARUTI:  Thank you.
19                    (Exhibit 32, marked.)
20       Q.  Okay.  And what are we looking at here, sir?
21       A.  This is that resume that was depicted from the
22       screen shot.
23       Q.  Okay.  Now, did you also find, um, several other
24       resumes with other titles indicative of the years
25       perhaps that they were current?
```

1    A.  Yes, I did.

2    Q.  Okay.  And what if anything made you actually --

3    what did you see, why were they significant to you?

4    A.  It showed that the, um -- that Mr. Levin indicates

5    he's an IT professional and has years in the field of

6    IT.

7    Q.  Okay.  Was there anything else specific to the

8    content of the resumes that drew your attention to --

9    perhaps actually let's look at -- we're looking at 32

10   right now.

11          MS. PARUTI:  Can we blow up under his

12   accomplishments.

13          (Blows up.)

14   A.  That's the -- it's at the bottom of that, um, where

15   it says "secured corporate assets from active cyber

16   attacks."

17   Q.  Okay.  Were there any other documents that you saw

18   that were, um -- that you saw that evidenced the user's

19   level of expertise or knowledge of computers or that

20   type of thing?

21   A.  There were the bitcoin money-type of documents.

22   Q.  Okay.  So bitcoin is something that I think you

23   referenced earlier very very generally.  So what is

24   bitcoin?

25   A.  A virtual currency that people can use to buy actual

1    items, but there's no hard currency backing it in a
2    specific bank or country.
3    Q.  Okay.  Now what types of things did you see
4    regarding the bitcoin?
5    A.  There is a PDF document, um, that was a bitcoin
6    mining guide.
7                MS. PARUTI:  Can we show the witness, please,
8    34.
9                (On screen.)
10   Q.  Okay, let's look at -- do you see what's on the
11   screen, sir?
12   A.  Yes.
13   Q.  Is this just another screen shot of what you saw?
14   A.  Yes, it is.
15   Q.  Is this an exact duplicate of what you saw?
16   A.  Yes, it is.
17               MS. PARUTI:  Your Honor, I'd offer this as
18   Exhibit 34, please.
19               THE COURT:  No objection?
20               MR. GAUDET:  No objection.
21               THE COURT:  It may be received as Exhibit 34.
22               MS. PARUTI:  May it be published, your Honor?
23               THE COURT:  It may be.
24               (Exhibit 34, marked.)
25   Q.  Okay.  Can you see the folder structure here, it

1   says -- do you see the highlighted document?

2   A.  Yes, I do.

3   Q.  What's the document called?

4   A.  "Bitcoin Guide Dot PDF."

5   Q.  Okay.  And what folder is that in?

6   A.  Within the -- it's within the btc robot folder, but

7   it's within "Documents."

8          MS. PARUTI:  Okay, please collapse that, and

9   if we can go down to the file path, please.

10  Q.  So it's within the Alex documents documents folder?

11  A.  Correct.

12  Q.  Okay.  "Btc," do you know that to be an abbreviation

13  for "bitcoin"?

14  A.  Yes.

15  Q.  Now, did you actually, um -- you didn't actually

16  export this document, did you?

17  A.  I did not.

18  Q.  Okay.  Did you see, um, any other, um, indications

19  of sophistication in that particular realm on the imaged

20  hard drive?

21  A.  In regard to bitcoin mining, there was an Attorney

22  General's Office complaint against a company called

23  Quinterra.

24  Q.  Quinterra?  Okay.  Did you see Quinterra anywhere

25  else in your review of the computer?

1    A.   There was a link file.

2    Q.   There was a link file?

3    A.   To that same document.

4    Q.   Okay.

5             MS. PARUTI:  Can we see, just for the witness,

6    BC on the screen.

7    Q.   Okay.  Is this another screen shot?

8    A.   Yes, it is.

9    Q.   Okay.  Is this an exact copy of what you were

10   looking at?

11   A.   Yes, it is.

12            MS. PARUTI:  I'd offer this as Exhibit 36,

13   please.

14            THE COURT:  Any objection?

15            MR. GAUDET:  No objection.

16            THE COURT:  It may be received, Exhibit 36.

17            MS. PARUTI:  May it be published please?

18            THE COURT:  It may.

19            MS. PARUTI:  Thank you.

20            (Exhibit 36, marked.)

21   Q.   So what are we looking at in this view, sir?

22   A.   This is a screen shot of what I actually was looking

23   at on my computer.

24   Q.   Okay.

25            MS. PARUTI:  So can we have the file path,

1    please.

2    Q.   So what folder is this in?

3    A.   That's in the Alex downloads folder.

4    Q.   Okay.  Were you actually able to locate this file?

5    A.   Um, yes, I was.

6    Q.   Okay, and did you export this file?

7    A.   Yes, I did.

8            MS. PARUTI:  May I have just 37 for the

9    witness, please.

10           (On witness screen.)

11   Q.   And what is this, sir?

12   A.   And this is that document, that PDF document of the

13   Attorney General's Office complaint.

14           MS. PARUTI:  It's currently marked X for

15   identification.  I move at this point to admit it as

16   Exhibit 37.

17           THE COURT:  Any objection?

18           MR. GAUDET:  No objection.

19           THE COURT:  It may be received as Exhibit 37.

20           MS. PARUTI:  And could I publish it to the

21   jury?

22           THE COURT:  You may.

23           MS. PARUTI:  Thank you.

24           (Exhibit 37, marked.)

25   Q.   And, Agent Phelps, why is this significant to you?

A.   Um, it tells me that the user was at least getting

started in attempting to use bitcoin mining.

Q.   Okay.  When you're using this term "mining," can you

basically tell us what that means?

A.   Um, very basically.  It is using the computer and

there's a couple of programs that you can use that can

go out and search a network that attempts to obtain

bitcoin.

Q.   Okay, and that's the mining?

A.   Correct.

Q.   All right.

A.   And this refers to a server that Mr. Levin attempted

to buy and Quinterra had advertised that they had

servers.  It takes a lot of processing power and memory

to do bitcoin money and so this server would have

allowed him to set it up and just let it run to mine for

bitcoin.

Q.   So you're saying that this complaint is about his

attempted purchase on that server?

A.   Correct.

Q.   All right.  And the very last thing I think you

mentioned as one of these things that you noticed was

where there was evidence of TOR, um, you described that

a couple of times.

            MS. PARUTI:  Could we have this just for the

```
 1    witness, 38, please.
 2              (On screen.)
 3              MS. PARUTI:  And this is marked Y for
 4    identification.
 5    Q.  What is this?
 6    A.  This is a screen shot depicting the TOR browser
 7    location.
 8    Q.  Is it an exact depiction of what you saw when
 9    looking at this location?
10    A.  Yes, it is.
11              MS. PARUTI:  At this point, your Honor, I'd
12    like to enter Y into evidence as Exhibit 38, please.
13              THE COURT:  No objection?
14              MR. GAUDET:  I object.
15              THE COURT:  You do object?
16              MR. GAUDET:  Yes, your Honor.  May we
17    approach?
18              THE COURT:  You may.
19
20              AT THE SIDEBAR
21              THE COURT:  Well I thought she was going
22    pretty far afield with bitcoin, but you have no
23    objection to that.
24         TOR seems to be relevant?
25              MR. GAUDET:  I don't see any relevance as to
```

1    this.  I don't see how the government can establish that

2    because a person has a TOR internet browser, that that

3    somehow confers some sort of specialized computer and

4    expertise.

5              THE COURT:  Why is it relevant?

6              MS. PARUTI:  I think it obviously does.  I

7    think a lay person has to explain that it's something

8    that anonymizes your activity on the internet, and that

9    certainly indicates a level of sophistication above an

10   average user.

11             THE COURT:  I think so.  I will so rule.

12             MR. GAUDET:  Your Honor, explaining how it

13   works would certainly be above a lay individual, but

14   using it is not.  There's no foundation that this is

15   something that requires technical knowledge to use or to

16   download or to understand what "deanonymizing" means.  I

17   agree that that would require a level of sophistication,

18   but there's no indication that that's what's going on.

19             THE COURT:  I think he's probably capable of

20   telling us that TOR anonymizes the user and that's

21   sufficient foundation for me.  But I'll sustain it until

22   you lay the foundation.

23             MS. PARUTI:  I think he has already said that,

24   your Honor.

25             THE COURT:  Well why don't you get him to say

```
1    it again.
2              MS. PARUTI:  Okay, yes.  Thank you, your
3    Honor.
4
5              (In open court.)
6    Q.  Agent Phelps, can you tell us one more time -- and I
7    know you said it a couple of times, but one more time
8    what "TOR" is?
9    A.  "TOR" is a browser that could be used to anonymize a
10   user's activity online as well as access to the dark
11   web.
12   Q.  Thank you.
13             MS. PARUTI:  At this point, your Honor, I move
14   Y for identification into evidence as Exhibit 38.
15             THE COURT:  It may be admitted over defense's
16   objection and your rights are saved.  It's admitted,
17   Exhibit 38.
18             MS. PARUTI:  Could we publish that, please.
19             (Exhibit 38, marked.)
20   Q.  Okay.
21             MS. PARUTI:  Can we just look at the left
22   panel, please.
23   Q.  And you see the TOR browser, um, right sort of in
24   the middle of that structure?
25   A.  I do.
```

```
 1    Q.  Okay.  Thank you.
 2              MS. PARUTI:  Can we just blow up the file,
 3    please.
 4              (Blows up.)
 5    Q.  And where was that located?
 6    A.  That is in the user's Alex desktop TOR browser
 7    folder.
 8    Q.  Okay.  And then --
 9              MS. PARUTI:  And can you blow up the upper
10    panel, please.
11    Q.  So the TOR browser itself is still located on the
12    computer on Box 20 of 2015?
13    A.  Yes, it was.
14              MS. PARUTI:  Thank you.  I have no further
15    questions, your Honor.
16              THE COURT:  Mr. Gaudet, do you wish to examine
17    this witness?
18              MR. GAUDET:  I do.
19              THE COURT:  You may.
20
21    CROSS-EXAMINATION BY MR. GAUDET:
22    Q.  Good morning, Agent Phelps.
23    A.  Good morning.
24    Q.  I'd like to begin by talking about the peer-to-peer
25    file-sharing programs you discussed.
```

1    A.   Okay.

2    Q.   So you said the laptop had a program called

3    "Frostwire" installed on it, correct?

4    A.   At one point that program was installed.

5    Q.   And there's also a program called Shiraza at one

6    point?

7    A.   At one point, yes.

8    Q.   And Frostwire and Shiraza are what are called "peer-

9    to-peer file-sharing programs," correct?

10   A.   That is correct.

11   Q.   And peer-to-peer programs allow users to share and

12   download files from each other, correct?

13   A.   Yes.

14   Q.   And they do that over the internet?

15   A.   Yes, they do.

16   Q.   And users can share different types of files, right?

17   A.   That is correct.

18   Q.   Audio files, for example?

19   A.   Yes.

20   Q.   Such as cell phones?

21   A.   Sure.

22   Q.   Video files like movies or TV shows?

23   A.   Yes.

24   Q.   Text files?

25   A.   Sure.

1    Q.   Such as books?

2    A.   Yes.  Yes.

3    Q.   And you can share computer software?

4    A.   Yes.

5    Q.   Right?

6    A.   Yes.

7    Q.   Now peer-to-peer users are able to make files on

8    their computers available for other users, right?

9    A.   That is correct.

10   Q.   And those other users can download files from them,

11   right?

12   A.   Yes.

13   Q.   And a user can make thousands of files available for

14   downloading?

15   A.   Yes, they could.

16   Q.   And these peer-to-peer programs, they have a search

17   function?

18   A.   Yes, they do.

19   Q.   Users can search for other types of files they want

20   to download?

21   A.   Yes, either by type or actual title.

22   Q.   I think the example used yesterday was if you were

23   looking for "Titanic," right?

24   A.   Right.

25   Q.   That you could just type in Titanic and then you

```
 1    would get search results for it?
 2    A.  Um, I might not have gotten into specifics.
 3    Q.  Well, you could do that, right?
 4    A.  Yes, you could.
 5    Q.  And then the program would return results with file
 6    names that matched the search term?
 7    A.  That is correct.
 8    Q.  Okay.  Now -- and then the user could select the
 9    files that they wanted, right?
10    A.  Yes.
11    Q.  Like download?
12    A.  Yes.
13    Q.  And eventually the contents of the file could be
14    downloaded into a computer?
15    A.  That is correct.
16    Q.  Now it's possible to sort by user on these programs
17    as well, right?
18    A.  Um, I'm not sure I'm following you.
19    Q.  Can you search -- well let me phrase it like this.
20    People who register or download peer-to-peer programs
21    can insert a user name, right?
22    A.  Yes.
23    Q.  And another user could search for that specific user
24    name?
25    A.  Correct.
```

1   Q.  To see what files they have available to share?

2   A.  Yes.

3   Q.  And then once a user finds that specific user name,

4   they can download whatever files and make them

5   available?

6   A.  Yes.

7   Q.  And so it's possible to download another user's

8   entire shared drive?

9   A.  Yes.

10  Q.  And after downloading that shared drive, the files

11  are saved to the other user's computer?

12  A.  Yes.

13  Q.  And Frostwire and Shiraza, those were the programs

14  that were used to -- that got the videos on Mr. Levin's

15  laptop onto it, right?

16  A.  That's correct.

17          MR. GAUDET:  Miss Johnson, could you pull up

18  Exhibit 18 for me.

19          (On screen.)

20  Q.  Agent Phelps, do you see Exhibit 18 on your screen?

21  A.  Yes, I do.

22  Q.  And that is the Frostwire screen shot, correct?

23  A.  That is correct.

24  Q.  Okay, and these are the files that you found in the

25  Frostwire folder?

1    A.  Yes.

2              MR. GAUDET:  Would you blow up the entirety of

3    the bottom parts and all the way to the other side.

4    Yes, thank you.

5    Q.  Now, Agent Phelps, I want to direct your attention

6    to the column, the third from the right.  Do you see

7    where it says "created"?

8    A.  I do.

9    Q.  Okay.  And now under that it lists a series of

10   dates, correct?

11   A.  Yes.

12   Q.  One date for each file?

13   A.  Correct.

14   Q.  Now, the created date refers to the date that the

15   files were downloaded, correct?

16   A.  Yes.

17   Q.  And now if you see the created date for these five

18   files, they're all October 11th, 2011, correct?

19   A.  Correct.

20   Q.  Between 4:17 p.m. and 7:24 p.m.?

21   A.  Yes.

22   Q.  Now, if you go to the right of that it's titled

23   "Accessed," right?

24   A.  That's correct.

25   Q.  And there are a series of dates below it?

1    A.   Yes.

2    Q.   Now "last accessed," that's a feature that some

3    versions of Windows have installed on it, right?

4    A.   Yes.

5    Q.   Um, and it's a feature that can be enabled or

6    disabled?

7    A.   Correct.

8    Q.   And this laptop had it enabled?

9    A.   Yes.

10   Q.   And when the feature is enabled, a time stamp is

11   created for the last time a file is accessed?

12   A.   Yes.

13   Q.   All right.  And this laptop had it enabled so that

14   it was a precise time stamp?

15   A.   Correct.

16   Q.   Now, any time a file is accessed, that last access

17   date will change?

18   A.   Yes.

19   Q.   Um, they'll update the time stamp to the most recent

20   time the file was accessed?

21   A.   Correct.

22   Q.   All right.  Now, Agent Phelps, you'll agree with me

23   that the last access date for these five files was fall,

24   January 31st, 2015 at 2:28 p.m.?

25   A.   Yes.

```
 1    Q.   And 38 seconds?

 2    A.   Yes.

 3    Q.   All at the exact same time?

 4    A.   Yes.

 5              MR. GAUDET:   Now, Miss Johnson, 22, please.

 6              (On screen.)

 7    Q.   Now, Agent Phelps, do you see Exhibit 22 on your

 8    screen?

 9    A.   I do.

10    Q.   Now this is the Incomplete folder, right?

11    A.   Correct.

12    Q.   And you found six files in this folder that you said

13    depicted child pornography?

14    A.   Yes.

15              MR. GAUDET:   Now please go to the bottom

16    portion.

17    Q.   I want to direct your attention, Agent Phelps, to

18    the created column again.

19    A.   Uh-huh.

20    Q.   Do you see that the created date for these files was

21    all October 11th, 2011?

22    A.   Yes.

23    Q.   And that's the same date that the five files in the

24    Frostwire folder were also created, right?

25    A.   Yes.
```

1    Q.  And you'll see that they were downloaded between

2    4:20 p.m. and 9:07 p.m.?

3    A.  Correct.

4    Q.  Using Frostwire?

5    A.  Correct.

6    Q.  And if I could direct you to the next column where

7    it says "accessed," you see that they all have a last

8    accessed date of January 31st, 2015 at 2:28 p.m.?

9    A.  I do.

10   Q.  The same as the five files you found in the

11   Frostwire folder?

12   A.  Correct.

13              MR. GAUDET:  Now Ms. Johnson.

14              (Pause.)

15   Q.  Agent Phelps, this is the Shiraza folder, correct?

16   A.  Yes.

17   Q.  And you found two video files in the Shiraza folder

18   that you said were child pornography?

19   A.  Yes.

20   Q.  And those with the ones with the check marks on the

21   left side, correct?

22   A.  Correct.

23   Q.  And again I direct your attention to the created

24   date.  Do you see what I'm referring to?

25   A.  I do.

1    Q.  The created date for both of these video files was
2    September 24th, 2011, correct?
3    A.  Yes.
4    Q.  One was downloaded at 9:14 and 0 seconds a.m.?
5    A.  P.m.
6    Q.  P.m., excuse me.
7    A.  Yes.
8    Q.  But otherwise the time was correct?
9    A.  Yes.
10   Q.  And the second was downloaded at 9:14 and 2
11   seconds p.m.?
12   A.  Yes.
13   Q.  Okay, so within 2 seconds of each other?
14   A.  Sure.
15   Q.  And if I could direct your attention to the next
16   column, they're access dates.  They were both January
17   31st, 2015 at 2:29:27 p.m., correct?
18   A.  2:19.
19   Q.  2:19, that's a typo of mine.  At 2:19:27 p.m. on
20   January 31st, 2015?
21   A.  Yes.
22   Q.  The exact same date as the other files that we just
23   discussed, January 31st, 2015?
24   A.  Yes.
25   Q.  Okay, so all 13 of the child pornography files that

1    we've been discussing in this trial were last accessed

2    on the exact same day?

3    A.   Yes.

4    Q.   Now these weren't manual user accesses, were they?

5    A.   Correct.

6    Q.   They're not the result of the computer's user

7    clicking on and opening the files?

8    A.   For the access, correct.

9    Q.   Okay.  You have no indication that these files,

10   their contents, were displayed on the screen on that

11   date?

12   A.   Correct.

13   Q.   And you have no indication that any of these 13

14   files were accessed after January 31st, 2015?

15   A.   Correct.

16   Q.   You don't know when they were accessed or if they

17   were accessed prior to January 31st, 2015?

18   A.   Correct.

19   Q.   And if they were accessed, you don't know for how

20   long?

21   A.   That is correct.

22   Q.   Now you examined -- no, strike that.

23        You're aware that the laptop was seized or taken

24   from Mr. Levin's home in August of 2015, correct?

25   A.   Correct.

```
 1   Q.  And you were actually there that day, right?

 2   A.  I was.

 3   Q.  So that was nearly 7 months after the last access

 4   date that was listed on these files?

 5   A.  Yes.

 6   Q.  The last access date on which the user did not

 7   access the files, correct?

 8            MS. PARUTI:  Objection.

 9            THE COURT:  No, he may have the question, if

10   the witness understands it.

11   A.  Could you repeat it, please.

12   Q.  So that was 7 months after the last access date in

13   which there was not a user access for those particular

14   files, correct?

15   A.  Correct.

16            MR. GAUDET:  Miss Johnson, would you mind

17   pulling up Exhibit 20.

18            (On screen.)

19   Q.  I just want to refer back to the Shiraza files,

20   Agent Phelps.  Do you see them on your screen?

21   A.  I do.

22   Q.  And both of these you said yesterday are partial

23   files, right?

24   A.  Correct.

25   Q.  Partial is the extension?
```

1    A.  Yes.

2    Q.  Okay.  Neither of these files have descriptive file

3    names, do they?

4    A.  No, they do not.

5    Q.  They're just a string of letters and numbers?

6    A.  Correct.

7    Q.  And you can see that there are other files within

8    this folder?

9    A.  Yes.

10   Q.  Okay.  And it appears that -- you would agree with

11   me that all of these files have nondescriptive file

12   names?

13   A.  That is correct.

14   Q.  And so you were able to determine, excuse me, that

15   these two files were depicted?

16   A.  Yes, I was.

17   Q.  Now the titles of these, you'd agree, do not

18   describe the contents of the files?

19   A.  Correct.

20   Q.  And so just by looking at the title, you don't know

21   what the file contained?

22   A.  That is correct.

23   Q.  Now, we just discussed the creation date for these

24   files and it was September 24th, 2011, right?

25   A.  Yes.

1    Q.   And you see that there were other files that were

2    also created on that day?

3    A.   Yes, I do.

4    Q.   Also with nondescriptive title names?

5    A.   Yes.

6    Q.   And those did not depict child pornography?

7    A.   I was unable to play them.

8    Q.   But you don't know that they did?

9    A.   I do not.

10   Q.   All right.

11        I want to ask you some questions about link files,

12   Agent Phelps.

13   A.   Okay.

14   Q.   You just discussed those on direct examination,

15   right?

16   A.   Yes.

17   Q.   And again link files are created when the file is

18   accessed, right?

19   A.   When the file is actually opened, yes.

20   Q.   And that could be done by a computer's user, right?

21   A.   Yes, it can.

22   Q.   And it's also possible for a program on a computer

23   to open a file?

24   A.   Depending on what it is, and it's not a user file

25   typically, it opens other system files.

1    Q.   Now link files are shortcuts?

2    A.   They are.

3    Q.   That's a good way to describe it, correct?

4    A.   Yes.

5    Q.   And it points to another file having been accessed,

6    correct?

7    A.   Yes.

8    Q.   Now, if the original file is deleted from the

9    computer, the link file remains?

10   A.   That is correct.

11   Q.   And the link files don't contain the contents of the

12   original file?

13   A.   Correct.

14   Q.   The name -- now you'd agree with me that the name of

15   a file alone does not tell you what its contents are?

16   A.   It does not.

17   Q.   And that goes for any types of files, right?

18   A.   Correct.

19   Q.   Now the files that you found in the Frostwire

20   folder, you didn't find any link files for those, did

21   you?

22   A.   I -- can we pull up that screen?  I don't recall off

23   the top of my head.

24   Q.   Sure, we can pull it up.

25              MR. GAUDET:  Could we pull up Exhibit 93.

1              (On screen.)

2    Q.   Did you find any link files for these, Agent Phelps?

3    A.   No, I did not.

4    Q.   Did you find any link files for the files that were

5    in the Incomplete folder?

6    A.   No, I did not.

7    Q.   Did you find any link files for the files that were

8    in the Shiraza folder?

9    A.   No, I did not.

10   Q.   Now the link files that you did find -- and again

11   the files were no longer on the computer, right?

12   A.   Correct.

13   Q.   They'd been deleted at some point?

14   A.   Correct.

15   Q.   Okay.  Now you said that they would have had to be

16   opened to create a link file?

17   A.   That is correct.

18   Q.   You don't know how long they would have been open

19   for?

20   A.   It does -- no, it does not.

21   Q.   It could have been a second, correct?

22   A.   Correct.

23   Q.   That it could have been closed and deleted?

24   A.   Correct.

25   Q.   Now -- and you don't know what their actual contents

```
 1   were?
 2   A.  That is correct.
 3   Q.  You only saw the title names?
 4   A.  Yes.
 5   Q.  Now, you also just testified about TOR, right?
 6   A.  Yes.
 7   Q.  Um, now TOR was a browser that was installed on
 8   Mr. Levin's laptop?
 9   A.  Yes.
10   Q.  And it's an internet browser, right?
11   A.  Yes, it is.
12   Q.  Like Internet Explorer or Firefox?
13   A.  Yes, it actually uses Firefox.
14   Q.  Oh, it does use Firefox?
15   A.  Yes.
16   Q.  Okay.  And you said it allows users to surf the
17   internet anonymously?
18   A.  Correct.
19   Q.  Anyone can download TOR?
20   A.  That is correct.
21   Q.  You can go to TOR's website and install it on your
22   computer?
23   A.  Yes.
24   Q.  It's free, isn't it?
25   A.  It is.
```

1   Q.  All you have to do to get to it is type "TOR" into

2   Google and it takes you to the website?

3   A.  Correct.

4   Q.  Um, now once it's installed on the user's computer,

5   they can search the internet on it?

6   A.  That is correct.

7   Q.  Just like they would on Internet Explorer?

8   A.  Yes.

9   Q.  It doesn't require any technical computer knowledge

10  to use TOR, does it?

11  A.  It does not.

12  Q.  And you referred to it as the use of the "dark web"?

13  A.  Yes.

14  Q.  That's the nickname people have given to it,

15  correct?

16  A.  Yes.

17              MS. PARUTI:  Objection.

18              THE COURT:  Well in view of the answer, I'm

19  going to let that stand.

20  Q.  It's perfectly legal to have TOR installed on your

21  computer?

22  A.  Yes, it is.

23  Q.  You're aware that it was invented by the United

24  States government?

25  A.  Yes, I am.

1   Q.  So I want to talk to you a little bit more about the

2   examination of the computer that you did.

3        The laptop had password protection enabled on it,

4   correct?

5   A.  Yes, it did.

6   Q.  And this is just standard password protection that

7   comes preinstalled on Windows?

8   A.  Correct.

9   Q.  It wasn't password protection that the computer's

10  user had to install?

11  A.  That is correct.

12  Q.  Or modify in any way?

13  A.  Nope.

14  Q.  Agent Phelps, are you familiar with the term

15  "encryption"?

16  A.  Yes, I am.

17  Q.  Do you know what it means to "encrypt" a digital

18  file?

19  A.  Yes, I do.

20  Q.  Could you just tell the jury what it means to

21  encrypt something?

22  A.  It means to, um, apply encryption or to make it

23  unviewable just by clicking on it.  You would need to

24  supply a password to be able to access it.

25  Q.  And it's possible to encrypt video files?

A.   Yes, it is.

Q.   It's possible to encrypt an entire hard drive?

A.   Yes, it is.

Q.   Now, an encryption takes readable data and basically
makes it unreadable, right?

A.   Correct.

Q.   The only way to access an encrypted file is if you
have an encryption key?

A.   That is correct.

Q.   And that's system to a password?

A.   Yes.

Q.   And without that you can't view encrypted files?

A.   Correct.

Q.   You'd agree with me that encryption is more secure
than simply password-protecting something?

A.   Yes.

Q.   Encryption is more sophisticated than password
protection?

A.   Yes.

Q.   It would take much longer to break an encryption
than a password?

A.   Yes, it would.

Q.   Somebody with some computer knowledge or experience
might know how to encrypt something?

A.   Yes.

1    Q.  Mr. Levin's laptop wasn't encrypted, was it?

2    A.  No, it was not.

3    Q.  The child pornography files you discovered were not

4    encrypted?

5    A.  No, they were not.

6    Q.  The folders they were in were not encrypted?

7    A.  No, they were not.

8    Q.  It's possible to password-protect files too, isn't

9    it?

10   A.  Yes, it is.

11   Q.  And it's possible to password-protect folders?

12   A.  Yes, it is.

13   Q.  The 13 files we've been referring to were not

14   password protected?

15   A.  No, they were not.

16   Q.  The folders they were in were not password

17   protected?

18   A.  No.

19   Q.  Now you've been a forensic examiner since 2015?

20   A.  That's correct.

21   Q.  And you've examined a lot of digital devices in that

22   period, right?

23   A.  Yes, I have.

24   Q.  And you do a very thorough job every time you do so?

25   A.  I try to.

1    Q.   Just like in this case?

2    A.   That is correct.

3    Q.   Now, this laptop was not the only device that was

4    seized from Mr. Levin's home, right?

5    A.   That's correct.

6    Q.   It's not the only one that was examined?

7    A.   That's correct.

8    Q.   And there was a thorough examination of each of the

9    devices?

10   A.   That is correct.

11   Q.   For example, there was a second laptop, right?

12   A.   Yes.

13   Q.   We'll call that -- is it fair to say that it was a

14   newer laptop?

15   A.   Yes.

16   Q.   And the same forensic examination that was performed

17   on the old laptop was performed on the new one?

18   A.   Yes.

19   Q.   Just as thorough, right?

20   A.   Correct.

21   Q.   And no child pornography on the second laptop, was

22   there?

23   A.   There was not.

24   Q.   And you examined or your office examined a Verizon

25   tablet?

1   A.   Yes.

2   Q.   And that's a device that's capable of connecting to

3   the internet?

4   A.   Yes, it is.

5   Q.   It can store videos, right?

6   A.   Yes.

7   Q.   And photographs?

8   A.   Correct.

9   Q.   And you didn't find any child porn on the tablet?

10   A.   I did not.

11   Q.   And you examined a Toshiba tablet?

12   A.   Yes.

13   Q.   And again it's something that's capable of storing

14   digital files?

15   A.   Correct.

16   Q.   And there's no child pornography files on it?

17   A.   No.

18   Q.   And you examined the two external hard drives?

19   A.   Yes.

20   Q.   Now an external hard drive is a portable digital

21   storage device, is that fair to say?

22   A.   Yes, it is.

23   Q.   And it can be used to store videos and photographs?

24   A.   Yes.

25   Q.   It can be connected to a laptop?

1    A.   Sure.

2    Q.   And it can be connected to a laptop using say WIFI,

3    depending on the model?

4    A.   Depending on the model, sure.

5    Q.   Or you could connect it with hardwire?

6    A.   Via a USB cable, sure.

7    Q.   And once connected the laptop can access the files

8    that are on the hard drive and vice-versa?

9    A.   Yes.

10   Q.   And neither of the external hard drives you examined

11   had child pornography on them?

12   A.   No, they did not.

13   Q.   And you examined two MP 3 players?

14   A.   I recall one.

15   Q.   So you examined one?

16   A.   Yes.

17   Q.   And the MP 3 players -- the MP 3 player, excuse me,

18   was capable of storing video files?

19   A.   It could.

20   Q.   It could also be connected to a laptop, right?

21   A.   Yes, it could.

22   Q.   And download files from the laptop?

23   A.   Sure.

24   Q.   The MP 3 player didn't have child pornography on it?

25   A.   No, it did not.

1    Q.   You examined a cell phone that was taken from

2    Mr. Levin's home?

3    A.   Yes.

4    Q.   And again the cell phone is capable of storing video

5    files?

6    A.   Yes.

7    Q.   And picture files?

8    A.   Correct.

9    Q.   You didn't find any child pornography on the cell

10   phone?

11   A.   No.

12   Q.   And you examined two thumb drives?

13   A.   Yes.

14   Q.   And a thumb drive, that might also be called a

15   "flash drive"?

16   A.   Sure.

17   Q.   Which is also a portable digital storage device?

18   A.   Yes.

19   Q.   And it could store videos and pictures, right?

20   A.   It could.

21   Q.   Now you can plug a thumb drive into a laptop in

22   order to connect it, right?

23   A.   Yes, you could.

24   Q.   And you can transfer files from the laptop to the

25   thumb drive and from the thumb drive to the laptop?

A.  Sure.

Q.  So you can view on your laptop videos that are on
the thumb drive?

A.  Yes.

Q.  And one of the thumb drives contains 32 gigabytes of
data, right?

A.  Yes.

Q.  And that's not a small amount, is it?

A.  It's not.

Q.  And it could hold hundreds of files, including
videos and pictures?

A.  Yes, it could.

Q.  And the other thumb drive had 4 gigabytes of data?

A.  Yes.

Q.  Enough to store less, but still photos and videos?

A.  Yes.

Q.  And the thumb drives physically fit -- about an inch
and a half, 2 inches long at the most?

A.  Sure.

Q.  Something you could easily hide somewhere?

A.  Yes.

Q.  And you didn't find any child pornography files on
those, did you?

A.  No, I did not.

Q.  So in total there were 11 electronic devices that

```
1    you examined, right?
2    A.  Yes.
3    Q.  And the only one that had child pornography was the
4    older laptop?
5    A.  Yes.
6    Q.  And you're not aware of any child pornography being
7    found anywhere else in Mr. Levin's home?
8    A.  No, I do not.
9              MR. GAUDET:  I have no further questions.
10             THE COURT:  Any redirect?
11             MR. GAUDET:  Actually, if I could, your Honor?
12             THE COURT:  Of course.  Yes.
13             (Pause.)
14             MR. GAUDET:  Nothing further, your Honor.
15             THE COURT:  Any redirect?
16             MS. PARUTI:  Just briefly, thank you.
17
18   REDIRECT EXAMINATION BY MS. PARUTI:
19   Q.  Now, sir, you said on cross you said that TOR is a
20   free, um, browser that you can use to access the regular
21   internet as well as the dark web, is that correct?
22   A.  That is correct.
23   Q.  As a forensic examiner, can you see anything about
24   the nature of a person's activity on TOR when you're
25   examining their hard drive?
```

1    A.  No.

2              MR. GAUDET:  Objection.

3              THE COURT:  No, she may have the question and

4    the answer may stand.

5              MS. PARUTI:  Thank you.

6    Q.  Um, if we could --

7              MS. PARUTI:  If we could put up Exhibit 22,

8    please.

9    Q.  This is one of the exhibits that counsel referred to

10   during his cross-examination of you.

11   A.  Okay.

12             MS. PARUTI:  Can we just blow up the file path

13   here, please.

14             (Blows up.)

15   Q.  I think the question implies that this was related

16   to Frostwire, but can you tell us what folder this

17   particular file came from?

18   A.  This particular file is in the Incomplete folder.

19   Q.  Okay.  And was the Incomplete -- was that an

20   Incomplete folder that was related to Frostwire?

21   A.  It is not.

22   Q.  Can you tell where this particular folder came from?

23   A.  I cannot.

24   Q.  In fact can you tell whether it was downloaded off

25   the internet or introduced by a thumb drive or some

1   other sort of storage device?

2   A.   I guess in direct relation to that testimony where

3   we said that the file paths were, or the names did not

4   indicate when it was an incomplete download, so if these

5   were incomplete, by that assertion these would not be

6   readable names, it would just be letters and numbers.

7   However this list of names in the Incomplete folder all

8   have "pedo" in the title or "PTHC" and these files were

9   playable and they do have the file extensions.

10  Q.   Okay.  So can you tell from that information where

11  exactly they came from?

12  A.   No, I can't.

13  Q.   Okay.

14           MS. PARUTI:  If you could collapse that and if

15  you can just blow up creative access modified.  Perfect.

16  Q.   You were talking about created dates and actual

17  dates and modified dates.  We've seen that date, January

18  31st of 2015 and the 3-22 on there.

19       Now we were talking about -- and I want to make

20  sure the testimony is clear, you're talking about, um,

21  manual access versus some other sort of access.  Can you

22  just explain what you meant by that when you were

23  answering the question?

24  A.   Sure.  And so it does get confusing where the access

25  comes from.  Because we do not have a link file to

1    specify that access on that date or time, oftentimes

2    this access can also refer to if Windows touches a file.

3    Um, by opening the folder or Windows does what's called

4    "indexing," so that when something is searched, it can

5    be easily accessed.  So as we talked earlier about this

6    start bar, and then the start button, and then the

7    search bar within that field that appears, that's how

8    Windows is able to search your entire hard drive

9    quickly, by that indexing function that is often used.

10   Q.  Okay.  And this doesn't tell you anything about

11   these particular kinds of data.  Does this tell you

12   anything about how often these particular files were

13   actually manually accessed between the created date and

14   the accessed date?

15   A.  No, it does not.

16              MS. PARUTI:  Yes, that one, please.  If you

17   could go to the Shiraza -- Exhibit 20, please.  Just

18   blow up the bottom left on that.  Okay.

19   Q.  So you said these files that were found, um, that

20   you viewed and you described one of them as TTR, I

21   believe.  You said that they were dot partial files?

22   A.  Yes.

23   Q.  Did that impede your ability to see them?

24   A.  It did not.

25   Q.  Okay.  In fact do you know how many minutes -- I

1    think you said that file was about 49 minutes long?

2    A.   49 minutes and 22 seconds.

3    Q.   Okay.  Were you able to see a significant portion of

4    that particular file?

5    A.   Yes, I was.

6    Q.   Okay.  Now looking at the string of letters and

7    numbers, um, in the names of these files, does that have

8    any significance to you, Agent, in your experience for

9    why those sorts of letters might be in the title of a

10   file?

11   A.   Um, I'm not sure.

12   Q.   Okay.  Does the term or the combination of ED 2k,

13   does that have any significance for you?

14   A.   Those are often letters and Number 2 is associated

15   with edonkey, which is another file from a bit torrent

16   file-sharing program.

17   Q.   Okay, and bit torrent, I think you said earlier, is

18   just a type of a file-sharing protocol?

19   A.   Correct.

20            MS. PARUTI:  Okay, now --

21   Q.   Now you said that, um, linked files -- you were

22   asked about, um, link files and I think counsel said,

23   um, a file could be accessed, that you can't tell from a

24   link file how long that file is accessed, correct?

25   A.   Correct.

1    Q.  Okay.  And then for the link files that you saw,
2    some of them, for example the one entitled "pedowoman
3    and her doggie dot lnk," you don't know how long that
4    was opened on Mr. Levin's computer, correct?
5    A.  Correct.
6    Q.  Okay.  Can you tell -- but you know that that file
7    wasn't still on the computer when you looked at it?
8    A.  That is correct.
9    Q.  Can you tell anything from your forensic examination
10   about how that computer -- excuse me, about what
11   happened to that file after it was removed from this
12   particular hard drive?
13   A.  No.
14   Q.  So, for example, link files don't tell you whether
15   or not files were in fact copied over to other media
16   like thumb drives?
17   A.  Correct.
18   Q.  And you described a thumb drive, and just for the
19   record tell us what is a "thumb drive," when we're using
20   that colloquial term?
21   A.  It's an external storage device.
22   Q.  And what is the size of thumb drives these days?
23   A.  It is very small, they've gotten even smaller.  I
24   think Mr. Gaudet referred to an inch and a half or 2
25   inches, but some are even smaller that that.

1   Q.  Okay.  So even back in say 2015, so, for example, in

2   August of 2015 or March of 2015, thumb drives were in

3   existence then, correct?

4   A.  Yes, they were.

5   Q.  And in fact you actually received how many thumb

6   drives from Mr. Levin's house, approximately?

7   A.  I believe there were two.

8   Q.  Okay, so there were only two thumb drives that were

9   found in Mr. Levin's house, correct?

10  A.  Correct.

11  Q.  And to be very clear, did the FBI or any other law

12  enforcement agency search any piece of media that was

13  not found at Mr. Levin's house?

14  A.  No.

15          MS. PARUTI:  Thank you.

16          THE COURT:  Nothing further?

17          MR. GAUDET:  Briefly, your Honor.

18          THE COURT:  You may.

19

20  RECROSS-EXAMINATION BY MR. GAUDET:

21  Q.  Agent Phelps, we were just discussing indexing.  And

22  so it's clear that the access dates of January 31st,

23  2015 were the result of computer indexing the files,

24  correct?

25  A.  I'm not saying that that was specifically what

1    happened, I was just describing something that could

2    potentially cause an access date -- a function by

3    Windows.

4    Q.  And if a computer indexes files, it goes through all

5    of them, right?

6    A.  Correct.

7    Q.  Sequentially?

8    A.  Correct.

9    Q.  At sort of the same time?  So that the access dates

10   would all be close in time?

11   A.  Close in time, correct.

12   Q.  Okay.  And the January 31st, 2015 access, the last

13   access date, do you have any indication that those files

14   were accessed prior to that, correct?

15   A.  I don't have something indicating it.

16   Q.  No.  So the date between the access creation date

17   and the access date, you don't have any indication there

18   was access before those dates?

19   A.  I do not know that.

20   Q.  And briefly, for peer-to-peer programs, it's

21   possible to download an entire drive at once, isn't it?

22              MS. PARUTI:  Objection.

23              THE COURT:  Sustained.  Beyond the scope.

24              MR. GAUDET:  Nothing further.

25              THE COURT:  Nothing further for this witness?

```
 1            MS. PARUTI:  No, your Honor.

 2            THE COURT:  You may step down.

 3        That's the government's case?

 4            MS. PARUTI:  Yes, your Honor, the government

 5    rests.

 6            THE COURT:  All right.  We're right on track.

 7    It's come up that I have to go to the doctors, so we're

 8    going to knock off about 40 minutes today and stop at

 9    12:20.  This is -- I'm going to give you a recess now

10    for -- till 10 of, and we'll start with the defense's

11    case.  We are staying right on track.  I do apologize

12    for stopping early.  Everyone's moving right along.  But

13    I need to do some legal talk with them with the case at

14    this stage.

15        You have not heard all the evidence, please

16    therefore keep your minds suspended, do not discuss the

17    case either among yourselves, nor with anyone else.  You

18    may stand in recess until 10 minutes to 11:00.  I'll

19    remain on the bench.

20            THE CLERK:  All rise for the jury.

21            (Jury leaves, 10:35 a.m.)

22            THE COURT:  Please be seated.

23        Does the defense wish to make a motion at this

24    stage?

25            MR. CARNEY:  Yes, your Honor.  I move for a
```

```
 1    directed verdict of not guilty.

 2              THE COURT:  Yes.  Your motion is denied.  Your

 3    rights are saved.  You can start at 10 of 11:00, we'll

 4    go until 20 after 12:00.  I'll call you to the sidebar

 5    before I do have to leave -- and I apologize, but I do

 6    have to leave, because I'd like your estimate.  And I

 7    will certainly rely on your good faith estimates.  I

 8    want to tell the jury, are we going to get the case to

 9    the jury next Wednesday the 29th or Thursday the 30th?

10    And you'll be able to tell me, I think, once we've gone

11    that distance.  So we'll recess briefly.  We'll recess.

12              THE CLERK:  All rise.

13              (Recess, 10:35 a.m.)

14              (Resumed, 10:50 a.m.)

15              (Note to judge from jury.)

16              THE COURT:  I have various questions from the

17    jury, but I don't have a witness, so we'll see if we

18    have a witness to whom those questions can be asked.

19    I'll give it to Ms. Gaudet and you may call your first

20    witness.

21              MR. CARNEY:  May we see the questions?

22              THE COURT:  Of course.  Of course.

23              (Shows questions to counsel.)

24              (Pause.)

25              THE COURT:  Okay, well let's go forward with
```

1   the evidence.  Call your first witness.

2          MR. CARNEY:  Thank you, your Honor.  The

3   defense calls Joseph Nicholls.

4          THE COURT:  He may be called.

5          (JOSEPH NICHOLLS, sworn.)

6

7          * * * * * * * * * * * * * * *

8          JOSEPH NICHOLLS

9          * * * * * * * * * * * * * * *

10

11  DIRECT EXAMINATION BY MR. CARNEY:

12  Q.  Good morning.

13  A.  Good morning.

14  Q.  Would you please introduce yourself to the ladies

15  and gentlemen of the jury.

16  A.  Joseph Nicholls.  N-I-C-H-O-L-L-S.

17  Q.  What kind of work do you do, sir?

18  A.  I'm a digital forensics examiner.

19  Q.  What is your educational background?

20  A.  I have an electrical engineering degree from Ohio

21  State.

22  Q.  For how long have you been in this line of work?

23  A.  I've been doing computers since 1974, designing and

24  developing computer systems commercially, and for the

25  past almost 10 years now, I've been doing digital

1    forensics.

2    Q.  Have you been found to be an expert by courts of

3    this Commonwealth or elsewhere?

4    A.  Yes.

5    Q.  I'd like to ask you just a few questions.  First,

6    can you remind us what a "peer-to-peer" program means?

7    A.  "Peer-to-peer" is, um -- I'll contrast it with the

8    normal website, let's say the website CNN.  You click on

9    a link, it takes you to the CNN page.  You click on a

10   story.  The CNN company, their computer servers will

11   send you back that story with it.

12       Peer-to-peer doesn't use a server, it uses other

13   people's computers, and we'll call those "remote

14   computers."  So you can request that items be downloaded

15   to your computer from these remote computers.  But

16   there's no central computer to do it from.

17   Q.  Does a peer-to-peer file-sharing program enable

18   persons who have Computer 1, with programs on it, to be

19   accessed by Person Number 2 from his own computer?

20   A.  Yes, it will -- keeping with that terminology, if

21   Computer Number 2 is the person downloading this

22   information, Computer Number 1, the person that owns

23   that tells the computer that "These are the files I am

24   willing to share with the outside world," it could be a

25   single folder, it could be a single file, it could be

1    multiple folders, it could even be a whole hard drive if

2    that person is willing to share his whole hard drive

3    with the rest of the world.

4    Q.  Is it uncommon that people will make their entire

5    hard drive available if they wish?

6    A.  It's uncommon, yes, but it can be done.

7              MS. PARUTI:  Objection.

8              THE COURT:  Well it's not timely.  We'll let

9    that stand.

10   Q.  Is it possible for a user to obtain every single

11   file on the hard drive of another computer user by

12   employing this peer-to-peer file-sharing?

13             MS. PARUTI:  Objection.

14             THE COURT:  Sustained.

15   Q.  What is -- well can a person identify specific

16   folders to transfer into his computer?

17             MS. PARUTI:  Objection.

18             THE COURT:  Well I think you're entitled to

19   explore how peer-to-peer file-sharing works and so, um,

20   I'm going to allow that.  We've already heard some

21   testimony that you can share music and the like and

22   you're explaining to us how now that works without a

23   server.  I wouldn't allow a question about what's

24   possible because we're not going to spend the time going

25   through every conceivable possibility, maybe we'll get

1    some testimony here.

2        But in the normal course -- I think your question

3    was, in the normal course, when it's peer-to-peer,

4    people are sharing particular files, is that the usual?

5            THE WITNESS:  Yes, it is.

6            THE COURT:  Go from there, Mr. Carney.

7    Q.  Is it possible --

8            THE COURT:  Well I'm not going for "Is it

9    possible?"

10           MR. CARNEY:  Oh, okay.  Right, your Honor.

11   Q.  Can a person obtain all of the files on a hard drive

12   in one fell-swoop?

13           MS. PARUTI:  Objection.

14           THE COURT:  He's answered that, and his answer

15   was it's unusual, but "Yes."

16       Is that right?

17           THE WITNESS:  That's correct.

18           THE COURT:  All right.

19   Q.  Is there a term for doing that used by computer

20   users?

21           MS. PARUTI:  Objection.

22           THE COURT:  No, overruled.

23   A.  The term is normally calmed "sweeping a hard drive."

24   Q.  How does one "sweep a hard drive"?

25           MS. PARUTI:  Objection.

1              THE COURT:  Sustained, there's no foundation

2      for any of this.

3              MR. CARNEY:  May I approach, please, for a

4      moment?

5              THE COURT:  You may.

6

7              AT THE SIDEBAR

8              THE COURT:  If the theory is that Mr. Levin

9      did that and he swept up these objectionable matters,

10     then we've got the order of witnesses wrong.  There's no

11     foundation for that.  And even though that's possible,

12     we're not going any further.  There's no real evidence

13     of that.

14             MR. CARNEY:  May I make an offer of proof?

15             THE COURT:  Not now.

16             MR. CARNEY:  I need to for this.  Please?

17             THE COURT:  Not now.

18             MR. CARNEY:  Your Honor, may I just make an

19     offer of proof?

20             THE COURT:  No, you may not.

21             MR. CARNEY:  My client's going to testify and

22     I'm going to put on the record what he's going to say,

23     and he's going to say that he swept these files.

24             THE COURT:  Well I'll let him step down.  We

25     can hear your fellow.  Then we'll hear him.

```
 1                    MR. CARNEY:  You won't accept my offer of

 2      proof?

 3                    THE COURT:  It's not a question of not

 4      accepting it, I want to hear it under oath.

 5                    MR. CARNEY:  You'll hear it from my witness, I

 6      assure you.

 7                    THE COURT:  I hear what you say, but we're

 8      going to hear him next, and then we'll hear Nicholls.

 9      You tell me how you want to do it?

10                    (Pause.)

11                    MR. CARNEY:  So you won't allow me to explore

12      any further the sweeping of hard drives?

13                    THE COURT:  That's correct.

14                    MR. CARNEY:  Um, all right, I'll continue with

15      this witness and I'll recall him after my client.

16                    THE COURT:  I'll allow that.

17

18                    (In open court.)

19      Q.  Mr. Nicholls, I'd like to focus your attention on

20      the 13 videos that are the subject of this indictment.

21      A.  Yes.

22      Q.  Are you aware of the 13 videos that the

23      Commonwealth -- I mean that the government has charged

24      Mr. Levin with knowingly having on his computer?

25      A.  Yes.
```

1   Q.  Now, can you tell us what a linked attachment to a

2   file indicates?

3              MS. PARUTI:  Objection.

4              THE COURT:  No, overruled.

5   A.  Yes, the most common way that a link file gets

6   created is if somebody opens a file -- we're talking

7   about videos and pictures, so we'll say somebody puts on

8   a video or a picture, and as we heard earlier the, um,

9   clicking on it by a person will create a shortcut to

10  that picture or video, and that is what we call the

11  "link file," it's linking the user to a file so that

12  they don't have to remember a long path name.

13  Q.  Is having a linked file at the end of a type of a

14  folder a clear indication that the user opened that

15  folder?

16             MS. PARUTI:  Objection.

17             THE COURT:  Oh, no, um -- well you are leading

18  this witness, so I'm going to sustain that.  But you may

19  certainly explore this.

20             MS. PARUTI:  Your Honor, can we be heard?

21             THE COURT:  Oh, I don't think so.  This has

22  all been opened up, we'll hear what he has to say about

23  it.

24  Q.  What can you determine from a linked file attachment

25  to a folder?

1    A.   To a folder or a picture?

2    Q.   To a picture or a video.

3    A.   The chances are good that that picture was opened

4    through the user interface.

5    Q.   If a folder -- rather let's say a video, does have a

6    linked-in signature after the, um, name of the folder,

7    is that clear evidence that the user has opened that

8    folder?

9              MS. PARUTI:  Objection.

10             THE COURT:  No, sustained, you're leading the

11   witness.

12   Q.   If there is a, um, appended to a videotape the word

13   "linked," is that or is that not clear evidence that the

14   user has opened the folder?

15             MS. PARUTI:  Objection.

16             THE COURT:  No, sustained.

17       If there's an appended link, what does that mean

18   to you?

19             THE WITNESS:  To me it means that chances are

20   very high that the user clicked on a picture to view it

21   on his screen.

22   Q.   And you saw no linked-in files -- linkage attached

23   to the 13, um, videos that are at issue in this case, is

24   that right?

25             MS. PARUTI:  Objection.

1           THE COURT:  Again you're leading the witness,
2      but you can ask him --
3           MR. CARNEY:  I'm trying not to, your Honor,
4      I'm just anxious to --
5           THE COURT:  But what's the -- what's the
6      relationship of linkage to the 13 files to which there's
7      been admission that they're all child pornography?  I'll
8      ask that.
9           MR. CARNEY:  Okay.
10          THE COURT:  Do you understand my question?
11          THE WITNESS:  Yes, I do, sir.
12          THE COURT:  You tell the jury, without
13     suggesting an answer.
14     A.  Since I found no link files that point to these 13
15     images, and following what I just said, to me that means
16     there's a good chance that those images were never
17     clicked on to view on the screen.
18          MS. PARUTI:  Objection.
19     Q.  Have you reviewed the --
20          THE COURT:  Well I'll treat it as a motion to
21     strike and the motion to strike is denied.
22          What does the word "accessed" mean in this
23     parlance with respect to a file being opened?
24          THE WITNESS:  "Accessed" means that the
25     contents of the file --

1          THE COURT:  Always tell the jury.

2          THE WITNESS:  I'm sorry.  All right.

3      "Accessed" means that the computer wanted to see

4  what was inside the file when it pulled the data out of

5  the file.  If it's a word processing document, it pulls

6  the data out that makes your letter to your grandmother,

7  the characters in it.  If it's a picture, it's pulling

8  the 1s and the 0s out of the picture to put them on the

9  screen in various colors.  That's "accessing" the file.

10          THE COURT:  In other words to display the

11  picture, you then would see the picture?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  Okay.  Go ahead.

14      Can you access something without opening the file,

15  or in computer parlance, open first, then access?

16          THE WITNESS:  Um, no.

17          THE COURT:  Again tell the jury.

18          THE WITNESS:  No.  There are other things that

19  can access it, printing, for example, um, and indexing a

20  file can access it and cause that access to make the

21  change.  But you cannot display the file on the screen

22  so you can see the picture and then not have an access

23  date.

24  Q.  Have you reviewed all of the digital evidence in

25  this trial?

A.   I have.

Q.   Was there any evidence whatsoever that showed that these 13 videos were ever opened by Mr. Levin?

          MS. PARUTI:  Objection.  Your Honor, may I be heard?  It's about the --

          THE COURT:  You may be.

          MS. PARUTI:  Thank you.


          AT THE SIDEBAR

          THE COURT:  Other than the fact that that's leading, but it could be asked in a nonleading way, what's the matter with that?

          MS. PARUTI:  The problem is the expert disclosure was that Mr. Nicholls was going to testify to his opinion about how the files got onto his computer. When I pressed counsel for more information of that, I received an e-mail that said "Joe's opinion is that the file has arrived on the computer via peer-to-peer file-sharing programs."  I was never apprised of any other opinion -- this is basically an opinion that these particular files were never accessed.

          THE COURT:  I understand that, but this is a criminal case.  Now I -- I am very strict in civil cases where there are requirements for detailed expert reports, but just as you don't have to give any detailed

1   export reports in a criminal case, nor do they.

2        Now I'll accept what you say, we all know what has

3   been disclosed, but what authority have you that where

4   he's testified about these files and it's relevant, I

5   ought not hear his answer?

6             MS. PARUTI:  It's highly prejudicial to the --

7             THE COURT:  It's intended to be prejudicial.

8             MS. PARUTI:  I'm only talking about the nature

9   of the evidence.  There's no evidence against it being

10  prejudicial.  The manner in which the nature of the

11  evidence has been hidden is prejudicial to the parties

12  and that's a people thing not an evidence thing.  And I

13  think it's highly unfair --

14            THE COURT:  I hear you, but what authority

15  have you?

16            MS. PARUTI:  I don't have a case now.  I'm

17  sure I could provide the Court with a case, and I will.

18  And I'll ask the Court to strike his testimony, it's

19  underhanded.

20            THE COURT:  Well that will be downstream and

21  we will see.  But you may continue.

22            MS. PARUTI:  Thank you, your Honor.

23

24            (In open court.)

25            THE COURT:  This is not rocket science, when a

1    party calls a witness, he can't lead the witness, he

2    can't ask questions which suggest answers.  In other

3    words, he can't ask a question and say, "You were

4    wearing a red hat, weren't you?" if you were the party

5    calling the witness.  But that last question could be

6    asked in a nonleading fashion, so let's try it.

7         You've testified you looked over all the digital

8    evidence in this case.  What evidence is there now, as

9    an independent examiner here, that Mr. Levin, who

10   undisputed had that computer, accessed those files that

11   are admitted to be child pornography?  From the computer

12   because that's all you looked at.

13                   THE WITNESS:  Right.

14                   THE COURT:  What evidence?

15                   THE WITNESS:  I found no evidence to that.

16                   THE COURT:  All right.  Go ahead.

17        Anything else?

18   Q.  You mentioned an "indexing program"?

19   A.  Yes.

20   Q.  Could you explain what an "indexing program" means?

21   A.  Yeah, an "indexing program" is, um, similar to a --

22   let's say an encyclopedia index where if you want to

23   find something out about elephants, you go find in the

24   back of the index of the encyclopedia where it says what

25   volume and page contains topics about elephants, and the

```
 1    same thing with the computer.  That Windows has the
 2    ability to say "I want to see all the files, documents,
 3    spreadsheets, whatever, that have to do with elephants."
 4    And in order to do that, Microsoft Windows has software
 5    that will look inside every file and find each time the
 6    word "elephant" in this example is referenced and make a
 7    note of that.  And that's put into an "indexing file,"
 8    is the easiest way to explain it, just like the index of
 9    the encyclopedia.
10         So when you type in on the computer "elephants,"
11    Microsoft could then go look in this indexing file and
12    put on your screen "These are the 17 files that I
13    found," or "I," that the operating system found, that
14    referenced "elephants" and then you can pick and choose
15    which one of those you want.  But to do that you'd have
16    to look inside each one of those files, and that's an
17    access, it's looking at the contents of each one of
18    those files.
19    Q.  Approximately how long does it take to index a
20    single video?
21              MS. PARUTI:  Objection.
22              (Pause.)
23              THE COURT:  On that foundation, sustained.
24    Wouldn't it depend on how long the video is, that type
25    of thing?
```

1      THE WITNESS:  Um, for a video, no.

2      THE COURT:  It would not?

3      THE WITNESS:  It would not.  It takes

4  milliseconds anyways.

5      THE COURT:  All right.  So your answer is "no

6  time at all."

7      THE WITNESS:  "No time at all."

8      THE COURT:  All right.

9      Go ahead, Mr. Carney.

10  Q.  What is a "millisecond"?

11  A.  A 1,000 -- 3 decimal points, which is a thousand.

12  1,000.

13  Q.  So is that 1/1000th of a second?

14  A.  Yes, some multiple of that.  A short time to a human

15  being.

16  Q.  All right.  Now there has been evidence in this case

17  that the 13 videos were accessed on January 31, 2015?

18  A.  That is correct.

19  Q.  Are you aware of that?

20  A.  Yes, I am.

21  Q.  Are you or are you not able to determine whether it

22  was -- whether they were accessed on that day as part of

23  the indexing function of Microsoft Windows?

24      MS. PARUTI:  Objection.

25      THE COURT:  No, he may have it.

1          Can you answer that?

2               THE WITNESS:  Yes, sir, I can.

3               THE COURT:  In nonleading ways, can you tell

4      how or by what mechanism they were accessed?  And your

5      answer to that is "Yes, you can"?

6               THE WITNESS:  In this case the answer is "Yes,

7      I can."

8      Q.  Pleased explain to the ladies and gentlemen of the

9      jury how you can tell this fact?

10              MS. PARUTI:  Objection.

11              THE COURT:  Overruled.

12     A.  I can tell in that they were all done within seconds

13     of each other and the blocks are like 5 in 1 second and

14     5 in another.  It was all sequential.  So I looked

15     inside the system and found that this sequential access

16     on January 31st started at approximately 1:48 a.m. and

17     continued to almost 9:00 a.m., multiple hours, and in

18     that I found there were thousands and thousands of files

19     that were accessed, um, subsequently.  And --

20              MS. PARUTI:  Objection, your Honor.

21              THE COURT:  Had you finished your answer to

22     that question that he gave you, Mr. Nicholls?

23              THE WITNESS:  Um, no.

24              THE COURT:  So you finish your answer to his

25     question.

1          THE WITNESS:  All right.

2     A.  So there were thousands of files and the sequential

3     access stopped and then a little bit later there was

4     access to the indexing files -- the index I talked about

5     like the index of an encyclopedia, and those were the

6     only accesses for a long time on that day.  So that

7     tells me, because it was sequential, and it was all in

8     the files, that it was going to -- that it would

9     normally be indexed, and the index files were also

10    updated in the same time frame, so that it was the

11    Windows indexing software that caused those access dates

12    of January 31st.

13    Q.  Mr. Nicholls, do you have an opinion, to a

14    reasonable degree of scientific certainty, whether the

15    defendant's computer was indexed on January 31st, 2015?

16          MS. PARUTI:  Objection.

17          THE COURT:  Overruled.

18    A.  I do.

19    Q.  Would you please tell the jurors what your opinion

20    is to a reasonable degree of scientific certainty?

21    A.  That again because of the sequential nature and the

22    last two files that were updated, it's highly likely --

23    I don't know the number to put on it, but that it's very

24    highly likely that it was the indexing software that

25    caused those access dates to be set the way they were.

1    Q.  And for how long was each of those 13 folders open

2    during this indexing process?

3    A.  (Pause.)  I am hesitating, the distinction was

4    between, in this case, because it was not a human that

5    opened them, but a computer.

6            MS. PARUTI:  Objection.

7    A.  I would like to understand what you mean by

8    "opened"?

9            MS. PARUTI:  Objection, move to strike.

10   Q.  All right.

11           THE COURT:  Wait a minute.  Wait a minute.

12   The motion to strike is denied.  We'll let that stand as

13   his answer.  And you ask another question, Mr. Carney.

14   Q.  How long were each of these videos accessed by the

15   computer during the indexing?

16           THE COURT:  Well I'm not clear on a foundation

17   question, which is can you tell that from your

18   examination?

19           THE WITNESS:  Yes.

20           THE COURT:  All right.  You may answer his

21   question.

22       How long?

23   Q.  How long was each video accessed during the indexing

24   process that occurred on January 31st, 2015?

25   A.  We're talking again about milliseconds because

1    access in this case does not mean displayed on the

2    screen.

3    Q.   Thank you very much.

4              MR. CARNEY:   That's all I have, your Honor.

5              THE COURT:   Any redirect?

6              MR. CARNEY:   And I reserve my right to recall

7    the witness, your Honor.

8              THE COURT:   I've said you could.

9         Go ahead.

10

11   CROSS-EXAMINATION BY MS. PARUTI:

12   Q.   Mr. Nicholls, you're being paid obviously for your

13   work on this case?

14   A.   Yes, this is my job.

15   Q.   How much are you charging an hour?

16   A.   $205 per hour.

17   Q.   Okay.  And how many hours have you been here today?

18   A.   Um, a little over 2 1/2.

19   Q.   Okay.  And how many hours were you here yesterday?

20   A.   Um, 5.

21   Q.   How many hours total do you expect to bill for this

22   case?

23   A.   I'd have to go check my records for that.

24   Q.   Okay.  Was yesterday the first day you worked on the

25   case?

A.   No.

Q.   Okay.  You've been contacted by the FBI at least two times, correct?

A.   Correct.

Q.   And you participated in phone conversations with agents, correct?

A.   Correct.

Q.   So there's hours involved in those.  How many hours did you spend with the FBI?

A.   The FBI?  I spent five days with the FBI.

Q.   Five whole days?

A.   Yes.

Q.   And so when you say "days," you mean an 8-hour workday?

A.   Um, 6 hours.

Q.   6 hours.  So 6 times 5 is 30.  So times $205 an hour, is that what you said?

A.   Yes.

Q.   Okay.  And when were you first contracted to work on this case, what year?

A.   Um, yes, it was last -- um, almost a year.

Q.   Okay.  So, um, apart from those several days worth of time that you referenced, did you work other days for payment by this defendant?

A.   I did, yes.

```
1    Q.  And approximately how many?

2    A.  Again I'd have to check my records.

3    Q.  You don't remember that?

4    A.  No.

5    Q.  Okay.  But you do -- I notice you don't have any

6    notes before you?

7    A.  Correct.

8    Q.  Okay.  Is this the only case you're working on right

9    now?

10   A.  No.

11   Q.  Okay.  How many other cases are you working on right

12   now?

13   A.  Um, my active case log I have, um, 63.

14   Q.  Okay.  So you have 63 other cases.  You remember all

15   the details about --

16        Did you generate a report about your examination

17   of the imaged hard drive in this case?

18   A.  No.

19   Q.  You didn't?

20   A.  No.

21   Q.  So do you have notes?

22   A.  I have notes.

23   Q.  You do.  Okay.  So you can rely on your notes as you

24   testify, um, and you remember all these details about

25   indexing and files you found, but you can't remember how
```

```
 1    many hours you're going to bill to get paid on this
 2    case?
 3              MR. CARNEY:  Objection, argumentative.
 4              THE COURT:  Overruled.
 5    A.  Um, yes.
 6    Q.  Okay.  Thank you.
 7    A.  I'd reviewed the notes about those topics before I
 8    took the stand.
 9    Q.  Okay.  Now you said -- you're talking a lot about
10    the access date of certain files here.  It is fair to
11    say, isn't it, that the access date just tells you about
12    the last time that something happened to that file,
13    correct?
14    A.  That's correct.
15    Q.  Okay.  It tells you nothing, absolutely nothing
16    about what happened before that date, correct?
17    A.  Correct, the computer only keeps track of the last
18    time.
19    Q.  The last time.  And sometimes for the first time,
20    right, the created date?
21    A.  The created date, yes.
22    Q.  And that created date is typically used to signify,
23    or we typically, depending on the operating system we're
24    using and lots of other variables, but we typically can
25    determine when a particular file was created on these
```

1    computers, so on a particular hard drive, not that it

2    was ever created like when the video was made, correct?

3    A.  Correct.

4    Q.  All right.  So we know, at the very least, that

5    these files we've been talking about made their way onto

6    Alex Levin's computer in 2011, correct?

7    A.  Yes.

8    Q.  Okay.  And if you need to refer to exhibits that we

9    have, absolutely tell me and I can call those up.  I

10   don't want you to have to rely on your memory.

11   A.  All right.

12   Q.  So we know that they made their way onto his

13   computer in 2011 and they were last accessed in some way

14   in 2015, correct?

15   A.  Correct.

16   Q.  Now you were sitting in the courtroom watching the

17   government's testimony today, correct?

18   A.  Correct.

19   Q.  What about yesterday?

20   A.  I was not.

21   Q.  Okay.  Did you hear about the testimony yesterday?

22   A.  I did not.

23   Q.  You didn't hear anything about any testimony of any

24   government witness yesterday?

25   A.  I was asked some questions after court adjourned

```
 1   yesterday, but, um, no, I was not given the narrative
 2   about what was testified to.
 3   Q.  Okay.  Have you reviewed the exhibits in this case?
 4   A.  I have.
 5   Q.  Okay, so you have some familiarity with those?
 6   A.  Yes.
 7             MS. PARUTI:  Just give me one moment, please,
 8   sir.
 9             (Pause.)
10   Q.  Okay.  You were talking about indexing.  Um, so if
11   we --
12             MS. PARUTI:  If we could have --
13   Q.  You were here Monday --
14             MS. PARUTI:  I'll just give the jurors time to
15   get their screens out.
16             THE WITNESS:  Yes.
17             (Pause.)
18   Q.  Okay.  So it looks like we're up and running.
19        So you know what this exhibit is, correct?
20   A.  Yes, this is an "Access Data Registry Report."
21   Q.  Okay.  And you're familiar with registry reports?
22   A.  Yes.
23   Q.  Okay.  And you have no question that the data
24   contained within a registry report is actually the data
25   that was recorded by the system, right?
```

1    A.  Correct.

2    Q.  All right.  So, um, you would agree then that it's

3    accurate.  And when we're looking at this first page,

4    um, here, um, the -- if you look at the bottom of the

5    page, the line number that says "25" and then it has a

6    short target name?

7    A.  Yes.

8    Q.  Okay.  And that's the one that has some symbols, um,

9    which are like peanuts maybe and then "pedo woman" and

10   numbers, correct?

11   A.  Correct.

12   Q.  All right.

13          MS. PARUTI:  Can you go to the next page,

14   please.

15          (On screen.)

16   Q.  And you see, actually at the top of the page, the

17   link file for that particular document or that

18   particular file, correct?

19   A.  Correct.

20   Q.  All right.  So a link file, you said, is something

21   that, um, existed on a computer and was opened on the

22   computer at some point?

23   A.  Yes.

24   Q.  Okay.  So we know that that was opened on the

25   computer.

1      Did you look to see if that particular file
2  existed on the computer?
3  A.  I did.
4  Q.  Okay, and did you find that particular file on the
5  computer?
6  A.  No.
7  Q.  Okay.  So that means that it was either deleted --
8  correct?
9  A.  Correct.
10  Q.  Were you able to search deleted space in this
11  particular computer?
12  A.  I was not.
13  Q.  Okay.  Did you try to?
14  A.  No, um, the size of these hard drives, it would have
15  taken more than the 5 days that I did spend with the
16  FBI.
17  Q.  Okay.  So, um, the size of this particular drive,
18  um, it had a lot of files on it, correct?
19  A.  I'm sorry, say that again?
20  Q.  This drive, the imaged hard drive that the files
21  came from, had a lot of files on it, correct?
22  A.  Yes, thousands.
23  Q.  Thousands and thousands of files?
24          MR. CARNEY:  Your Honor, may I be heard,
25  please?

1          THE COURT:  You may.

2

3          AT THE SIDEBAR

4          MR. CARNEY:  Your Honor, I object to this

5   testimony, it's applying to files of which there's no

6   remnant whatsoever on the computer, and if it had been

7   deleted, it could have been found on the computer.  It's

8   also beyond the 13 videos that your Honor said we would

9   focus on.

10          THE COURT:  Now wait a minute.  I have allowed

11   in evidence and I've confined your judicial admission to

12   those 13 videos.  You've made a point of that in your

13   motion and I indeed strike them from the physical

14   evidence.  You put him on the stand and he has

15   demonstrated that -- his knowledge about computers.  My

16   order stands.  We're not going to get into anything

17   about deleted videos beyond the ones that have the names

18   that we've already talked about.

19          But nothing that I hear her asking about files

20   that were -- and I have instructed that you have to come

21   to the sidebar if anyone wants to get into that.  I see

22   no reason to, but she may cross-examine him.

23          All right?

24          MS. PARUTI:  Just one thing.  I heard in some

25   of the questioning -- and I don't remember, I think it

1    was the cross of Agent Phelps, where the question was

2    asked, "You didn't find any other child pornography?"

3    And the answer was "No."  But the answer really was

4    "Yes, there was other child pornography found," but

5    they're not going to get into the other child

6    pornography.

7          So I just want to make sure that I hear, at least

8    keeping that I cannot inquire about how that referred to

9    some additional child pornography that was found, I just

10   want to make sure that he understands that the defense

11   will not be able to, um --

12              THE COURT:  -- argue that there is no other.

13   That's how I interpret my ruling.

14              MS. PARUTI:  All right.  Great.  Thank you.

15

16              (In open court.)

17              THE COURT:  Proceed, Ms. Paruti.

18   Q.  Mr. Nicholls, do you remember my question?

19   A.  I do not.

20   Q.  I think we've been talking about -- I think you had

21   said that there were -- that given the size of this

22   drive, it was pretty big and so you were not able or you

23   didn't have time to, um, analyze the unallocated space

24   or the deleted space in this drive?

25   A.  Correct.

1    Q.  Okay.  So you have no idea whether or not any of

2    these files that are noted as deleted files here, that

3    don't have original or target files present on these

4    normal spaces on the hard drive, you have no idea of

5    whether or not they were located in unallocated space?

6             MR. CARNEY:  Speculative, your Honor.  I

7    object.

8             THE COURT:  Overruled.

9    A.  Right, I don't know where these files are or were.

10   Q.  Okay.  Now, in a drive of that size --

11            MS. PARUTI:  Actually, could you put up 6,

12   please.

13            (On screen.)

14   Q.  You said that the drive was pretty huge.  And you

15   would agree, wouldn't you, that it also had a pretty

16   extensive, um, file structure, a user-defined file

17   structure within the drive itself, wouldn't you?

18   A.  Yes.

19   Q.  Okay.  So when you say that, so that everybody knows

20   what we're talking about, um, we mean that there would

21   be sort of the beginning folder, and that was sort of

22   the root folder, right, that's where everything started?

23   A.  Yes.

24   Q.  And that underneath that you have other subfolders,

25   right?

1    A.   Many subfolders.

2    Q.   Right.  And would you say hundreds in this

3    particular case or thousands?

4    A.   Um, there was definitely thousands.

5    Q.   So thousands of subfolders where there was a

6    different type of data stored on this computer, correct?

7    A.   Correct.

8    Q.   So, for example, there were Word documents that you

9    saw?

10   A.   Yes.

11   Q.   Okay.  And I just want to be clear, did you actually

12   look at certain items that were still physically on that

13   hard drive?

14   A.   I looked only at the contents of items that had been

15   specified in the government's reports.

16   Q.   Okay.  So you only looked at, um -- by that do you

17   mean you only looked at like child pornography?

18   A.   Um, I -- yes, there were those, um, just to make

19   sure that there's no typo in the names.

20   Q.   Okay.

21   A.   Um, the folders they were in.

22   Q.   Uh-huh.

23   A.   I did look at -- we'd call it a "tree," a folder

24   there having more folders in it, subfolders and

25   subfolders and subfolders, it's commonly called a

1    "tree," and I did look at the meta data about the files

2    in that tree.  "Meta data" meaning information about the

3    file.

4    Q.  So you looked at that information, right?

5    A.  Yes.

6    Q.  Okay.  And that's to make sure that the government

7    wasn't like making up files or saying they existed

8    somewhere that they didn't, correct?

9    A.  I haven't found a case yet where they made it up.

10   I've seen typos, but I would not say they made it up.

11   Q.  Okay.  And there were no typos in this case, were

12   there?

13   A.  Um, not in this case that I found.

14   Q.  Okay.  So -- but so you said the "tree," it starts

15   like big and then there's folders underneath and then it

16   grows and it grows?

17   A.  Yes.

18   Q.  And some of the -- but you're aware, from reviewing

19   generally the contents of the hard drive, that there

20   were documents there?

21   A.  Yes.

22   Q.  Okay.  And that there were, um, different types of

23   movie files there?

24   A.  Yes.

25   Q.  So "avi" is one sort of type of a file?

A.   Yes.

Q.   And "avi," does that just tell the computer or the
program what it needs to be played or how it is to be
played?

A.   That tells Windows the kind of file it thinks it is.
But it's not absolute.  You can change it.

Q.   Okay.  But you also saw all types of files there in
all those subfolders that were picture files, correct?

A.   Yes.

Q.   Okay.  And, um, would it be fair to say then that
to -- that unless you have a specific distinct memory of
where a particular file that you wanted to look at was
located in those thousands of folders, um, that you
would probably have to use some way to -- or you would
have to search for a particular file to locate it, would
that be fair to say?

A.   If you had no idea where it was, yes.

Q.   Okay.  So, for example, if you had multiple folders
labeled "download," um, and you were looking for one
specific file, but you couldn't remember which folder it
was in, Windows allows you to actually search your
computer to find that, doesn't it?

A.   Yes.

Q.   Okay.  And Windows -- are you familiar with Windows
7?

1    A.   I am.

2    Q.   Are you aware that Windows 7 was the operating

3    system installed on Alex Levin's computer in August of

4    2015?

5    A.   Yes, Windows 7 Ultimate.

6    Q.   So you're familiar with that?

7    A.   Yes.

8    Q.   And that was part of your exam, to make sure you

9    knew what the parameters of your examination were going

10   to be, correct?

11   A.   Correct.

12   Q.   All right.  So you know that then in Windows 7 it

13   allows users to search the contents of the whole

14   computer by simply typing a search word?

15   A.   Yes.

16   Q.   Okay.  And if somebody types in a search word -- for

17   example I think you used the term "elephant" during your

18   direct examination, um, the computer system would then

19   be able to search, using those indexes that you talked

20   about --

21   A.   Yes.

22   Q.   -- all the contents of all the files to find files

23   that matched those search terms, correct?

24   A.   Yes.

25   Q.   Okay.  And is it fair to say then that when that

1    type of search happened, that that's also something that

2    could trigger a particular access date because it's in

3    fact being touched by the indexing function?

4    A.  Um, no.

5    Q.  You're saying the access date cannot be affected by

6    a file being searched for and then hit on if it

7    contained a search term that was used?

8    A.  Yes, it could have, but just the fact that he

9    searched for it will not change it.  But if you then

10   subsequently click on it, no matter how you got the name

11   of the file on your screen, that would change the access

12   date.

13   Q.  Okay.  And so if, for example, you were searching

14   the term "elephant" and, um, one particular folder had

15   like, I don't know, four or five files with the term

16   "elephant" in it, or somewhere in that file, that all of

17   those might have the same access date, is that

18   conceivable?

19   A.  Um, I don't think I understand your question.

20   Q.  All right, I'll move on from that.

21        Now when we're talking about, um, access dates, I

22   know you were talking about how indexing can cause

23   access dates to be the same?

24   A.  Yes.

25   Q.  But the access date can also be changed by a user

1    manually clicking on the file, as you just said,

2    correct?

3    A.  Yes, and the way this computer was configured,

4    manually clicking on a file would update the last access

5    date.

6    Q.  Okay.  So this computer, Alex Levin's computer, if

7    you click on a file, that is something that would change

8    or update the access date?

9    A.  Yes.

10    Q.  But nothing about this operating system changes the

11    fact that the system doesn't log every single access

12    date, correct?

13    A.  For these user files, the way it was configured, it

14    doesn't log any -- it logs every access date, but it

15    only keeps the last one.

16    Q.  Got it.  So you can't tell, for example, if a file

17    has been, um, searched for more than once and then

18    clicked on more than once, you can't tell that just from

19    analyzing the data that's available to you?

20    A.  No, but it would only be speculation to try to say

21    that.

22    Q.  Okay.  Now, you talked about, um, in peer-to-peer

23    software, when you were talking about that, um, that

24    when you set up --

25         So are you familiar specifically with "Frostwire"?

```
1    A.   I have not used "Frostwire" myself.

2    Q.   Okay.  Are you familiar with it?

3    A.   I'm familiar with it.

4    Q.   Okay.  Are you familiar with Shiraza?

5    A.   Yes.

6    Q.   Have you used that yourself?

7    A.   No.

8    Q.   Okay.  Do you know what sort of file-sharing

9    protocol both of those use?

10   A.   Um, they all can use multiples in terms of --

11   Q.   Well my question is do you know which file-sharing

12   protocol Frostwire uses?  Yes or no.

13   A.   Frostwire can use multiples.

14   Q.   Okay.  So you said then they all can.  I want to

15   know about Frostwire.  Frostwire can use multiple types?

16   A.   Yes.

17   Q.   Okay.  And what about Shiraza?

18   A.   Yes.

19   Q.   Okay.  But regardless of what the file-sharing

20   protocol is -- and when we say "protocol," we just mean

21   basically how the computers talk to each other, right?

22   A.   Right.

23   Q.   On the network?

24   A.   Just like the State Department has a protocol of how

25   it talks to Germany and how it talks to Russia, the
```

1    computers have a protocol that define the sequence of

2    handshakes, exchanges, and messages, so that they can

3    talk to each other and each other knows what is really

4    meant by the data that's going back and forth.

5    Q.  Well I don't think you mean Russia, but I think --

6    A.  Yes, I'm sorry.

7    Q.  But I think one thing that the computer probably

8    does need to know is that, um -- and you can tell us,

9    that in order for somebody to be a member of a file-

10   sharing network, they have to download software and

11   install it on their computer, right?

12   A.  Correct.

13   Q.  So that's a choice they make, they say "I want to be

14   able to access files that other people have that I want,

15   so I'm going to put that program on my machine"?

16   A.  Yes.

17   Q.  Okay.  And, um, then once they do that, they say "I

18   know what files on my computer I'm going to let other

19   people have access to and I'm going to check that off,"

20   right?

21   A.  Um, sometimes they leave a default, but, yes, they

22   can check it off.

23   Q.  Okay.  And so sometimes the default, it depends on

24   the program, doesn't it?

25   A.  Yes.

Q.   Okay.  And then for them to actually get a file from
another person on a peer-to-peer network, like Shiraza
or Frostwire, they have to actually tell the program
what kind of file they want, right?

A.   They have to specify -- sometimes it's the kind,
which would get them all the files of that kind,
sometimes it's an individual file name, and sometimes
it's all the files that contain these specific letters
in it.

Q.   So letters like "PTHC," for example?

A.   That's a possibility, yes.

Q.   All right.

        MS. PARUTI:  Just one moment, sir.

        (Pause.)

        MS. PARUTI:  Actually can we go back to
Exhibit 26, Page 6.

        (On screen.)

Q.   Okay.  Are you familiar, sir, do you see on the
bottom sort of the third of the page there's a, um --
yes, there's a part that says "word wheel query"?

A.   I am.

Q.   Okay.  And you would agree that that, um, is the
part, I guess, of the registry file that groups or logs
and reports the different sorts of searches that
appeared on this computer, correct?

1    A.   Searches against this computer's hard drive, yes.

2    Q.   Yes, so not the internet we're talking about?

3    A.   No, not the internet.

4    Q.   We're talking about somebody, a user of the

5    computer, um, actually typing in letters that they want

6    to look for?

7    A.   Yes.

8    Q.   Okay.  So -- and you can't tell what -- it's fair to

9    say that this registry report doesn't tell you exactly

10   when that search was entered, correct?

11   A.   No, um, all it tells you is the last -- the time and

12   date of the last one that was done.

13   Q.   Okay.  So on this particular one, if we can

14   highlight the last written time?

15   A.   Yes.

16   Q.   And what's that last written time here?  Just the

17   date.  We don't need the time.

18   A.   February 12th, 2015.

19   Q.   Okay, so February 12th of 2015 was the last time

20   that this was written, correct?

21   A.   Correct.

22   Q.   All right.  So, um, and it's fair to say, isn't it,

23   that if we --

24              MS. PARUTI:  That we're starting at 68 and

25   then going to the next page, please.

1           (On screen.)

2     Q.   That all of these particular search terms are listed

3     in the order from most recent to just recent, correct?

4     A.   Um, I know they're in order, but I don't know if

5     they're chronological or reverse chronological in this

6     report.

7     Q.   Okay.  Is there a way that Windows -- well never

8     mind.  Strike that.

9           But you know that these are, um, basically sort of

10    like -- so, for example, if we're looking at the item

11    that's listed as 67, we see that search term was

12    "Microsoft media player," correct?

13    A.   Correct.

14    Q.   Okay, and we know that that was searched either

15    immediately before or immediately after "media player,"

16    right?

17    A.   Correct.

18    Q.   Okay.  And then -- and so forth and so on throughout

19    the list?

20    A.   Correct.

21    Q.   Okay.  So then --

22           MS. PARUTI:  If we could go to Page 10,

23    please.

24           (On screen.)

25    Q.   So we see at Line Item 13, we see that some user of

1    this computer searched for "TOR," correct?

2    A.  Correct.

3    Q.  All right.  And you know "TOR" to be, um, basically

4    a browser that enables people to anonymously access data

5    on the internet, correct?

6    A.  Yes, it stands for "The Onion Router."

7    Q.  Okay.  And it allows people to access the regular

8    internet that we use, but also another portion of, um,

9    not really the internet, but the dark web or that part

10   of the deep web, correct?

11   A.  (Silence.)

12   Q.  Are you familiar with that?

13   A.  Oh, yes.

14   Q.  Okay.  So we know that right around the time that

15   somebody searched for "TOR," they also searched for

16   "Droid" at Number 42, do you see that?

17   A.  Yes.

18   Q.  Okay.  And we also know right around that time they

19   searched for "Motorola," correct?

20   A.  Correct.

21   Q.  All right.  Now if we go to Page 11, we can see, at

22   Number 33, that somebody typed in the letters "PTHC"

23   into this computer looking for, um, files on this

24   computer that would include that term, correct?

25   A.  Correct.

1   Q.  Okay.  And a search -- you'd agree with me that a

2   search for those letters, "PTHC," would return files

3   that had PTHC appearing anywhere in them, correct?

4   A.  Yes.

5   Q.  So not just files that matched that were named like

6   "PTHC.doc" or "PTHC.avi," correct?

7   A.  Correct.

8   Q.  All right.  So any -- by typing this into the search

9   bar on the -- and in Windows 7 it would be sort of on

10  the desktop, right?

11  A.  Right.

12  Q.  So you're looking at "Computer" down on the left,

13  you type it in, and then hit "Go" or "Search" or

14  whatever it says, and then the computer looks through

15  everything on the computer, through each of those -- for

16  example in this case thousands of folders, and it will

17  return any files that are responsive to that request,

18  correct?

19  A.  Correct.

20  Q.  All right.  Do you see just a few searches down in

21  there there's also one labeled "Incomplete"?

22  A.  Yes.

23  Q.  Okay.  Are you -- you looked at the file structure

24  for the child pornography files that were found on Alex

25  Levin's computer, did you not?

1    A.   Yes.

2    Q.   And you know then, don't you, that some of those

3    files were found in a folder that was called

4    "Incomplete," correct?

5    A.   Yes.

6    Q.   Okay.  And you know that that particular folder, um,

7    wasn't necessarily assigned or associated with any other

8    particular program file, is that correct?

9    A.   Um --

10   Q.   If you need to see the exhibit, I can call it up,

11   um, to be fair.

12   A.   I remember that, um, some folders were called

13   "incomplete," but other folders were not.

14            MS. PARUTI:  Actually why don't we bring up

15   the exhibit, Ms. Johnson, off the playlist.

16            (On screen.)

17   Q.   Now let's look at Exhibit 20.  Okay?

18            MS. PARUTI:  Can we blow up the upper left

19   panel, please.  (Enlarged.)  Okay.

20   Q.   So can you see Exhibit 20 on your screen, sir?

21   A.   Yes.

22   Q.   Okay.  And you see a folder that's highlighted that

23   says "Incomplete"?

24   A.   Yes.

25   Q.   All right.  You would agree that, um, that

1    "Incomplete" folder is associated with Shiraza?

2    A.  Yes.

3    Q.  Okay.  And would you also agree that, um -- well I

4    know you said you didn't use Shiraza or you haven't used

5    Shiraza.  Are you familiar with how it, um, creates a

6    sort of default, um, folder structure?

7    A.  Yes.

8    Q.  All right.  Would it be fair to say that often or

9    that files -- that Shiraza as a program would create a

10   folder called "Incomplete" for files that did not

11   completely download, um, from start to finish?

12   A.  Yes, it can take sometimes days for these file-

13   sharing applications to download folders, which is why

14   they create a place "Incomplete" to keep it while it's

15   still getting pieces from various places.

16   Q.  Okay.  So it can take days or TOR could take seconds

17   sometimes to download a particular folder, correct?

18   A.  Correct.

19   Q.  A file, excuse me, from a file-sharing software

20   program?

21   A.  Or folders.

22   Q.  Or folders, right?

23   A.  Yes.

24   Q.  And sometimes there are folders called "Downloads,"

25   have you seen that in your experience?

A.   Yes.

Q.   Okay.  And, um, are you familiar with how users of file-sharing software, um, use the programming or the programs?

A.   I am familiar with many different ways to use it and software development, um, file-sharing is used quite often.

Q.   Okay.  But it would be fair -- if somebody's looking to download a lot of files at once, you're familiar with -- or you would say then that it's pretty frequent that they might search for certain types of files, click on all the ones they want, and then maybe go to something else while the file's downloaded so that they could come back and get them later once they were there, rather than sitting and watching the screen for that download process to finish?

A.   Right, once the request had been put in to download the folder, let's say, and it may take a week to download a whole folder, it happens in what we call the "background," there's no interaction by the user needed and they can go off and do other things.

Q.   Okay, perfect.  But sometimes the files themselves, for whatever reason, because the person they were getting it from might shut down their computer, so when they were in mid-download, so then -- if I was

1   downloading something from you, for example, and we both

2   are using Shiraza, and I say, "Oh, I want that file from

3   elephant.doc," and I tell my computer, "I want

4   elephant.doc," the computer will go and look and see who

5   else has that file, correct?

6   A.   Correct.

7   Q.   All right.  And then the software will determine

8   what's the easiest way, like the path of least

9   resistance to get that file, correct?

10   A.   Yes, or multiple passes to get that file.

11   Q.   Or multiple, because on file-sharing networks, the

12   computers aren't looking at the word "elephant.doc," are

13   they?

14   A.   No, they aren't.

15   Q.   They're looking at hash value of the file, correct?

16   A.   In these file-sharing programs, yes.

17   Q.   Okay.

18          MS. PARUTI:  So let's collapse that window and

19   let's blow up the bottom panel the best you can.

20   (Enlarged.)  Yes, that's fine.

21   Q.   Okay.  So do you see these title names on the screen

22   in a way that -- are they big enough for you to read?

23   A.   Oh, yes.

24   Q.   So you see the first one that's checked and it's

25   pink and it says "ED 2K"?

1    A.   Yes.

2    Q.   Okay.  Are you aware that that's a prefix that

3    signifies some relation to "EU" or "eDonkey"?

4    A.   "EDonkey," yes.

5    Q.   Okay.  And "eDonkey" is another type of file-sharing

6    software?

7    A.   There are dozens of them, yes.

8    Q.   Okay.  And, um, is it fair to say that these numbers

9    and letters here, those likely refer to some portion of

10   the hash value of the file that was searched for,

11   correct?

12   A.   Usually, yes.

13   Q.   Okay.  Thank you.

14              MS. PARUTI:  And you can collapse that.

15              (On screen.)

16              THE COURT:  What is the "hash value" of the

17   file?

18              THE WITNESS:  The "hash value" is a term we

19   use for, um, what we call getting a "digital

20   fingerprint" of what's inside the file, the content we

21   keep talking about.  You can rename a file anything, but

22   the content, it stays the same or will have the same

23   digital fingerprint or hash value, and it's done with a

24   fancy software, algorithms, math, that type of stuff.

25   But it's easiest to think of it as a "digital

1   fingerprint" of what the actual content is, which may or

2   may not relate to what the name is on the file.

3   Q.  Okay, thank you.

4            MS. PARUTI:  Could we please see Exhibit 21,

5   please.

6            (On screen.)

7            MS. PARUTI:  Okay, and just blow up the left

8   hand side.

9            (Enlarged.)

10  Q.  Okay, Mr. Nicholls.  Do you know what you're looking

11  at here?

12  A.  Um, yes.

13  Q.  Okay.  So this is -- this is, um, showing basically

14  the file structure of one very small piece of this

15  computer, right?

16  A.  Yes.

17  Q.  Okay.  And, for example --

18           MS. PARUTI:  Let's see if I can do this

19  without, um, blowing it up.

20           (On screen.)

21  Q.  So we're looking at these vertical lines, um, so,

22  for example, on the left-hand side there's like a

23  vertical dotted line, and then another one next to it,

24  and another one, and they appear to get closer together.

25  Do you see what I'm talking about?

1    A.   Yes.

2    Q.   What do those signify?

3    A.   This, um, what's on the screen tries to show the

4    folder structure of the tree.  And so the vertical lines

5    lets a viewer of this try to keep in mind which folders

6    are contained within a parent folder.

7    Q.   Okay.  We just can't see all of the folders like

8    being open because there's so many of them, right?

9    A.   Correct.

10   Q.   Okay, but what we can see on here includes a folder

11   named "Incomplete"?

12              MS. PARUTI:  Could you highlight that, please.

13              (Enlarged.)

14   Q.   Do you see that?

15   A.   I do.

16   Q.   Okay.  All right.  So that has the same level as

17   Frostwire, correct?

18   A.   It's not at the same level as Frostwire, no.

19   Q.   Okay, tell me where that is?

20   A.   That is a subfolder of the folder called, um,

21   "Program Files."

22   Q.   Okay, so "Program Files" --

23              MS. PARUTI:  Would you highlight that, please.

24              (On screen.)

25   Q.   So that's the folder and then a subfolder is

1    "Incomplete"?

2    A.  Yes.

3    Q.  Okay.  So "Incomplete" is not a subfolder of

4    Frostwire, though, right?

5    A.  No, I'm sorry, I want to correct my statement.  It's

6    a subfolder of "Virtual Store."

7    Q.  Okay.  And you can tell that -- and it's kind of

8    confusing, right, because there's so many different

9    files and so many different levels?

10   A.  Yes, and the arrows there cover over some of the

11   dotted lines.

12   Q.  Okay.  So "Incomplete" is a subfile of "Virtual

13   Store"?

14   A.  Correct.

15   Q.  Okay.  But it's not a subfolder of Frostwire?

16   A.  That's correct.

17   Q.  Okay.  And --

18           MS. PARUTI:  Will you pull up that, please.

19   (On screen.)  Okay.

20   Q.  But you would agree with me, wouldn't you, that --

21           MS. PARUTI:  Can we just blow up the bottom

22   left panel, please.

23           (Enlarged.)

24   Q.  So all of these files, um, that -- all of these

25   files in that folder were actually on the computer,

```
1    correct?
2    A.  Yes.
3    Q.  Okay.  They were present on the computer when it was
4    seized from Alex Levin, is that correct?
5    A.  Correct.
6    Q.  Okay.  So the access date really doesn't matter,
7    does it?
8    A.  I'm sorry, say that again?
9    Q.  The access date doesn't negate the fact that they
10   were on the computer on August 12th of 2015, does it?
11   A.  No, the access date was --
12   Q.  Okay, thank you.
13              (Counsel is seated.)
14              MR. CARNEY:  May he finish his last answer,
15   please?
16              THE COURT:  You'll have a chance further to
17   inquire.  He's answered it.
18              THE WITNESS:  I'm sorry, your Honor, but I
19   forget the question now?
20              THE COURT:  Well now he's going to ask you
21   other questions, so we'll pick it up from there.
22              THE WITNESS:  Oh, okay.
23              THE COURT:  Any redirect, Mr. Carney?
24              MR. CARNEY:  Yes, thank you.
25
```

1    REDIRECT EXAMINATION BY MR. CARNEY:

2    Q.  The prosecutor asked you questions about ways an

3    individual can transfer a file on peer-to-peer.  Do you

4    remember that?

5    A.  Yes, I do.

6    Q.  And you stated it can be transferred by the title of

7    the file alone, correct?

8              MS. PARUTI:  Objection.

9              THE COURT:  No, well he may ask that.

10         Did you so state?

11   A.  It can be selected by the user by title.

12   Q.  Okay.  Did you also say it can be selected by the

13   kind of file it is?

14   A.  Yes.

15   Q.  Can a person transfer all of the files on a

16   peer-to-peer server, um, if he has that server's

17   permission?

18             MS. PARUTI:  Objection.

19             THE COURT:  Yeah, in view of my earlier

20   rulings, I'm going to stand on that, and we'll proceed

21   as we've discussed.

22        Anything further?

23   Q.  You said that peer-to-peer is quite common among a

24   particular group.  Do you remember saying that?

25             MS. PARUTI:  Objection.

```
 1    A.  Yes, I said it was commonly used by software
 2    developers.
 3    Q.  Thank you.
 4              MS. PARUTI:  Objection.
 5              THE COURT:  Commonly used by software --
 6              THE WITNESS:  Developers.
 7              THE COURT:  Developers.  Thank you.  I'll let
 8    that stand.
 9              MS. PARUTI:  Move to strike, your Honor.
10              THE COURT:  Motion to strike is denied.
11         Anything further for this witness?
12              MS. PARUTI:  Just on that.
13              THE COURT:  Well, of course, you may inquire.
14              MS. PARUTI:  Thank you, your Honor.
15
16    RECROSS-EXAMINATION BY MS. PARUTI:
17    Q.  Mr. Nicholls, you said it's commonly used by
18    software developers, correct?
19    A.  Yes.
20    Q.  All right.  Would you say that your -- in your
21    experience -- well have you been -- you said you had
22    about 60-something cases right now?
23    A.  Correct.
24    Q.  How many of those are child pornography cases?
25    A.  Um, 10 maybe.
```

1    Q.  Only 10?  How many child pornography cases have you

2    worked on in your career in this capacity as a -- well

3    let me clarify it, because I know you've been working

4    for a long time.

5         But as an expert who is hired to review evidence

6    that the government has against a defendant and then

7    sometimes come into court and testify and sometimes not,

8    how many of those or what percentage of those cases have

9    been child pornography cases?

10   A.  Over, um, my forensic career, probably 40 percent

11   have been child pornography.

12   Q.  Okay, so about 40 percent.  And, um, you've seen

13   that over your probably long career, so 40 percent of

14   that you've seen peer-to-peer technology being used by

15   people who are accused of -- well actually let me strike

16   that, who are convicted of child pornography offenses,

17   correct?

18                 MR. CARNEY:  I object to that, your Honor.

19                 THE COURT:  Yeah, sustained.  I think that's

20   beyond the scope.  But you may inquire.  Or I'll ask

21   this question, which occurs to me.

22        In many of those types of cases, people were using

23   peer-to-peer file-sharing, were they not?

24                 THE WITNESS:  Yes, they were.

25                 MS. PARUTI:  Thank you, your Honor, that's

1   satisfactory.

2           THE COURT:  Very well.

3       Nothing further for this witness, is there?

4           MR. CARNEY:  No, your Honor, thank you.

5           THE COURT:  You may step down.  Thank you.

6   Call your next witness.

7           MR. CARNEY:  I call Alex Levin.

8           THE COURT:  He may be called.

9           (ALEX LEVIN, sworn.)

10

11          * * * * * * * * *

12          ALEX LEVIN

13          * * * * * * * * *

14

15  DIRECT EXAMINATION BY MR. CARNEY:

16  Q.  Good morning.

17  A.  Good morning.

18  Q.  Could you please introduce yourself to the jurors?

19  A.  Alex Levin.  My last name is spelled L-E-V-I-N.

20          THE COURT:  Mr. Levin, you be comfortable

21  there, but pull that microphone closer to you so it

22  picks up your voice better.

23  A.  Alex Levin, my last name is spelled L-E-V-I-N.

24  Q.  How old are you, sir?

25  A.  I am 52.

```
1    Q.   Where were you born?

2    A.   I was born in Belarus.

3    Q.   And what nation is that?

4    A.   Well right now it's Belarus, but it was formerly

5    part of the USSR.

6    Q.   When did you come to the United States?

7    A.   In 1979.

8    Q.   With whom did you come?

9    A.   My parents and my brother.

10   Q.   Was someone already living in the United States?

11   A.   My oldest brother.

12   Q.   Where did your family move to upon arrival in the

13   United States?

14   A.   Worcester.  Worcester, Massachusetts.

15   Q.   Did you come to this country legally?

16   A.   Yes.

17   Q.   Did you become a United States citizen?

18   A.   Yes, in 1985.

19   Q.   And have you been a citizen of this country ever

20   since 1985?

21   A.   Yes.

22   Q.   Are your parents still living?

23   A.   They are.

24   Q.   Where do they live?

25   A.   They live in Worcester in Assisted Care, they're
```

1   over 90 years old.

2   Q.   Do you have any siblings?

3   A.   I do, I have two brothers.

4   Q.   And you'll have to keep your voice up, please.  Why

5   don't you sit up near the microphone.

6   A.   Yes.  (Moves microphone.)  I have two older

7   brothers.

8   Q.   And what are their names?

9   A.   Gregory and Edward.

10  Q.   Is one of them present in this courtroom?

11  A.   Yes.

12  Q.   Have you ever been married?

13  A.   I have.

14  Q.   For how long?

15  A.   15 years.  Almost 15 years.

16  Q.   And what happened at that point?

17  A.   In 19 -- I was married in 1996 and in 2011 we

18  divorced.

19  Q.   Was it a contentious divorce or --

20  A.   Not at all, we're still on very good terms.

21  Q.   Did you have any children?

22  A.   Yes.

23  Q.   How many?

24  A.   One.  I have one daughter, she's 13 years old.

25  Q.   Do you have any contact with this daughter?

```
 1    A.  I do, on a regular basis.

 2    Q.  Do you do anything on a daily basis with this

 3    daughter?

 4    A.  We chat every single day.

 5    Q.  On the telephone?

 6    A.  On the telephone.

 7    Q.  Do you ever see her?

 8    A.  I see her at least once a week.

 9    Q.  After you arrived in high school, did you attend

10    schools there?

11    A.  After I arrived in high school?

12              THE COURT:  Yeah, I don't understand the

13    question.

14              MR. CARNEY:  Yes.  I'm sorry.

15    Q.  After you arrived in Worcester, did you attend

16    schools there?

17    A.  Yes, I attended Doherty Memorial High School.

18    Q.  Did you graduate from high school?

19    A.  I did, in 1984.

20    Q.  The year before you became a United States citizen?

21    A.  Correct.

22    Q.  Did you attend college?

23    A.  I did.

24    Q.  Where did you go to school?

25    A.  Central New England College of Technology in
```

1    Worcester.

2              MS. PARUTI:  I'm sorry, I'm just having a

3    little difficulty hearing him.

4              THE COURT:  Yes, if you'd repeat the answer.

5    A.  Central New England College of Technology in

6    Worcester.

7              THE COURT:  Central New England College of

8    Technology.

9         Now go ahead.

10   Q.  And what was your degree in?

11   A.  My major was in computer science.  My minor was

12   comparative religions.

13   Q.  Did you follow that with a master's degree?

14   A.  I did.

15   Q.  And what college or university did you attend?

16   A.  Fitchburg State College, I believe it's now part of

17   UMass.

18   Q.  And when did you receive that degree?

19   A.  In 1992.

20   Q.  And what was your degree in?

21   A.  Computer Science.

22   Q.  Could you give us a brief summary of your work

23   history after you graduated from Fitchburg State?

24   A.  I started as an embedded systems developer, a

25   programmer, I grew into a programmer lead, and from

1    there I became an IT manager managing the full spectrum

2    of IT disciplines, software development, database

3    administration, security, and business analysis.

4    Q.   And what do those topics involve?

5    A.   Software development is, I think, self-explanatory.

6    Database Administration and Systems Administration, they

7    all involve, um, working with computer systems.  For the

8    past 15, 20 years or so, I've been more on the business

9    side, technical project management, taking business

10   requirements and converting them into technical

11   specifications.

12   Q.   I'd like to ask you if you have familiarity with the

13   Frostwire program?

14   A.   I do.

15   Q.   What is "Frostwire"?

16   A.   It's --

17               MS. PARUTI:  Objection.

18               THE COURT:  No, overruled.  He may tell us.

19   A.   It's a peer-to-peer file-sharing software.

20   Q.   What does that mean to you?

21   A.   To me it means being able to download -- being able

22   to share files of any nature with other users on the

23   internet who also have the same software installed.

24   Q.   What does it allow you to do with someone else who

25   is on this peer-to-peer network?

A.  It allows you to download the files that they made
available on the program.

Q.  Did you use that program?

A.  I did.

Q.  What does the "drive sweep" mean to you, that
phrase?

MS. PARUTI:  Objection.  May I be heard, your
Honor, actually?

THE COURT:  You may be.

MS. PARUTI:  Thank you.


THE SIDEBAR

THE COURT:  Well I'm going to allow that
objection because it jumps too far, you're going to need
a time --

MR. CARNEY:  I didn't hear.

THE COURT:  It jumps too far, we're going to
need a time and a place and a person who had these
files, and then we'll get into what was done with these
files.  But it seems to me he covers SAM, so I'm sort of
allowing it.

MS. PARUTI:  I just want to front for you why
I'm concerned.  I understand that he is conversant in a
lot of matters that are beyond the expertise of the
jury.  I am concerned that there will be -- I anticipate

```
 1    there will be questions asked that will infringe really
 2    the number of areas of expert testimony, which is
 3    absolutely inappropriate.  If he -- given that he is a
 4    percipient fact witness, obviously he can testify to
 5    what he did on his computer, but he cannot strike
 6    relevant expert testimony.
 7              THE COURT:  Nor do I give advisory opinions.
 8    I'll have to go question by question.
 9              MS. PARUTI:  Thank you.
10
11              (In open court.)
12    Q.  Mr. Levin, how long have you used a computer that
13    accesses the internet?
14    A.  I think since the invention of the internet, the
15    early '90s.
16    Q.  Um, did you learn about peer-to-peer file-sharing
17    once you began using the internet?
18    A.  Yes.
19    Q.  And what is "peer-to-peer file-sharing"?
20              MS. PARUTI:  Objection.
21              THE COURT:  Well again there's much to what
22    she said at the sidebar.  He may tell us his experience.
23    What's your experience with peer-to-peer file-sharing?
24              THE WITNESS:  Users of this software make
25    files available on their computers and you can download
```

 1    those files.

 2                THE COURT:  Well -- and what's your experience

 3    with doing it?  When did you first do that?

 4                THE WITNESS:  Probably late 2000s to early

 5    teens.

 6                THE COURT:  Yeah, for what purpose?

 7                THE WITNESS:  I downloaded mostly

 8    high-definition concert videos, music videos, movies,

 9    and after 2010, when it became available, cryptocurrency

10    mining software.

11                THE COURT:  Go ahead, Mr. Carney.

12    Q.  How would you determine if something you wished to

13    acquire was available from another person's hard drive?

14                THE COURT:  Not how would he, how did you?

15    A.  There are two ways.  One, is you can search on the,

16    um, on Frostwire itself, on the program itself.  Second,

17    is the users that I know that I have downloaded software

18    I needed, that I wanted from before, I would see those

19    users available and I would just drive sweep their, um,

20    their drives.

21    Q.  Now, do you have to obtain a file from another user's

22    hard drive, one file at a time?

23    A.  No, you can specify a wild card and you'll get all

24    the files that match those wild cards.

25                MS. PARUTI:  Objection and move to strike on

```
 1    the same basis.
 2                 THE COURT:  Well you didn't -- no, that may
 3    stand.
 4                 THE WITNESS:  Sorry.
 5                 THE COURT:  No, no, you just answer the
 6    questions.  That may stand.
 7            Go ahead, Mr. Carney.
 8    Q.  In addition to acquiring a single folder, were there
 9    ways to acquire more than one folder at a time?
10                 MS. PARUTI:  Objection.
11                 THE COURT:  Sustained.
12    Q.  Did you acquire mother than one file at a time?
13    A.  Yes.
14    Q.  And how would you do that?
15    A.  You would enter a search term with a wild card as a
16    filter, so basically any folder or any file that matches
17    that has those characters in it, or if a user has
18    enabled a drive sweep, I would just download the entire
19    drive.
20                 THE COURT:  And when first did you do that?
21                 THE WITNESS:  The drive sweep?
22                 THE COURT:  Well you described it.  When first
23    did you download by putting in a term -- um, when first
24    did you use this "wild card" as you've referred to it?
25                 THE WITNESS:  File-sharing?  I started using
```

```
 1    file-sharing in the late 2000s.
 2             THE COURT:  And, um, precisely my question,
 3    when did you first use this "wild card" feature?
 4             THE WITNESS:  From the very beginning.
 5             THE COURT:  All right.
 6         To do what, to access what?
 7             THE WITNESS:  To access the files that I was
 8    looking for.
 9             THE COURT:  All right.
10         And when first did you use drive sweep?
11             THE WITNESS:  Pretty much from the start.
12             THE COURT:  Okay.
13         And why did you do that?
14             THE WITNESS:  Because the previous --
15             THE COURT:  Always tell the jury.
16             THE WITNESS:  The previous times that I'd seen
17    a specific user that had the files that I wanted and if
18    I saw the same user being enabled in a drive, I didn't
19    want to go and search through all their -- you know all
20    their stuff, so I just downloaded it to my drive and
21    then I'd look for the software that I needed on my
22    drive.
23             THE COURT:  Doesn't that take up a lot of
24    memory on your computers?
25             THE WITNESS:  Not memory, drive space.
```

1              THE COURT:  "Drive space."

2              THE WITNESS:  Storage space.

3              THE COURT:  "Storage space."  I'm using the

4    wrong term?

5              THE WITNESS:  That's okay.  Storage space is

6    cheap.

7              THE COURT:  Tell the jury.

8              THE WITNESS:  Storage space is abundant.  It's

9    free.  Um, it's nearly free.  You can always get another

10   external drive and just plug it in.  It's cheap.

11             THE COURT:  And go from there, Mr. Carney.

12   Q.  When you would employ a "drive sweep," how would you

13   actually do that?

14   A.  If the user -- if you can see the user has been

15   enabled, just get the software, and if you just click on

16   it and save, you can create a folder on your drive and

17   save or put everything in the folder.

18   Q.  Did you find people on the internet who would give

19   permission to a fellow person on a peer-to-peer program

20   to permit you to download their or switch over their

21   entire hard drive to your computer?

22   A.  Yes.

23             MS. PARUTI:  Objection.

24             THE COURT:  Well that's leading, but I'll let

25   that stand.

1          So you've found occasions that people would allow

2    this.  Go from there.

3                    THE WITNESS:  Yes.

4    Q.  What would you do once that person's entire hard

5    drive was now located on your computer hard drive?

6    A.  I would go into the folder and either look for the

7    files specifically or I would do -- I would research on

8    the computer for the, um, for the -- usually it's

9    concert videos that I was looking for.

10   Q.  Was there a particular band that you were looking

11   for concert videos of?

12   A.  95 percent of the time it was "The Grateful Dead."

13   Q.  Let's say that you had the other person's hard drive

14   now on your hard drive --

15   A.  Yes.

16   Q.  -- what type of searches would you perform on your

17   computer accessing this other hard drive?

18   A.  "San Francisco, April 7th, 1969."

19   Q.  Okay.  You indicated you also used it to find other

20   things?

21   A.  I have.

22   Q.  Could you give us examples?

23   A.  Um, movies.  I think the last thing that I

24   downloaded through Frostwire was the whole "Godfather"

25   trilogy.  I also downloaded crypto-mining, crypto-

1    currency software.

2    Q.   What is "crypto-currency"?

3    A.   Bitcoin is a crypto-currency, and there are other

4    coins as well.

5    Q.   What is "Bitcoin"?

6    A.   "Bitcoin" is a digital asset or digital currency

7    that's decentralized that allows peer-to-peer payment.

8    Q.   How does one acquire Bitcoin?

9    A.   These days you can buy it on --

10             MS. PARUTI:   Objection.   I'm sorry to again --

11             THE COURT:   How does one -- in the subjunctive

12   we'll sustain it.

13        Did you acquire any Bitcoin?

14             THE WITNESS:   I did.

15             THE COURT:   How did you do it?

16             THE WITNESS:   I used the mining TOR software

17   that I would download from Frostwire.

18   Q.   When you would download to your computer an entire

19   hard drive and you looked for specific items such as

20   Grateful Dead videos or Bitcoin information, what did

21   you do after you completed those searches?

22   A.   I would just nuke the rest.   I would delete the

23   rest.

24   Q.   You would what?

25   A.   You're saying what would I do with the rest of the

```
 1   files that I --
 2   A.  Yes, would you -- did you ever look at those other
 3   files?
 4              THE COURT:  "I would delete the rest," he
 5   said.
 6   A.  Yes, I would delete the rest.
 7   Q.  All right.  Did you do that in every instance?
 8   A.  Um, probably not.  I wasn't terribly, um, you know,
 9   terribly accurate.  I would just see what -- I would
10   take what I need and I would delete the rest.  But did I
11   go through every tree structure?  Probably not.
12   Q.  All right.  Were there times when you brought over,
13   from peer-to-peer, the entire hard drive of someone else
14   and you wouldn't delete the stuff that you were not
15   interested in?
16              MS. PARUTI:  Objection.  I just don't
17   understand the question?
18              THE COURT:  No, no, it's just a little
19   different.
20         Do you recall times when you didn't delete the
21   rest?
22              THE WITNESS:  Yes, I am certain, I'm positive
23   there were times that I just didn't -- didn't bother.
24   Q.  Would you have any way to know what was on those
25   files that you did not download?
```

1          MS. PARUTI:  Objection.

2          THE COURT:  Well you keep asking "Would he."

3     Can you give us an instance, do you recall any

4     instance where you didn't?

5          THE WITNESS:  Well like I said, I wasn't very

6     methodical.  I probably, you know, in hindsight should

7     know what it is, but I can tell you that I saw

8     something -- if I saw something that I wasn't sure what

9     it was, I would just say "To hell with it."

10         THE COURT:  "I would just say 'To hell with

11    it'"?

12         THE WITNESS:  "To heck with it."  I would just

13    say "I'll deal with it later," and never get to it.

14         THE COURT:  So you've testified, um, you

15    weren't very methodical on this, but once you had a

16    whole bunch of files, you'd search for what you wanted,

17    and sometimes you'd delete the rest --

18         THE WITNESS:  Most of the time.

19         THE COURT:  Your testimony is "most of the

20    time"?

21         THE WITNESS:  Yeah, most of the time.  But not

22    every time.

23         THE COURT:  All right.

24    Go ahead.  Well actually I think it's time now.  I

25    need to see you at the sidebar.

1

2          AT THE SIDEBAR

3          THE COURT:  Okay, now having in mind I said

4   you could recall Nicholls, you understand I'm going to

5   take Nicholls -- in effect it's the same rules, that is

6   he can get on now and say that you can do this drive

7   sweep with file-sharing, if that's his expert opinion.

8   But that's it.

9          Now recognizing that, we're going to give this to

10  the jury on Wednesday or Thursday?

11         MS. PARUTI:  I don't know how long Mr. Carney

12  expects to have the defendant on the stand.

13         THE COURT:  I can't believe he's going to have

14  him on much longer, do you?

15         MR. CARNEY:  I agree, your Honor, maybe 15 or

16  20 minutes.

17         MS. PARUTI:  I can't see the cross being much

18  longer than 30 minutes or so.

19         THE COURT:  And then -- so we're going to give

20  it to them on Wednesday.  I mean we're not going to hold

21  you to it, it's a criminal case, but I want them to be

22  prepared.  All right?  And so I will tell them that.

23

24         (In open court.)

25         THE COURT:  Mr. Levin, we're going to have to

1    stop because of my obligation, so you may step down.

2         So you know what I'm asking them over there,

3    "Where are we here?"  And again I'm not holding people

4    to this, but everyone is cooperating in terms of the

5    schedule, and here's what they tell me and what I tell

6    you.

7         It very much looks like we will be able to give

8    you this case next Wednesday, the 29th, that is to say

9    that while there is more evidence to come, so you must

10   keep your minds suspended, there isn't that much more in

11   terms of the time.

12        There are important parts of the case that come

13   after the testimony.  The lawyers get a chance to sum

14   up, to argue to you the conclusions that they would urge

15   you to draw from the evidence and I must in detail --

16   and now we know what is specifically disputed here, so I

17   must be very careful in instructing you as to the law.

18   But when that's done, the case is yours.

19        We expect that it will be in your hands by 1:00,

20   our usual lunch time next Wednesday the 29th.

21   Thereafter you're in charge, that is to say -- I've told

22   you we're not staying into the evening, so we're not

23   going to stay after 5:00.  If you get to a point and

24   you'd like to go home, collectively we can stop the

25   deliberations, you can come back on Thursday.  But so

1    you know the schedule, we expect to need you all day on

2    Wednesday the 29th.

3         Now we knew what the schedule would be -- I'm

4    sorry I have to cut it short now, but that's my

5    responsibility.  But we knew we were going to give you

6    the Memorial Day holiday and I wish you the most

7    meaningful Memorial Day holiday.

8         But I have this caution for you.  I hope you have

9    a wonderful holiday, which probably will mean seeing

10   people you don't normally see.  It would be best if you

11   not bring up this subject, but again the schedule is

12   fine and you have every right to bring up the fact that

13   you're serving on a jury, so long as you immediately

14   say, "And the judge has told us we can't say anything

15   about it."  Nothing about it, not whether it's on a

16   so-called criminal or a civil case.  You just can't talk

17   about it.

18        So have a wonderful holiday.  We resume on

19   Wednesday.  So if you're going anywhere, you'll have

20   time to get back.  At 9:00, and I know I can count on

21   you, but expect to be with us all day on Wednesday.

22   Keep your minds suspended, because you've not heard all

23   the evidence, nor have you heard the arguments or my

24   instructions.  Do not discuss the case either among

25   yourselves or with anyone else.  Have a very good

```
 1    weekend.

 2                    THE CLERK:  All rise for the jury.

 3                    THE COURT:  We'll be in recess until Wednesday

 4    the 29th of May at 9:00 a.m.  We'll recess.

 5                    (Jury leaves, 12:20 p.m.)

 6                    (Adjourned, 12:20 p.m.)

 7

 8                    C E R T I F I C A T E

 9

10        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

11    hereby certify that the forgoing transcript of the

12    record is a true and accurate transcription of my

13    stenographic notes, before Judge William G. Young, on

14    Wednesday, May 22, 2019, to the best of my skill and

15    ability.

16

17

18

19    /s/ Richard H. Romanow 06-25-20
      _____
20    RICHARD H. ROMANOW  Date

21

22

23

24

25
```