1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                            No. 1:15-cr-10271-WGY

4

5    UNITED STATES OF AMERICA

6

7    vs.

8

9    ALEX LEVIN

10

11                      * * * * * * * *

12

13                  For Hearing Before:
                 Judge William G. Young

14

15                     Sentencing

16

17              United States District Court
                District of Massachusetts (Boston.)
                One Courthouse Way

18              Boston, Massachusetts 02210
                October 9, 2019

19

20                      * * * * * * * *

21

22         REPORTER: RICHARD H. ROMANOW, RPR
                 Official Court Reporter

23            United States District Court
       One Courthouse Way, Room 5510, Boston, MA 02210

24              bulldog@richromanow.com

25

```
1                  A P P E A R A N C E S

2


3    ANNE PARUTI, ESQ.
        United States Attorney's Office
4        One Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
5        (617) 748-3310
        E-mail: Anne.paruti.lohnes@usdoj.gov
6        For the United States of America


7


8    J.W. CARNEY, JR., ESQ.
     DANIEL J. GAUDET, ESQ.
9        J.W. Carney, Jr. & Associates
        20 Park Plaza, Suite 1405
10       Boston, Massachusetts 02116
        (617) 933-0350
11       Email: jcarney@carneydefense.com
        for the defendant
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          P R O C E E D I N G S
 2          (Begins, 2:30 p.m.)
 3          THE CLERK:  Now hearing Criminal Matter 15-10271,
 4     the United States of America versus Alex Levin.
 5          THE COURT:  Good afternoon.  Would counsel
 6     identify themselves.
 7          MS. PARUTI:  Good afternoon, your Honor, Anne
 8     Paruti for the government.
 9          MR. CARNEY:  Your Honor, good afternoon, I'm J.W.
10     Carney, Jr. for Alex Levin.
11          MR. GAUDET:  Daniel Gaudet, also for Alex Levin.
12     Good afternoon.
13          THE COURT:  Good afternoon.  If I may address,
14     Mr. Levin?
15          Mr. Levin, have you read the presentence report
16     that's been prepared in your case?
17          THE DEFENDANT:  I have.
18          THE COURT:  Have you talked it all over with your
19     attorney?
20          THE DEFENDANT:  I have.
21          THE COURT:  Do you think you understand it?
22          THE DEFENDANT:  I do.
23          THE COURT:  Please be seated.
24          Nothing has been withheld from the presentence
25     report under the rules of criminal procedure?
```

1          PROBATION OFFICER:  No, your Honor.

2          THE COURT:  Thank you.

3          This is a sentencing that proceeds under 18 United

4    States Code, Section 3553(a).  Sentencing in this

5    session of the court proceeds in four steps, the first

6    three of these steps are largely arithmetic.

7          First, I calculate the highest sentence that, as I

8    understand the Constitution, is constitutionally

9    permissible.  That sentence is the top of the applicable

10   guidelines without any regard to any mitigating factors.

11         Second, I make reference to the average sentences

12   for offenses of this sort.  I do not sentence from any

13   average, but the averages are not insignificant because

14   they inform the Court as to the weight to be given to

15   the now advisory sentencing guidelines.

16         Third, I accurately calculate, as is required by

17   law, the sentencing guidelines.

18         And then fourth, I -- and most important, we have

19   a discussion to fashion a fair and a just sentence for

20   Mr. Levin having in mind the specific facts of the case,

21   the needs of society, and his particular circumstances.

22         Now in this case -- you will understand that in

23   this case I have read the briefs, I have read the most-

24   recently filed, or they were filed recently, victim

25   impact statement.  I believe I'm prepared for your

1    arguments.

2          So as to the first steps, um, and, Mr. Carney, you

3    challenge certain enhancements in the presentence

4    report, and why don't you point out what those

5    enhancements are and I will hear you in those

6    challenges.

7          MR. CARNEY:  There are three sentencing

8    enhancements, your Honor, to which we object.  The first

9    is the use of a computer.  The second is prepubescent

10   minors.  And the third is sadomasochistic images.

11         THE COURT:  I'll hear you.

12         MR. CARNEY:  May I have one moment, please, your

13   Honor?

14         THE COURT:  Of course you may.

15         (Pause.)

16         MR. CARNEY:  I also object to the enhancement for

17   more than 600 images.

18         THE COURT:  Very well.  Go ahead.

19         MR. CARNEY:  The enhancements contained in the

20   sentencing guidelines were included in the very first

21   sentencing guidelines that was set forth.  At the time

22   these guidelines were created, the use of a computer was

23   nowhere near as prevalent as it is now.  It really made

24   a difference if there were prepubescent minors in there,

25   it made a difference if there were sadomasochistic

images, and it made a difference if you attributed 75

images for every video.  Now we have the data of how

these enhancements have continued to be used.

In particular, at one time the sentencing

enhancements were viewed as warranted because of these

additional things that the defendant had done, but now

we know that it's not so aberrational.

THE COURT:  Well let me -- I guess -- let me say

this to you.

I consider myself constrained by the -- at least

the highest possible sentence by the top of the

sentencing guidelines, so if you were to persuade me not

to include any one of the challenged enhancements, that

could -- that would reduce the guideline calculation and

would limit the highest sentence that I could give.  But

your argument -- I view the guidelines in a quasi-

statutory sense, but they are only guidelines.  We're

going to get to your appendices, which I want to ask you

about, but not now, where you list a large number of

sentences in this court, by myself and many of my

colleagues, all of them below guideline sentences.  I

intend to at least ask you about that in figuring the

average sentence to understand the weight I should give

to the guidelines, and that's what you're arguing, the

weight I should give to these guidelines.  But under the

1    law, I must accurately calculate the guidelines.  So the

2    fact that the sentencing commission hasn't updated them

3    may well go to the weight I give to the guidelines, but

4    it has little effect on the language which the

5    sentencing commission has used in light of the offense

6    characteristics borne out by trial.

7         You go ahead.

8         MR. CARNEY:  I submit, your Honor, that addressing

9    these enhancements prior to coming up with a final

10   guideline sentence is important.  In fact if the four

11   enhancements that I suggest are not to be applied to

12   this case, I believe the guideline sentence would go

13   down 18 points, which is an extremely significant

14   amount.  And therefore, if that affects what the

15   guideline are, then the Court -- and the Court intends

16   to depart downward from this revised guideline number,

17   then the Court I think is more likely to impose a lower

18   sentence because the sentencing guidelines are lower

19   when you subtract the four enhancements.

20        THE COURT:  I'll hear you, but you seem to be

21   arguing policy whereas I'm looking at these as though

22   they were a statute, even though they're not, they're

23   really just a guideline.

24        Go ahead.

25        MR. CARNEY:  I understand.  But the point is that

1    at one time the use of a computer was viewed as a fact

2    that makes that crime, 25 years ago, more significant.

3    The guidelines haven't been revised but the sentencing

4    commission has noted itself that use of a computer is

5    present in 96 percent of the cases.  So therefore,

6    despite the fact that the sentencing guidelines

7    commission, the sentencing commission has not revised

8    it, the Court can make a ruling that this enhancement

9    should not apply because it is so outdated, and

10   therefore if I don't apply this enhancement, then the

11   guideline numbers go down.

12        And it's the same argument for the prepubescent

13   minor, at one point that was viewed as aberrational, now

14   it too is applied or is contained in 96 percent of the

15   cases.

16        As the Court knows, there's a core guideline and

17   then there are enhancements that are supposed to apply

18   to more serious offenders because of the uniqueness of

19   that enhancement, but they don't work any more and I

20   submit that virtually every judge in this district has

21   acknowledged that.

22        The third one and the fourth one similarly are no

23   longer abberational.  The defendant, in this case, had

24   13 videos, that puts him over the 700 individual

25   photographs.  Well now people have many more videos than

1    in the past and that again should not be an enhancement

2    especially when it's as modest as this is.  There are

3    cases that have thousands and thousands, tens of

4    thousands, even hundreds of thousands of photographs and

5    videotapes, and the Courts have cited that this

6    guideline shouldn't apply.

7         THE COURT:  Well actually that last argument, when

8    you say today that's not aberrational, doesn't that

9    suggest that maybe -- and I'm not saying it does, but

10   maybe more severe sentences are warranted because the

11   sentences being imposed are insufficient to curb the

12   appetite for this disgusting type of -- and it is, no

13   doubt about it, sexual abuse of actual children?

14        MR. CARNEY:  Well --

15        THE COURT:  The fact that we don't have more of it

16   is hardly an argument for a more lenient sentence.

17        MR. CARNEY:  Well let me address those two points.

18   This is a horrible crime, but, um, I'll first talk about

19   my only personal experience.

20        When I was a public defender in the late '70s and

21   would be assigned a child pornography case, I'd been

22   surprised that it was treated so seriously when I

23   thought the only thing the offender did was look at

24   photographs, he didn't -- he wasn't involved in taking

25   the photograph, nor was he involved in distributing the

1   photograph, he merely looked at it.  And I wondered,

2   isn't that comparable to someone who wants to look over

3   and over again at a video of a horrendous accident where

4   two people in a convertible were decapitated when the

5   car went underneath a truck, and the person liked

6   looking at those photos?  That did not do any further

7   damage to the victims in that car, it's kind of puerile,

8   but so be it.  And I thought that was the same way to

9   look at child pornography cases.  But I now know

10  differently.  I now am convinced 100 percent that there

11  is a harm done to the young women who are depicted on

12  these photographs and videos for the exact reason that

13  they say, because they grow up, they see a man, they

14  think he has seen the video of her, and it becomes very,

15  um, just like it's a -- it's something that they carry

16  on their back like a very heavy weight.  I now

17  appreciate that.  But the reality is even -- even after

18  a couple of years in the criminal justice system, I did

19  not realize this until I was educated by someone who

20  told me about the harm that it's caused.

21          The reason I relate this is virtually every single

22  defendant that I have represented in this court on a

23  child pornography case has said to me, "I didn't realize

24  I was doing harm to these girls, I thought I was just

25  looking at pictures," and that's the case with my

1   client.  He obtained these, he really didn't even look

2   at them, and he didn't realize the harm that was caused

3   by his having these.  He now does, your Honor.  He's

4   been educated by me, in large part, and not by society,

5   not by deterrent effects, he figured he's not

6   distributing this, he's not making this, he's just

7   looking at the pictures.

8        And so it's an unusual criminal who did not

9   realize the severity of the crime he was committing at

10  the time he committed it.  And so as horrible and

11  disgusting as these cases are, you get good men, like

12  Alex Levin, well-educated, hardworking, a beloved father

13  of his daughter, and he finds himself in this court

14  charged with this?  I just need to emphasize that my

15  client, like so many others, did not appreciate the harm

16  that he was causing, but he now does and is so

17  remorseful for it.

18       THE COURT:  Thank you.  We'll be back to you.

19       Ms. Paruti, on the issue of the enhancements and

20  the guideline calculation, I'll hear you as to that.

21       MS. PARUTI:  Your Honor, to answer your question

22  directly, I agree with probation's calculation as it's

23  laid out in the PSR.  If the Court would like to hear my

24  response to Mr. Carney's argument about how much you

25  should weight the guidelines based on the arguments he

1  has made, I'm happy to reserve that until you're ready

2  for it or address it now.

3       THE COURT:  Reserve the weight.  You're answering

4  me directly and I appreciate it.  But his argument is

5  that these are dated guidelines and that the channels of

6  distribution and the facts of, um, sad though they are

7  of what's available on the dark web, are such that this

8  is far from abberational conduct.  There's truth to

9  that.  What do you say?

10      MS. PARUTI:  Well, your Honor, I think that, um --

11 actually one of the comments that you made sort of

12 addresses part of his argument squarely, and noting

13 that, um, it's not a good argument to say that because

14 there's so much more of this now, because it's so

15 persuasive, we must treat it less severely or less

16 harshly.  And I think that when you're talking about

17 whether or not certain offenders who come before federal

18 court judges, um, all nowadays might tend to be ones who

19 do qualify for the application of these particular

20 enhancements, I would suggest that that's a symptom of

21 the fact that this crime is so persuasive and it is so

22 abundant, which this Court knows, this defense counsel

23 knows -- the Court may know there was press coverage

24 recently about how inundated the law enforcement is

25 across the country, maybe even across the world with

 1    this problem, that law enforcement is necessarily

 2    required to focus its investigative efforts on the

 3    people who commit the most heinous versions of this

 4    crime.  And how do we know what are the most heinous

 5    versions?  Well we look at things like the age of the

 6    children depicted, we look at the number of images that

 7    people have -- and I'll address that separately actually

 8    as well, we look at the type of behavior, whether or not

 9    it's sadistic or represents or shows, I should say, the

10    sexual exploitation of a toddler or a baby, these are

11    all factors that objectively, um, the -- and here the

12    commission has identified these as factors that should

13    be weighted heavily in assessing the severity of the

14    defendant's violation in this realm.

15         THE COURT:  All right.

16         MS. PARUTI:  And with respect actually to the

17    number of videos or the number of images -- and I

18    referenced this, um, briefly in my written submission,

19    but nowadays where -- we're not talking about magazines

20    or printed pictures, we're talking about videos which,

21    um, any person who has had to sit, as a function of

22    their job, like me, like the police officers and federal

23    agents who have to investigate and choose to dedicate

24    their lives to investigating and prosecuting these

25    crimes, to sit and watch a video is one of the starkest

1    reminders that a human being can have about what the

2    reality of the harm is that is caused by people who

3    choose to do that.  Not those that are required to

4    protect children, but those who choose to do it like the

5    defendant.

6         And so I think whether it's 8 videos, which would

7    be enough to qualify a person for the most, um, the

8    largest enhancement in that particular category, or

9    whether it's 100 videos, in the government's mind there

10   is no difference and those two people should be treated

11   equally.

12        I will also say that defendants who now, because

13   of the advancements in technology, which this defendant

14   is quite familiar with, um, there are ways that

15   offenders can access material without having to save it

16   in their -- on their laptop hard drives or on removable

17   media, as we are used to as practitioners in this field,

18   and now people can access hidden services on the dark

19   web, they can have access to terabytes of data that they

20   can, for the most part, access with complete anonymity.

21        THE COURT:  But I -- I was understanding your

22   argument until you got into these technicals here.  I'm

23   sentencing Mr. Levin for Mr. Levin's crimes.

24        MS. PARUTI:  Absolutely.

25        THE COURT:  Now it's against a background -- and I

1    guess I pause to say, and so that's not him?

2         MS. PARUTI:  And so it is him, and we know that

3    from the, um -- well let me finish and I'll --

4         THE COURT:  We know how he accessed it, yes, but

5    what we know from the record in this case is how he

6    accessed it and what he had.

7         MS. PARUTI:  Right, and I guess -- let me finish

8    that part -- the original argument about, um, access

9    to -- originally when I started talking about that, it

10   was in the context of the defendant's challenge to the

11   applicability, the modern-day applicability of the

12   number of images enhancement.  And so one part of my

13   response to that argument is talking about the value of

14   videos, um, in this context.

15        The second part is that, um -- when Mr. Carney

16   makes the point, in his written submission and here

17   before you today, that there are defendants who had been

18   prosecuted by the federal government who had thousands

19   of images and hundreds of thousands of images, and I say

20   nowadays you don't need to actually have that number,

21   that collection in your possession, because it is

22   available in a different more technologically advanced

23   and quote, unquote "safer medium," and by that I mean

24   the dark web.  So that argument is more addressing

25   specifically whether or not this case, where Mr. Levin

1    himself had in his possession, um, and the evidence at

2    trial was 13 videos and images in his possession,

3    whether or not he should be compared to --

4          THE COURT:  Respectfully I don't think that

5    argument goes anywhere and here's why.  I think I

6    understand this.

7          As Mr. Carney concedes, though he says it's hardly

8    a proper measure of culpability, Mr. Levin possessed

9    sufficient videos to qualify for the enhancement with

10   more than 600 images.  He concedes that.  You've just

11   argued that "Well he only had 18 videos and that

12   qualifies and remember someone who is as skilled as he

13   could get -- could get vastly more."  But that argument

14   would not work at least as I approach the guideline.

15         Let's say he had a portion of one video, so he was

16   well under 600.  I wouldn't allow you then to argue,

17   "Well he could have gotten more, look at the dark web,

18   it's all available there."  The argument just doesn't

19   prove anything either way.

20         MS. PARUTI:  Well I would not make that argument

21   in that scenario.  Here I think the short answer is --

22   to your question should this -- because the question

23   really is twofold, I think.  I think what the question

24   you're asking is do these enhancements apply?  And on

25   their face --

1          THE COURT:  It is the question at this stage, yes.

2          MS. PARUTI:  Right, and the government says "Yes,"

3    and I think Mr. Carney really academically has to say

4    "Yes" as, you know, in advocating for his client, but he

5    is advocating that they should not, um -- not that they

6    do not, but that they should not.  And so I think that's

7    really where I was going with the second part.

8          THE COURT:  Thank you.  I understand.

9          I have a question of the probation officer.  If

10   you look at Paragraph 34 on Page 9, the enhancement for

11   prepubescent minors, the text says to increase by 4

12   levels, but the actual increase, as you've -- that you

13   allocated here is 2 levels.  Which is it?

14         PROBATION OFFICER:  Your Honor, let me -- if I

15   could have a moment just to look at that.  My

16   understanding is it's the 2 levels.  But let me verify

17   that.

18         (Pause.)

19         PROBATION OFFICER:  Yes, your Honor, it would be 2

20   levels.

21         THE COURT:  Very well.

22         Having heard argument on the point, and believing

23   that it's the Court's duty accurately to calculate the

24   guidelines, I do not -- I am satisfied that each of the

25   guidelines, on the record before the Court applies, each

of the enhancement applies.  And so we'll calculate the
guidelines now, so we're clear.

This is a base offense level 18.  The prepubescent
minor enhancement adds another 2 levels.  The sadistic
or masochistic conduct adds another 4.  The, um -- it
involved the receipt of materials on a computer, adding
another 2.  And the number of images adds another 5.
For an aggregate of 31.  His criminal history category
is 1.

Arithmetically the guidelines are properly
calculated, are they not, Ms. Paruti?

MS. PARUTI:  I agree that they are.

THE COURT:  Saving the arguments that you've made,
Mr. Carney, arithmetically the guidelines are properly
calculated?

MR. CARNEY:  I agree, your Honor.

THE COURT:  Very well.

So under the guidelines then, as this Court
conceives its authority, the highest sentence the Court
could impose is 135 months.

I do look at the sentences actually imposed for
this offense.  I turn first to the sentences imposed or
the data from the United States Sentencing Commission,
that gives me -- the most recent data gives me a whole
lot of sentences, but it groups it in a way that may

1    capture significantly different conduct.  Nationwide

2    since *Booker*, if we added those -- not added, if we

3    looked at the sentences nationwide, the median sentence

4    for someone in criminal history category 1 nationwide is

5    78 months.  In the District of Massachusetts it is -- in

6    the First Circuit rather, it is 63 months.  In the

7    District of Massachusetts, it is 60 months.

8         Mr. Romanow, the Official Court Reporter in this

9    session of the court, keeps a record of all the

10   sentences which this court has handed down, he's added

11   on to a database started by his predecessor, Mr. Womack,

12   and since *Booker* I have sentenced for this particular

13   crime -- this particular crime, um, let's see, I have

14   sentenced 8 times and the median sentence in this court

15   is 73 months.

16        Now, um, I do want to turn, Mr. Carney, to the

17   data you have supplied, which I said resonated with the

18   Court and, um, I certainly rely upon you as an officer

19   of the court, but I need to know what does this purport

20   to be, is this all of the sentences?  For instance, it

21   doesn't seem to have all of my sentences.  But I

22   recognize that one reason is, in a number of my 8

23   sentences, there are other offenses as well as simply

24   knowing possession of child pornography.  So you tell

25   me, represent to me what this list shows?

 1          MR. CARNEY:  Are you referring to the chart?

 2          THE COURT:  I'm looking at your appendix, it

 3    starts with a 2012 sentence imposed by Judge Zobel and

 4    appears -- no, I misspoke.  A 2000 -- it's right after

 5    your affidavit.  After the first page of the affidavit,

 6    we go over to **Stefanadakis**, my sentence, a 2010

 7    sentence, and then it ends with a 2017 sentence from

 8    Judge Hillman.  It's those two pages.

 9          How did you put that together?

10          MR. CARNEY:  What we did is we identified a child

11    pornography case, determined what the sentence was.  We

12    were able to get the guidelines sentence in those cases.

13    And so that we would list them to show the very

14    significant downward departures that the judges of this

15    court, most certainly including your Honor, have imposed

16    here.

17          THE COURT:  But that doesn't -- you're not

18    representing to me this is all the sentences, are you?

19          MR. CARNEY:  No, your Honor.

20          THE COURT:  All right.  Because on this list

21    anyway, there is not a single sentence that's within the

22    guideline.  Not one.

23          MR. CARNEY:  That's what I was trying to show you,

24    your Honor.

25          THE COURT:  All right.

1       MR. CARNEY:  Of course I wasn't able to produce

2   every sentence for every child pornography charge.  It

3   would be something that is a useful -- a useful analytic

4   that we should be looking for, but because we're all

5   doing it just by case by case by case, there's a limit

6   as to how much time we can devote to this.

7       THE COURT:  It is, I could not agree more.  I

8   think it all ought to be public and we ought know it.

9   In any event, I am struck by the appendix that you put

10  before me, there's not a single sentence that's within

11  the guidelines.

12      Very well.  I've gone through the arithmetic

13  portion of it and I think we ought to turn to fashioning

14  a fair and a just sentence for Mr. Levin.

15      Ms. Paruti, I will turn to you first, but before I

16  do, I want to make a general statement so that you will

17  address it in your --

18      If I understand it, and you've been very candid in

19  your -- in your memorandum and I appreciate it, you

20  point out that, um, while you vigorously argue for a

21  severe sentence, how severe is difficult, and where you

22  come out is the bottom of the guideline.  So you're

23  going to argue to me a sentence of 108 months.

24      I've properly read your memorandum?

25      MS. PARUTI:  Yes, that's correct.

```
 1            THE COURT:  Here's my concern, because I want you
 2    to argue it.  I've been wrestling with the problem which
 3    commentators have pointed out about our criminal justice
 4    system, that there appears to be a penalty for
 5    exercising one's Sixth Amendment right to go to trial.
 6    Mr. Levin went to trial in this case, that is his right.
 7    He was convicted.  Now I must impose sentence.  But the
 8    statistics, and I have looked at the statistics, that
 9    over 96 percent of the offenders who come before the
10    federal courts plead guilty.  Under the sentencing
11    guidelines, 97 percent, more than 97 percent of that 96
12    percent, get three levels off for that, and it's
13    sophistry, but what we choose to call "acceptance of
14    responsibility."  In fact it's for pleading guilty and
15    sparing the government the burden and expense of a
16    trial, which is the defendant's constitutional right.
17    It seems therefore hard for the government to argue, if
18    in 97 percent of the cases 3 levels come off the
19    guidelines, that a sentence higher than the top of the
20    guideline range for one who pleas -- in this case the
21    range would be 78 to 97 months, that higher than 97
22    months is appropriate but not greater than necessary to
23    accomplish the goals of the criminal justice system,
24    since like offenders who plead guilty, there would be a
25    real issue about going higher than 97 months?  If you
```

1   understand what I'm saying, I'm asking.

2        If one who pleaded guilty would be somewhere

3   between 78 to 97 months in a guideline sentence, how can

4   you argue 108 months here?  And I'll hear you.

5        MS. PARUTI:  So I think there's two ways to look

6   at it, one is in the sort of abstract, which is I think

7   how you posed it, and one is through the lens of this

8   particular case.  So I think I'll -- I think abstractly

9   I'll comment, but I'd like to address it more through

10  the lens of this case.

11       I understand that in federal -- especially having

12  been a state practitioner where, um, as a child abuse

13  prosecutor, where almost all of my cases went to trial,

14  um, we did not have a guideline system that would -- we

15  had a guideline system but it was not followed in the

16  same vein that our districts courts here follow the

17  federal guidelines.  Even though they're advisory, they

18  are of course, as the Court's admitted to doing, they're

19  a starting point for determining what in fact is

20  something that is in the realm of reasonableness.

21       I think even though the -- well so if you look at

22  the 3-level discount, um, as an incentive to encouraging

23  a guilty plea rather than a trial, I think that's -- I

24  think that's a reasonable way to look at it, that's

25  certainly how the government sees it, rather than as a

1   penalty post-trial for not getting it.  I think

2   especially here where we tend to have -- when we're

3   charging cases we tend to have a very high amount of

4   evidence, um, we tend to charge very strong cases, um,

5   that are backed up by either physical evidence or

6   forensic evidence, and so it may seem like a foregone

7   conclusion to some defendants, but I think it is

8   important to have some incentive to help defendants

9   realize that deciding to plead guilty and waive those

10  rights is appropriate.

11       In this particular case, notwithstanding how you

12  view that particular shift in the guidelines, whether

13  it's a reward or a penalty, in this particular case the

14  question really is did this defendant accept

15  responsibility?  I understand that there are situations

16  where defendants can test the quantum of proof that the

17  government has, um, through a trial and may still be

18  very accepting of their responsibility when and if they

19  are found guilty.  In this case, however, the defendant

20  took the stand and the defendant, um, testified that he

21  did not look for child pornography, that he did not know

22  it was on his computer, and he gave an explanation that

23  the government most certainly rejects as totally

24  implausible, um, and evidently, given the proof, it was

25  either you believe the government's version of the facts

1    or you believe the defendant.  The jury clearly rejected

2    the defendant's story to account for -- that he

3    proffered to account for why child pornography was on

4    his computer.

5          So I think in light of these particular facts, I

6    don't think this is a situation where your Honor should

7    struggle with that particular concept and whether or not

8    this defendant is in fact being penalized for electing

9    to go to trial because the facts certainly don't support

10   that interpretation, I think, of this particular case,

11   or in the context of this particular case.

12         So here I don't see that struggle whether we think

13   it's -- I don't see that struggle here at all.  And so I

14   think that, um, the guidelines here, as they've been

15   calculated, not taking into account that 3-level

16   discount that is typically given to defendants who

17   decide to plead rather than go to trial is not

18   problematic, or I don't think it's problematic at all

19   frankly here, your Honor.

20         I think that -- well I'll say that the government

21   recognizes that -- and you just alluded to this, that

22   it's very difficult to figure out what we actually mean

23   by "severe" or, um, "lengthy" because those are terms

24   that are completely subjective, um, and they mean

25   different things to different people.  Somebody who has

1     never served a day of jail in their life might find a

2     two-week sentence severe and that might be appropriate

3     for that person.  For other people a lengthier time in

4     prison subjectively to them might be deemed very severe.

5     In this case I think there's a range of reasonable terms

6     of incarceration that would form a reasonable punishment

7     and a fair punishment and one that's necessary, um, and

8     I think necessarily when there are ranges of punishment

9     that are appropriate, um, I think you can necessarily

10    identify places within that range without saying that

11    one may be is more than or greater than necessary.  It's

12    a very fluid determination, as this Court knows, you've

13    had to engage in it, um, hundreds or thousands of times.

14         Here the nature of the crime here is, um, so

15    severe that the sentence that the government is

16    suggesting, even though it is longer, um, than some

17    sentences that others -- that maybe the medium of the

18    defendants here have had imposed on them, um, it's

19    appropriate here and it's reasonable and it's warranted.

20         And I'd like to -- I'm not going to regurgitate

21    everything that I've put in my written submission to the

22    Court, because it is on the public record, but I do want

23    to just address a couple of those things that, um,

24    counsel included in his memorandum which we basically

25    filed simultaneously.

```
 1          One of the most tragic pieces of this, I think, is

 2     the fact that the defendant is a father, and I'm not

 3     saying that it's tragic for him, although it certainly

 4     is, I'm sure, um, but it's tragic for his child.  And

 5     the government, um -- the problem however with using

 6     that as a mitigating factor for the Court's

 7     consideration when you're trying to determine what is

 8     reasonable and fair here, I think the lens is a little

 9     twisted.

10          The focus should not be on how Mr. Levin's

11     punishment will affect his child, the focus that should

12     properly be taken by the Court is about how the

13     defendant's crime has affected his child.  This is a

14     defendant who, when he was a father, when he was playing

15     this role for a child who was, um, based on the child

16     pornography that we saw, around the same age as some of

17     the kids in the videos that he had on his computer, the

18     defendant should have reasonably foreseen the effect,

19     the consequences of that behavior, illegally accessing

20     videos and keeping videos on his computer of young

21     children, some as young as toddlers, being sexually

22     abused by adults, he should have foreseen that that

23     could carry the consequences that he is facing today,

24     and he should have foreseen, especially as a father, how

25     that would impact his family, specifically his daughter.
```

```
 1              So I object to the Court considering it as a
 2       mitigating factor on his behalf, it most certainly, in
 3       the government's view, is an aggravating factor.  This
 4       is a person who is using his -- now he's -- and I don't
 5       mean to disparage the argument at all, I understand it,
 6       but I want to be realistic here, that this is a person
 7       who is touting himself as a father and that frankly is
 8       the piece that comes out, um, I think most obviously in
 9       the filing.  When we're talking about his -- the nature
10       and characteristics of this defendant, that is one of
11       the most positive aspects in here.  Of course there's
12       talk about him being a good friend, I know he has family
13       support and friends, some of them are present in the
14       courtroom today, but the fact that he holds that role
15       and committed this type of violation against other
16       children, um, should be viewed as something that
17       militates against him and against the request for a
18       deeply-discounted sentence, a variance all the way down
19       to, I think, 18 months is what the defendant is asking
20       for.
21              THE COURT:  Thank you.  Mr. Carney?
22              MS. PARUTI:  I'm happy to answer any other
23       questions you have, but I think I've addressed all the
24       issues that need your attention.  Thank you.
25              THE COURT:  I believe you have.  I'll hear
```

1    Mr. Carney.

2         MR. CARNEY:  As your Honor may know, I have been

3    in the criminal justice system now for 41 years.  I know

4    there are people in this courtroom who have been in it

5    longer, but, um, I think mine's a fairly significant

6    number of years devoted to the criminal justice system

7    either as a public defender, a state court prosecutor,

8    or now in private practice.

9         I often receive journals or other things brought

10   to my attention on the web that talk about sentencing.

11        (Pause.)

12        MR. CARNEY:  I'm just waiting for your Honor to

13   finish reading.

14        THE COURT:  No, no, go ahead.

15        MR. CARNEY:  And I read a lot of materials by

16   penologists who are talking about imprisonment and what

17   many of them say -- what many of them say is the ideal

18   construct of a criminal justice system is the following.

19   A person commits a crime.  He is immediately sentenced

20   to incarceration for that crime.  After a certain amount

21   of time, he is put in a halfway house and then allowed

22   to remain on the street on supervised release.  That is

23   an ideal way that the criminal justice system should

24   work, and it rarely ever does.  But I think in this case

25   it did work.  Mr. Levin was arrested, charged with

```
 1    possessing child pornography, he was held without bail.
 2    He spent 8 months in a maximum security facility before
 3    the Court amended the bail after allowing the
 4    defendant's motion to suppress the evidence.  So
 5    Mr. Levin now was released on bail on significant
 6    conditions.  He has remained in that setting, or he
 7    remained in that setting for about 3 years.  And
 8    periodically I would approach the Court to seek to
 9    lessen some of the restrictions on him and I was
10    supported, in every instance, by the probation
11    department, that thought taking away this restriction
12    would be useful.  It might have been a curfew he was on
13    or it might have been allowing him to work a particular
14    job.
15         He got a very good job at Amazon.  He was not
16    terribly restricted in his activities, he could
17    routinely get permission, for example, to go to New York
18    to attend the Bar Mitzvah of his daughter -- or the Bat
19    Mitzvah.  And in an ideal way this case has met that
20    idealistic goal, that a person commits a crime, he's
21    punished, he's incarcerated, then after being
22    incarcerated for a significant period of time, 8 months
23    -- which is very significant for someone who has never
24    been in a prison, and then he's out.  And he has proven
25    over the 3 years that he was released, until the end of
```

1    this trial, that he was not a danger to society, that he
2    was not a criminal, that he was not someone that the
3    Court could worry about would be committing another
4    crime.
5            The deterrence that he had from 8 months in
6    prison, locked away from his daughter, was all the
7    deterrence that he needed.  He will never ever ever
8    again jeopardize his freedom by doing something as
9    foolish as saving child pornography.
10           He has gone back to work.  Throughout his life
11   he's been a very hard worker.  He not only has stayed
12   away from anything to do with child pornography, but
13   this Court permitted, with the support of probation,
14   that he obtain a job in which he would use a computer.
15   A monitoring device was put on that computer to ensure
16   that nothing illegal was ever viewed.  And in the 3
17   years that Mr. Levin has been on release, he didn't
18   have, to my knowledge, a single violation of any term of
19   release.  If he had to be home at a particular time, he
20   was there.  If he would be permitted out to do a
21   particular task, he was let out, did the task, and
22   returned home.  He has strictly observed everything that
23   this Court has set for him as a condition of his being
24   on bail.
25           And so in an ideal world, Mr. Levin should simply

1   be placed on further supervised release so that he can

2   continue all the good things he's been doing.  The 8

3   months in prison was enough for this man, just like it

4   would be enough for virtually any person who is well-

5   educated, hardworking, a dedicated father to his

6   daughter, and at one time downloaded these videos.  He

7   has learned his lesson completely.  And to start him

8   over again in sending him to prison, and he'll have to

9   reacclimate to that, and then he will eventually be

10  released, back on supervised release for 5 years, which

11  I'm convinced he will do as well as he has done over the

12  past 3 years.

13      So in a system where you're trying to emphasize to

14  someone that he has done a crime, that goal was met when

15  he was immediately incarcerated.

16      Having it be a deterrent effect on a defendant.

17  Well Mr. Levin has no prior criminal activity whatsoever

18  in his life, he's never acted as a criminal.  And as I

19  mentioned, he didn't even see the harm he was doing in

20  looking at these photos.

21      It has deterred others, because just as Mr. Levin

22  has lost all hope of having an employment that will

23  really use his skills, he's had other devastating

24  aspects in his life.  His mother died while he was in

25  custody.  His father died two days ago while he was in

custody.  Those two acts were acts that he had to deal
with, the consequences, alone by himself in a prison
cell.  And as he told me this morning, you don't get a
lot of ability to deal with the loss of a loved parent
when you're in a prison, it will show weakness, and you
can never show weakness in prison.  So he had these two
events of his parents dying within four months of each
other and consoling himself alone in a cell in a prison.

I think that the rest of my argument is contained
in the memorandum.  I know your Honor reads that
carefully.  I don't want to belabor anything.  I'll end
with this.

Alex Levin is a good man.  Everybody would say
he's a good man.  He's a man who made a mistake.  The
punishment he has received to date is enough.  But
notwithstanding that, I'm asking for a sentence of 18
months.  Mr. Levin will return to the prison setting.
He will be able to prepare for being released fairly
soon.  There can be actions taken in the prison that
will help him even more to do well on supervised
release.  And then when he comes out, he'll be on
supervised release for 5 years.

I'm not saying that anyone is responsible for the
hurt to his own daughter for doing this, more the hurt
that was suffered by these victims when their videos

1    were viewed by Mr. Levin.  But the essential point here,

2    your Honor, is you can take into consideration the

3    impact of a child from the father's incarceration, and

4    that's another ground for a variance.  And I would thank

5    your Honor completely for listening so carefully to my

6    argument.

7          THE COURT:  Thank you.

8          Mr. Levin, you have the right to talk to me

9    directly.  You are not required to.  If you want to,

10    I'll hear you now.

11          THE DEFENDANT:  I would like to, your Honor.

12          First of all, I'd like to sincerely and profoundly

13    say I'm sorry to the real victims, the real victims I

14    now understand about, I now know the real victims of

15    this.  When I was doing this, as Mr. Carney stated, I

16    honestly, you know, in my heart didn't think what I was

17    doing was a crime.  I now understand what I've done and

18    I will think about this for the rest of my days.

19          I can't stop thinking about my daughter and what

20    this has done to her.  The prosecution is correct, what

21    I did while being a father, I should have known better.

22    She is absolutely devastated by this.  She and I are

23    very very close, always have been.

24          When I was initially incarcerated in 2015, it was

25    8 months, and I know she cried herself asleep every

1  night.  Now that I've been out on bail, on probation for

2  3 years, we tried -- we've grown, you know we've

3  reattached.  In her mind she thinks that, you know, I'm

4  back in her life.  And this is on me.  I should have

5  done a better job managing her expectations.  But she

6  thinks I'm back in her life.

7       I'm grateful to your Honor for allowing me to go

8  to her Bat Mitzvah.  It was in Philadelphia.  It's not

9  too far to travel, but you have no idea how much it

10  meant to her.  I don't even want to think what she'd

11  think if I wasn't there.

12       I'd like to thank the circle of my loved ones,

13  most of them right now are at the temple, today's the

14  highest holiday, um, most of my friends are religious

15  and today's Yom Kippur, the highest Jewish holiday, and

16  I got to go there to Seder and pray.  I can do more good

17  there than here.  Clearly some of them didn't give up on

18  me and I thank them.

19       Your Honor, I may have a done a terrible thing,

20  but I'm not a terrible person.  I worked very very hard

21  all my life, I've been a model dad and a great dad.

22  When this nightmare is over, there's only two things

23  that I want to do, I want to be there for daughter and I

24  want to pass my time and work very very hard and be a

25  productive member of society that I was prior to this.

1    Thank you, your Honor.

2         (Pause.)

3         THE COURT:  Mr. Alex Levin, in consideration of

4    the terms of 18 United States Code, Section 3553(a), the

5    information from the United States Attorney, your

6    attorney, the probation officer and yourself, this Court

7    sentence you to 6 years and 6 months -- 78 months in the

8    custody of the United States Attorney General.  The

9    Court gives you credit toward the service of that

10   sentence from August 12, 2015 to April 26th, 2016, and

11   from May 30th, 2019 to the present.

12        The Court imposes upon you no fine due to your

13   inability to pay a fine.  The Court places you on

14   supervised release following your imprisonment for 5

15   years with all the general conditions of supervised

16   release and the, um, following special conditions.

17        You are required to register pursuant to the Adam

18   Walsh Child Protection and Safety Act.  You must

19   participate in a sexual-specific evaluation as required

20   by the probation office.  You must submit to periodic

21   polygraph testing.  You must allow the installation of

22   computer internet monitoring software.  You must advise

23   anyone using the monitored internet-capable devices,

24   that those devices are being monitored by probation.

25   You must not possess or use any computer or internet-

1   capable device without prior permission from the

2   probation office.  You must disclose all account

3   information relative to internet access.  You must

4   provide the probation officer with access to requested

5   financial information.

6        You must not knowingly have direct contact or

7   contact to a third-party with children under the age of

8   18 years, unless previously approved by the probation

9   office.  This is not intended to restrict your contact

10  with your daughter.  You must not knowingly have any

11  contact with victims without a prior approval.  You must

12  consent to third-party disclosure to any employer.

13  Prior to accepting any form of employment, you must seek

14  the approval of the probation office.  You shall be

15  required to contribute to the cost of evaluation and

16  treatment to the extent of your ability to pay.

17       No restitution is decreed at this time.  The Court

18  will schedule, within 90 days of today's date, a hearing

19  on the matter of restitution.  Let me explain this

20  sentence to you.

21       You have done a terrible thing.  You're not a

22  terrible person.  I acknowledge that.  You are not a

23  terrible person.  But this is no mistake.  And in the

24  doing of it, it encourages, it enables one of the most

25  hideous forms of child sex abuse of which we are aware

1    and we have chosen to deal with it by sentencing

2    offenders who receive such material.  This is a just and

3    a fair sentence and I have no hesitancy in imposing it.

4         You of course, having reserved the right to the

5    trial, you have a right to appeal from any findings or

6    rulings the Court has made against you.  Should you

7    appeal and should your appeal be successful, in whole or

8    in part and the case remanded, you'll be resentenced

9    before another judge.  Mr. Carney, if an appeal is

10   decided upon, you want transcript, seek it from this

11   session of the court because I'll turn it around right

12   away.

13        Do you understand?

14        MR. CARNEY:  May I ask a question, your Honor?

15        THE COURT:  Of course you may.

16        MR. CARNEY:  Will the judgment not be entered

17   until the amount of restitution is determined?  In other

18   words, there's a time limit in which I have to file a

19   notice of appeal and I'm interpreting that the

20   sentencing won't be completed until the restitution is

21   decided.

22        THE COURT:  That's a good point and I will say if

23   the time should await the judgment, and since the

24   government does seek restitution, I do allow the

25   materials to be sealed, obviously available to

1    Mr. Carney.  I do want to say one thing to the

2    government about restitution.

3         If you go back to the motion to suppress, and I

4    have utterly no issue and it bears not at all on my

5    reasoning with the decision of the Court of Appeals, but

6    I noted in a footnote a moral ambiguity here, and now

7    that the government is seeking restitution, that

8    ambiguity becomes more concerning and it's this.  The

9    way the government did this, that is enforced the law

10   and apprehended Mr. Levin, of course was operating this

11   pornographic site with malware such that they could

12   trace it to Mr. Levin.  Now had they shut it down as

13   soon as they had it, he never, at least through this

14   site, would have accessed these videos.

15        When I read the papers about restitution, that

16   came back to me.  I express no opinion because I've

17   deferred ruling, but, Ms. Paruti, I'll -- and counsel,

18   I'll be interested to be advised on that point.

19        But the short answer is that judgment will not

20   enter until I've decided the issue of restitution.  I'll

21   schedule it within 90 days, but by agreement you two may

22   agree to bring it forward so that it may be resolved.

23   All right?

24        MR. CARNEY:  Thank you.

25        THE COURT:  He's remanded to the custody of the

 1    marshals.

 2         MS. PARUTI:  I'm sorry, your Honor, may I just

 3    mention one other thing?

 4         THE COURT:  You may.

 5         MS. PARUTI:  The only issue of forfeiture in this

 6    case was the one laptop, um, that HP --

 7         THE COURT:  Forfeiture is decreed as requested.

 8         MS. PARUTI:  Thank you.  There will be a motion

 9    filed on the docket.

10         THE COURT:  Thank you.

11         MR. CARNEY:  Will the defendant be held --

12    continue to be held in Rhode Island -- Oh, in Plymouth,

13    until he is brought back to the restitution hearing?

14         THE COURT:  I really don't know, but it makes

15    sense because, um -- well they'll have to transport him

16    back for that hearing.

17         MR. CARNEY:  Right.  I wonder if we could suggest

18    a date that would be convenient to the Court?

19         THE COURT:  Why don't you do that.

20         (Pause.)

21         THE COURT:  I was saying to Ms. Gaudet, for whom

22    in a very literal sense I work, that I'm not trying to

23    put it off, so we could get to it as soon as convenient

24    for the parties.  It's from Ms. Paruti, it's from your

25    papers that reminds me I have to do it within 90 days,

1    that's the reason I suggested that time.  I will address

2    it more rapidly.

3           MR. CARNEY:  Would either the 4th or the 5th of

4    November be convenient?

5           THE COURT:  Ms. Paruti, do those dates suit you?

6           MS. PARUTI:  I would say the 5th, if that's

7    available to the Court.

8           THE COURT:  Thank you.  I'll confer with

9    Ms. Gaudet.

10          It's on for a hearing on restitution on the 5th of

11   November at 2:00 p.m.

12          MR. CARNEY:  Thank you, your Honor.

13          THE COURT:  Thank you.  And I'll expect that he

14   will be available for that hearing.

15          MR. CARNEY:  Your Honor, before you leave the

16   bench, may I approach the Court ex parte, um, regarding

17   a matter?  I've alerted Ms. Paruti as to what that

18   matter is.

19          MS. PARUTI:  I have no objection, your Honor.

20          THE COURT:  Fine.  Of course you may.

21

22          AT THE SIDEBAR

23          MR. CARNEY:  This is related to a motion for funds

24   that your Honor granted.

25          (Hands to judge.)

1          THE COURT:  Oh, yeah, I think I remember the issue

2     here.  I'll consider it.  Thank you.

3          MR. CARNEY:  Okay, thank you, your Honor.

4

5          (In open court.)

6          THE COURT:  All right, we'll recess.

7          THE CLERK:  All rise.

8          (Ends, 3:50 p.m.)

9

10               C E R T I F I C A T E

11

12          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

13     hereby certify that the forgoing transcript of the

14     record is a true and accurate transcription of my

15     stenographic notes, before Judge William G. Young, on

16     October 9, 2019, to the best of my skill and ability.

17

18

19

20     /s/ Richard H. Romanow 06-25-20
       _____
21     RICHARD H. ROMANOW  Date

22

23

24

25